# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

JEREMY BRADEN, individually and on behalf )
of all others similarly situated, )
                                 )    No.
                   Plaintiff, )
                                 )    **CLASS ACTION**
       v.                            )
                                 )    COMPLAINT FOR VIOLATIONS OF THE
WAL-MART STORES, INC., STANLEY )    EMPLOYEE RETIREMENT INCOME
GAULT, BETSY SANDERS, DON )    SECURITY ACT (ERISA)
SODERQUIST, JOSE VILLARREAL, STEPHEN )
R. HUNTER, DEBBIE DAVIS CAMPBELL, and )
JOHN AND JANE DOES 1-20, )
                                 )
                 Defendants. )

## I. INTRODUCTION

1.      Plaintiff Jeremy Braden ("Plaintiff") alleges the following based upon personal information as to himself and the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Wal-Mart Stores Inc. ("Wal-Mart" or the "Company"), including Wal-Mart's proxy statements (Form DEF 14A), annual reports (Form 10-K), and the annual reports (Form 11-K) filed on behalf of the Wal-Mart Profit Sharing and 401(k) Plan (the "Plan"), a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL"), a review of fund prospectuses for the following investment options: PIMCO Total Return Fund (Administrative Class); Davis New York Venture Fund (Class A); Merrill Lynch Equity Index Trust (Tier 1); Massachusetts Investors Growth Stock Fund (Class A); Ariel Fund; Franklin Small-Mid Cap Growth Fund (Class A); Merrill Lynch Small Cap Index Trust (Tier 1); AIM International Growth Fund (Class A); American

EuroPacific Growth Fund (Class R4); and Allianz RCM Technology Fund (Class A), (collectively, "Plan Investment Options"), interviews with participants of the Plan, and a review of available documents governing the operations of the Plan. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II. NATURE OF THE ACTION

2.      This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

3.      The Plan is a retirement plan sponsored by Wal-Mart.

4.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets from January 31, 2002 to the present (the "Class Period").

5.      Although Defendants are responsible for the selection of Plan Investment Options and for ensuring that participants are provided with prudent options in which to investment their retirement savings, Defendants fail to satisfy these duties. Despite the ready availability of reasonably priced investment options, particularly for a massive Plan like Wal-Mart's with tremendous potential to leverage economies of scale, Defendants select and offer to Plan participants unreasonably expensive retail funds. As a result, the Plan has squandered tens of millions of dollars of participants' retirement savings to pay for over-priced mutual

funds that do not serve the best interests of the Plan participants. Absent relief from this Court, the unnecessary and entirely avoidable drain on participants' retirement savings will continue and cause further substantial harm to the Plan and to the participants and beneficiaries of the Plan. The failure of Defendants to ensure that the fees and expenses charged to the Plan are reasonable is particularly galling given that Wal-Mart has built its image in the marketplace around the concept of cutting costs and rolling back prices. The Company has failed its "Associates"[1] by not living up to its own slogans: "Always Low Prices" and "Save Money. Live Better." To make matters worse, the unreasonably expensive funds in many respects significantly underperformed their benchmarks. Thus, the additional fees paid did not buy a better product. To the contrary, more money was spent on, by and large, inferior products – a further affront to the Wal-Mart credo.

6. The Complaint sets forth Five Counts for relief. Plaintiff alleges in Count I that Defendants who were responsible for the selection of investment options for the Plan acted imprudently and disloyally in violation of ERISA §§ 404(a)(1)(A) and (B) by failing to implement a prudent process for evaluating fund options, and by selecting unreasonably expensive retail mutual funds, thereby causing the Plan to incur excessive fees and expenses that substantially diminished the retirement savings of Plan participants. Count I further alleges that with respect to certain Plan Investment Options, Defendants imprudently offered expensive funds that provided inferior returns.

7. In Count II, Plaintiff alleges that the Defendants, who were responsible for the appointment of the Plan's other fiduciaries, failed to properly monitor the performance of their

---

[1] "Associates" is a term Wal-Mart uses to refer to its employees.

fiduciary appointees and to remove and replace those whose performance was inadequate in violation of ERISA §§ 404(a)(1)(A) and (B).

8.     In Count III, Plaintiff alleges that the Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information to participants regarding the impact excessive fees charged by the Plan Investment Options have on their retirement savings, the bases of the Defendants' selection of the Plan Investment Options, and the ready availability of far less expensive options in the marketplace.

9.     In Count IV, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring in violation of ERISA § 405(a).

10.     In Count V, Plaintiff alleges that Defendants, Plan fiduciaries, engaged in prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a) by causing the Plan to engage in transactions with the Plan Trustee, Merrill Lynch & Co. Inc.,[2] whereby, the Plan assets were transferred to and used for the benefit of Merrill Lynch.    Specifically, the Defendants authorized, approved, and allowed Merrill Lynch to receive revenue sharing and other kickback payments from the Plan Investment Options, where such payments were not in exchange for any actual services provided to the Plan, and instead were merely the *quid pro quo* for offering the Plan Investment Options as fund options for the Plan.

---

[2] Merrill Lynch & Co. Inc., together with its subsidiaries, including Merrill Lynch Bank & Trust Co., FSB (formerly known as Merrill Lynch Trust Co., FSB) and its Global Wealth Management business segment (formerly known as Merrill Lynch Investment Managers LLC), (collectively, "Merrill Lynch").

11.     Defendants' breaches of fiduciary duty have caused the Plan to squander tens of millions of dollars of lost retirement savings for Plan participants in violation of ERISA §§ 404(a)(1)(A) and (B) and §405(a).

12.     Based on publicly available information for the Plan and information regarding far less expensive comparable investment alternatives readily available in the marketplace, Plaintiff conservatively estimates that Defendants' breaches of fiduciary duty have in the past six years alone caused the Plan to spend over $60 million of participants' retirement savings in excessive fees and unreasonable expenses. Plaintiff conservatively estimates that Defendants' failure to prudently and loyally manage Plan assets will cause the Plan to incur substantial additional losses at a rate of approximately $20 million per year due to excessive fees and expenses. Defendants could have avoided these losses in their entirety by selecting reasonably priced investment options that are readily available in the marketplace instead of selecting the unreasonably expensive retail funds in the Plan.

13.     Compounding the effect of the Plan Investment Options' high fees, the funds selected by Defendants have, to a large extent, failed to meet or exceed the benchmarks they were designed to track. Even though the Plan Investment Options charged fees that substantially exceeded the cost of relevant index funds as well as readily available less expensive, better performing actively managed funds, the Plan Investment Options often performed worse than their benchmarks.[3] Thus, Wal-Mart Plan participants paid more for mutual funds, and in return were "rewarded" by lower returns. Taking into account the

---

[3] *See* Wal-Mart Profit Sharing and 401(k) Plan Investment Policy Statement (Updated through September 26, 2007) (hereinafter the "Investment Policy") at Exhibit 2 for a list of the asset class and indices the Plan Investment Options are designed to track.

excessive fees charged, and the poor performance achieved, it is abundantly clear that Defendants failed to implement an adequate and effective process for evaluating and selecting fund options, and breached their obligation under ERISA to prudently and loyally manage the Plan's assets.

14. This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, an accounting, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

15. ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan during the Class Period.

16. In addition, because the information and documents on which some of the Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity on information and belief. At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

## III. JURISDICTION AND VENUE

17. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

18. **Personal Jurisdiction.** ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in Missouri.

19. **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or may be found in this district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391, because Wal-Mart systematically and continuously does business in this district and because a substantial part of the events or omissions giving rise to the claims occurred within this district.

## IV. PARTIES

### A. Plaintiff

20. Plaintiff Jeremy Braden is a resident of Ozark, Missouri. Plaintiff Braden began working for Wal-Mart in May, 2002 and is a current employee at the Company. Plaintiff Braden is a current participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

B.    Defendants

21.    **Defendant Wal-Mart Stores, Inc.**    Defendant Wal-Mart is a Delaware corporation headquartered in Bentonville, Arkansas. Wal-Mart operated nearly 4,000 stores throughout the United States in 2006. Outside the United States, the Company operated more than 1,000 stores. Wal-Mart's annual sales totaled more than $300 billion in 2006, and Wal-Mart transacts millions of dollars of business within Missouri each year. In 2006, the Company employed approximately 1.8 million employees worldwide, 1.3 million of whom were employed in the United States.

22.    The Plan provides that the Company is the "Plan Administrator."

23.    **Compensation and Nominating Committee.** As explained in more detail below, the Compensation and Nominating Committee ("Compensation Committee") is appointed by Wal-Mart's Board of Directors and had certain fiduciary responsibilities with respect to the Plan, including appointment and oversight responsibilities, at relevant times during the Class Period. The Defendants identified in this paragraph are referred to as the "Compensation Committee Defendants." On information and belief, the Compensation Committee Defendants are as follows:

> (1).  **Defendant Stanley Gault** served as a member of the Compensation Committee at relevant times during the Class Period.
>
> (2).  **Defendant Betsy Sanders** served as a member of the Compensation Committee at relevant times during the Class Period.
>
> (3).  **Defendant Don Soderquist** served as a member of the Compensation

Committee at relevant times during the Class Period.

(4). **Defendant Jose Villarreal** served as a member of the Compensation Committee at relevant times during the Class Period.

24. **Vice President, Retirement Plans Governance and/or Vice President, Retirement Savings Plans.** As explained in more detail below, the Vice President, Retirement Plans Governance and/or the Vice-President, Retirement Savings Plans (collectively, "VP Retirement Plans") had certain fiduciary responsibilities with respect to the Plan, including appointment and oversight responsibilities with respect to Plan fiduciaries.

(1). **Defendant Stephen R. Hunter** served as the Vice President, Retirement Savings Plans at relevant times during the Class Period.

(2). **Defendant Debbie Davis Campbell** served as the Vice President, Retirement Savings Plans at relevant times during the Class Period.

25. The identity of another person(s) who may have served as the VP Retirement Plan during the Class Period is currently unknown to Plaintiff, and is therefore named fictitiously as John or Jane Doe 1. Once the identity of John or Jane Doe 1 is ascertained, Plaintiff will seek leave to join him/her under his/her true name.

26. Defendants Hunter, Campbell, and John or Jane Doe 1 are referred to as the "VP Retirement Plans Defendants."

27. **Defendant Wal-Mart Retirement Plans Committee.** As explained more fully below, the Wal-Mart Retirement Plans Committee (the "Retirement Plans Committee") is appointed by the Vice President, Retirement Plans Governance and/or the Vice-President,

Retirement Savings Plans, and at relevant times during the Class Period, also was appointed by the Compensation Committee, and has certain fiduciary responsibilities and duties for the Plan.

28.     The Plan provides that the Retirement Plans Committee is a "Named Fiduciary" of the Plan.

29.     The identities of the members of the Retirement Plans Committee are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 2-20. Once the identities of the members of the Retirement Plans Committee are ascertained, Plaintiff will seek leave to join them under their true names. The Retirement Plans Committee (John and Jane Does 2-20) are referred to as the "Retirement Plans Committee Defendants."

## V.  THE PLAN

30.     The Plan, sponsored by Wal-Mart, is an "employee pension benefit plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The Plan is also an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and contains a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401 (k), 26 U.S.C. § 401(k).

31.     The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l). In a breach of fiduciary duty action such as this, however, the Plan is neither defendant nor plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. ERISA § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

**32.**    The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in trust by Merrill Lynch pursuant to the trust agreement.  All contributions made to the Plan constitute a form of deferred compensation.

**1.    Wal-Mart Profit Sharing and 401(k) Plan.**

**33.**    Wal-Mart initially had two plans, the Wal-Mart Stores, Inc. Profit Sharing Plan, effective September 1, 1971, and the Wal-Mart Stores, Inc. 401(k) Retirement Savings Plan, effective February 1, 1997.  *See* Wal-Mart Profit Sharing and 401(k) Plan, Effective October 31, 2003, including amendments adopted through August 31, 2007 (hereinafter the "Plan Document"), at 1.  Effective October 31, 2003, the two plans were merged into one plan and renamed the Wal-Mart Profit Sharing and 401(k) Plan.[4]  *Id.*

**34.**    The Plan has two separate accounts for participants' and Company Contributions:  the Profit Sharing Account and the 401(k) Account.

**35.**    The Profit Sharing Account holds Wal-Mart's Company Contributions to the profit sharing portion of the Plan, both before October 31, 2003 and after October 31, 2003, and earnings on those contributions.  *See* Summary Plan Description (hereinafter the "SPD") at 208. The Profit Sharing Account is considered an Employee Stock Ownership Plan.  *Id.* at 214.

**36.**    The 401(k) Account holds some or all of the following: (1) participant's contributions to the Plan and earnings on those contributions; (2) the Company-Funded 401(k)

---

[4] All employees who were participants in the Plan prior to the 2003 merger continued to be Plan participants after the merger, as long as they continued to be eligible employees.  Each eligible employee who was not a Plan participant prior to October 2003, and who completed at least 1,000 hours of service in a consecutive 12 month period is eligible to participate in the Plan.

Account which holds Wal-Mart's Company Contributions to the 401(k) portion of the Plan and earnings on those contributions; and (3) the 401(k) Rollover Account which holds any contributions that a participant rolled over to the Plan from another qualified retirement plan and earnings on those contributions. *Id.* at 208.

37.     All eligible Wal-Mart employees may participate in the Plan and may elect to contribute from one percent to 25 percent of their eligible wages to the 401(k) Account in the Plan. Regardless of whether an employee contributes to the Plan, he or she is entitled to receive a portion of the Company's Qualified Non-Elective contributions and Profit Sharing Contributions, if otherwise eligible. To be eligible to receive Company Contributions, an employee must complete at least 1,000 hours of service during the Plan year for which the contributions are made, as well as be employed on the last day of that Plan year.

38.     At the end of each plan year, Wal-Mart determines the amount of the Company Contribution (if any) for the plan year. The contribution is a percentage of an employee's pay while he or she was a participant for the plan year. The contribution percentage can vary from year to year and may be reduced or eliminated in the future. Company Contributions are made to a participant's Profit Sharing Account and to the Company-Funded 401(k) Account.

39.     Plan participants are immediately vested in all elective contributions, catch-up contributions, qualified non-elective contributions, roll-over contributions, tax credit contributions and Profit Sharing Plan rollover contributions. A participant's Profit Sharing Contributions vest based on years of service at a rate of 20 percent per year from years three

through seven. Effective January 1, 2008, a participant becomes fully vested in the Profit Sharing Contributions after six years of service. *Id.* at 212.

40.     Throughout the Class Period, the Plan fiduciaries, by and through the Retirement Plans Committee, selected the Plan Investment Options that were made available to Plan participants for investment of their retirement savings. Plan Document § 4.2(c).[5] The Plan consists of a variety of mutual funds, a common/collective trust, Wal-Mart common stock, and a stable value fund, which consists of a money market fund, a common/collective trust, and traditional and synthetic guaranteed investment contracts. 2006 Form 11-K at 8.

**41.**     Selection of the Plan Investment Options was a discretionary decision made by the Defendants subject to the fiduciary duty requirements of ERISA. Nothing in the Plan limits the ability of the Plan fiduciaries to remove particular Plan Investment Options or divest assets invested in the options as prudence dictates.

## VI. DEFENDANTS' FIDUCIARY STATUS

**A.     The Nature of Fiduciary Status.**

42.     **Named Fiduciaries.** Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

43.     **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in

---

[5] If further discovery shows the involvement of other entities, Plaintiff will amend the complaint to the extent necessary and appropriate.

fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

44.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

45.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

46.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

47.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, on information and belief, Wal-Mart chose to assign the appointment and removal of fiduciaries to the monitoring Defendants named herein.  These persons and entities in turn selected Wal-Mart employees, officers and agents to perform most fiduciary functions.

48.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.      Wal-Mart's Fiduciary Status.**

49.     Pursuant to the Plan Document, the Company was the "Administrator" as that term is defined in ERISA § 3(16)(A).  Plan Document § 9.5.  In addition, to the extent not delegated to other Plan fiduciaries, Wal-Mart exercised responsibility for communicating with participants regarding the Plan and Plan assets and providing information and materials required by law and ERISA.  SPD at 223.

50.     Moreover, Wal-Mart, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the VP Retirement Plans Defendants and the Retirement Plans Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Wal-Mart is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

51.     Finally, under basic tenants of corporate law, Wal-Mart is imputed with the knowledge that the Defendants had regarding the breaches of fiduciary duty alleged herein, even if not communicated to Wal-Mart.

52.     Consequently, in light of the foregoing duties, responsibilities, and actions, Wal-Mart was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

53.     Wal-Mart, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Wal-Mart relied directly on the Compensation Committee Defendants, the VP Retirement Plans Defendants, and the other individual Defendants named herein to carry out its fiduciary responsibilities under the Plan and ERISA.

**C.     The Compensation Committee Defendants' Fiduciary Status.**

54.     The Compensation Committee Defendants had the authority to appoint the members of the Retirement Plans Committee.[6]  Plan Document § 9.1(a).  Accordingly, the

---

[6] The Plan was subsequently amended and, effective December 5, 2003, the Compensation Committee ceased to have the responsibility to appoint the members of the Retirement Plans Committee. *Id.* at 2003-1 Amendment, such authority thereafter being assigned to the Vice-President, Retirement Savings Plans, or if no individual holds such position, the individual performing the functions (the "Appointing Fiduciary").

Compensation Committee Defendants had the duty to monitor the Retirement Plans Committee Defendants in order to ensure that the members of the Retirement Plans Committee satisfy their fiduciary duties under ERISA, and to the extent necessary and appropriate under the circumstance replace the members with competent fiduciaries. Thus, according to DOL regulations, the Compensation Committee Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

55. Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**D.    The VP Retirement Plans Defendants' Fiduciary Status.**

56. The VP Retirement Plans Defendants had the authority to appoint the members of the Retirement Plans Committee. *Id.* at 2003-1 Amendment and 2005-1 Amendment. Accordingly, the VP Retirement Plans Defendants had the duty to monitor, and to remove, the Retirement Plans Committee Defendants. Thus, according to DOL regulations, the VP Retirement Plans Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

57. Consequently, in light of the foregoing duties, responsibilities, and actions, the VP Retirement Plans Defendants were *de facto* fiduciaries of the Plan within the meaning of

ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**2.    The Retirement Plans Committee Defendants' Fiduciary Status.**

58.    According to the Plan Document, the Retirement Plans Committee is the "Named Fiduciary" of the Plan, as that term is defined under ERISA, with authority to manage, interpret and administer the Plan.  Plan Document § 9.1(b).

59.    Pursuant to the Plan Document, the Retirement Plans Committee "generally shall be responsible for the management, interpretation, and administration of the Plan."  *Id.*  In addition, the Retirement Plans Committee has the following duties:

> (1).    Determine the names of those Employees who are eligible to participate, together with their Compensation, Hours of Service, Beneficiary designations, Termination of Employment and such other matters as may be necessary to determine a Participant's benefits under the Plan;
>
> (2).    Establish procedures for allocation of responsibilities among fiduciaries of the Plan and Trust which are not allocated herein or in the Trust Agreement;
>
> (3).    Establish a written investment policy, including a participant directed investment policy under Section 404(c) of the Act, which investment policy will be reviewed by an independent advisor at least annually;[7]
>
> (4).    With respect to any Participant, determine the amount of any benefits payable under the Plan; and

---

[7] Prior to the amendment effective December 5, 2003, §9.1(b)(3) of the Plan provided that the Retirement Plans Committee:  Establish a written investment policy subject to the approval of the Compensation and Nominating Committee of the Board of Directors of Wal-Mart Stores, Inc., including a participant directed investment policy under Section 404(c) of the Act.

(5). Perform such other functions and take such other actions as may be required by the Plan or may be necessary or advisable to accomplish the purpose of the Plan.

*Id.* and 2003-1 Amendment.

60. The Retirement Plans Committee is authorized to select investment managers and "may use the services of one or more outside investment advisers to assist in the selection of investment alternatives and investment managers under the Plan." Investment Policy at 3.

61. The Retirement Plans Committee was also specifically assigned responsibility for the selection of Plan Investment Options, Plan Document at § 4.2(c), which it may have discharged with the assistance of outside consultants.

62. On information and belief, the Retirement Plans Committee exercised responsibility for communicating with participants regarding Plan assets in a plan-wide, uniform, mandatory manner through ERISA required disclosures and information.

63. Consequently, in light of the foregoing duties, responsibilities, and actions, the Retirement Plans Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## VII. FACTS BEARING ON FIDUCIARY BREACH

A.   **The Plan Investment Options Were** Imprudent Investments for the Plan During the Class Period and Defendants Breaches Have Caused the Plan to Incur Substantial Losses**.**

1.   The Fees and Expenses Charged by the Plan Investment Options Are Excessive.

64.   There is no shortage of reasonably priced well managed investment options in the 401(k) plan marketplace. Nonetheless, Defendants ignored these options and instead assembled a small group of funds for the Plan – the only funds made available for participants' retirement savings – that charged unreasonably high fees and expenses. Moreover, they stuck with the Plan Investment Options, even though, for the most part they fell short of the indices they were designed to track. As a result, contrary to the Wal-Mart way, and indeed, its very corporate culture, the Plan wasted money – large sums of money – on inferior products. While perhaps an explanation, though certainly not an excuse, it was *not* Wal-Mart's money that was wasted; rather, it was the retirement savings of Wal-Mart's hard-working, low-paid employees.

65.   By failing to implement a prudent and adequate procedure for evaluating, selecting and monitoring fund options and for ensuring that the reasonably priced, prudent investment options were selected for the Plan, Defendants caused the Plan to incur substantial losses. Thus, the Defendants violated their fiduciary duties under ERISA.

66.   Fiduciaries of a prudently managed retirement plan of the size of the Wal-Mart Plan should evaluate investment options in the marketplace in order to select reasonably priced, well-managed funds. The 401(k) marketplace is highly competitive and there are many options available that are far superior to the Plan Investment Options selected by Defendants. An adequate investigation in this respect would have revealed to Defendants that the Plan Investment Options are imprudent, and a reasonably prudent fiduciary would have acted differently under the circumstances.

67. All of the Plan Investment Options are Retail Class shares. Retail Class shares are generally for individual investors and not large pools of retirement savings. Large retirement plans, such as Wal-Mart's Plan, have the ability to obtain Institutional Class shares for company-sponsored retirement plans. Institutional Class shares are vastly cheaper than Retail Class shares, for the same or better performance, which is why prudent retirement plan fiduciaries often select the funds for inclusion in large plans. The relatively higher fees for the Retail Class shares in the Plan are unwarranted when better options, in the form of Institutional Class shares, are available.

68. Further, the Plan Investment Options are predominantly actively managed funds. Upon even the most cursory inspection of fund performance, one can see that many of the actively-managed funds selected by the Defendants yielded lower returns than the passively-managed funds, at a higher cost to the Plan.

69. Furthermore, seven of the Plan Investment Options[8] charge 12b-1 fees to the Plan. Accordingly, Plaintiff and the other Wal-Mart Plan participants paid distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders, regardless of whether they were Plan participants or not. *See* C.F.R. § 270.12b-1 ("Distribution Plans"). The distribution fees are based on a percentage of the net assets of each of the Plan Investment Options. 12b-1 fees are purportedly collected to grow or stabilize the assets of the Funds so that the Funds can benefit from economies of scale through reduced advisory and administrative

---

[8] Plan Investment Options charging 12b-1 fees are: AIM International Fund, American Europacific Fund, Ariel Fund, Davis NY Venture Fund, Franklin Small-Mid Cap Fund, MFS Growth Stock Fund, and PIMCO Total Return Fund.

fees. In reality, they are hidden loads that do not benefit Plan participants, and instead cost them money.

70.    The selection of mutual funds with 12b-1 fees represents an imprudent Plan Investment Option because there is no shortage of comparable and better performing funds that do not charge such fees, and participants derive no benefit whatsoever from the 12b-1 fees because the sole purpose of the fees is to reimburse the mutual fund companies for advertising the funds in order to attract new customers. For this reason, even outside the ERISA context, 12b-1 fees are often criticized. The following chart shows the amount that Plan participants paid in 12b-1 fees during the Class Period:

| Investment Option | 12b-1 Fees | Class Period 12b-1 Fees |
|---|---|---|
| AIM International Fund | 0.25% | $715,590 |
| American Europacific Fund | 0.25% | $3,698,805 |
| Ariel Fund | 0.25% | $1,766,044 |
| Davis NY Venture Fund | 0.25% | $3,613,773 |
| Franklin Small-Mid Cap Fund | 0.25% | $2,167,739 |
| MFS Growth Stock Fund | 0.35% | $4,084,443 |
| PIMCO Total Return Fund | 0.25% | $10,524,962 |
| TOTAL: | | $26,571,356 |

71.    In order to demonstrate the amount of losses to Plan participant's retirement savings caused year-after-year by Defendants' failure to ensure the fees and expenses charged to the Plan are reasonable, Plaintiff provides the following tables that: (1) summarize the fees and expenses of the Plan Investment Options; (2) compare the Plan Investment Options to less expense investment alternatives available in the marketplace; and (3) provide an estimate of the losses to the Plan from January 31, 2002 to January 31, 2007, the dates for which we have

available Plan asset information.[9]   The estimated losses are based on rates published by Vanguard. On information and belief, investment houses such as Vanguard offer even lower rates to large institutional clients with hundreds of millions of dollars to invest.  To the extent that the Plan could have negotiated even lower fees, the actual losses to the Plan are even greater than the estimates herein.  Plaintiff reserves the right to claim such higher damages following discovery.

72.     As of January 31, 2007, the Plan had in excess of $122 million in the AIM International Growth Fund (the "AIM Fund").  2006 Form 11-K at 29.  Despite the fact that the Plan had over $100 million invested in the AIM Fund, the Plan holds Class A shares, which are Retail Class shares.  The participants' investments are assessed a gross expense ratio of 1.59 percent.  The Defendants chose this fund despite the existence of high-quality alternatives designed to track the same index available in the marketplace, alternatives that have lower cost fees and more reasonable expenses.  *For example*: Vanguard's International Growth Fund, an actively managed fund in the same Morningstar category as the AIM Fund, offers an expense ratio of 0.55 percent to *retail* investors.  The Plan's investments in the AIM Fund amounted to more than $2.8 million in losses due to excessive fees and unreasonable expenses during the Class Period, based solely on a comparison of funds with a less expensive actively managed retail fund.  The contrast is even starker when the AIM Fund is compared to either a retail or institutional index fund in the same asset category.

---

[9] All calculations of losses use actively-managed and passively-managed Vanguard funds of the same Morningstar category as points of comparison. These funds are chosen as examples of investment products available in the marketplace.

| Mutual Fund Name: | AIM International Growth Fund |
| --- | --- |
| Expense Ratio: | 1.59% |
| Actively Managed Alternative Expense Ratio: | 0.55% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.32% |
| Passively Managed Alternative Expense Ratio (Institutional): | Less than 0.32% |
| Initial Plan Assets in Fund: | $2,618,000.00 |
| Estimated Total Contributions: | $111,441,493.80 |
| Estimated Losses (Active): | ($2,874,330.17) |
| Estimated Losses (Passive – Retail Class): | ($3,699,330.54) |
| Estimated Losses (Passive – Institutional Class): | At least ($3,699,330.54) |

73.     As of January 31, 2007, the Plan had in excess of $168 million in the actively
managed American Europacific Growth Fund (the "Europacific Fund"). 2006 Form 11-K at 16.
The participants' investments are in Class R4 shares that are assessed a gross expense ratio of
0.87 percent. The Defendants chose this fund despite the existence of high-quality alternatives
designed to track the same index available in the marketplace, alternatives that have lower cost
fees and more reasonable expenses. *For example*: Vanguard's International Value Fund, an
actively managed fund in the same Morningstar category as the Europacific Fund, offers an
expense ratio of 0.46 percent to retail investors. The Plan's investments in the Europacific Fund
amounted to more than $5.8 million in losses due to excessive fees and unreasonable expenses
during the Class Period based solely on a comparison with a less expensive actively managed
retail fund. The contrast is even starker when the Europacific Fund is compared to either a
retail or institutional index fund in the same asset category.

| Mutual Fund Name: | American Europacific Growth Fund |
| --- | --- |
| Expense Ratio: | 0.87% |
| Actively Managed Alternative Expense Ratio: | 0.46% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.32% |
| Passively Managed Alternative Expense Ratio (Institutional): | Less than 0.32% |
| Initial Plan Assets in Fund: | $168,860,000.00 |
| Estimated Total Contributions: | $181,631,583.70 |
| Estimated Losses (Active): | ($5,859,893.91) |
| Estimated Losses (Passive - Retail Class): | ($8,212,078.41) |
| Estimated Losses (Passive - Institutional Class): | At least ($8,212,078.41) |

74. As of January 31, 2007, the Plan had in excess of $232 million in the actively managed Ariel Fund. 2006 Form 11-K at 16. The participants' investments are assessed a gross expense ratio of 1.07 percent. The Defendants chose this fund despite the existence of high-quality alternatives designed to track the same index available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Strategic Equity Fund, an actively managed fund in the same Morningstar category as the Ariel Fund, offers an expense ratio of 0.35 percent to retail investors. The Plan's investments in the Ariel Fund amounted to more than $5.5 million in losses due to excessive fees and unreasonable expenses during the Class Period based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the Ariel Fund is compared to either a retail or institutional index funds in the same asset category.

| Mutual Fund Name: | Ariel Fund |
|---|---|
| Expense Ratio: | 1.07% |
| Actively Managed Alternative Expense Ratio: | 0.35% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.08% |
| Initial Plan Assets in Fund: | $95,943,000.00 |
| Estimated Total Contributions: | $175,140,904.70 |
| Estimated Losses (Active): | ($5,599,372.43) |
| Estimated Losses (Passive - Retail Class): | ($6,793,331.03) |
| Estimated Losses (Passive - Institutional Class): | ($7,850,106.78) |

75.     As of January 31, 2007, the Plan had in excess of $362 million in the passively

managed Merrill Lynch Equity Index Trust ("Merrill Index Fund"). 2006 Form 11-K at 16. The

participants' investments are assessed a gross expense ratio of 0.30 percent for this index fund

that seeks to track the performance of the Standard & Poor's 500 Index (the "S&P 500"). The

Defendants chose this fund despite the preponderance of high-quality alternatives designed to

track the same index available in the marketplace, alternatives that have lower cost fees and

more reasonable expenses. *For example*: Vanguard's Institutional Index Fund, a passively

managed fund that tracks the S&P 500, offers an expense ratio of 0.05 percent to institutional

investors. The Plan's investments in the Merrill Index Fund amounted to more than $2.7

million in losses due to excessive fees and unreasonable expenses during the Class Period based

on a comparison with a less expensive retail index fund. The contrast is even starker when the

Merrill Index Fund is compared to an institutional index fund in the same asset category.

| Mutual Fund Name: | Merrill Lynch Equity Index Trust |
|---|---|
| Expense Ratio: | 0.30% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.05% |
| Initial Plan Assets in Fund: | $297,306,000.00 |
| Estimated Total Contributions: | $181,074,545.30 |
| Estimated Losses (Passive - Retail Class): | ($2,797,037.13) |
| Estimated Losses (Passive - Institutional Class): | ($5,819,873.22) |

76.     As of January 31, 2007, the Plan had in excess of $363 million in the actively managed Davis New York Venture Fund (the "Davis Fund"). 2006 Form 11-K at 16.   The participants' investments are assessed a gross expense ratio of 0.88 percent.   The Defendants chose this fund despite the existence of high-quality alternatives available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Windsor Fund, an actively managed fund in the same Morningstar category as the Davis Fund, offers an expense ratio of 0.19 percent for Admiral Class shares.[10]   The Plan's investments in the Davis Fund amounted to more than $7.4 million in losses due to excessive fees and unreasonable expenses during the Class Period based solely on a comparison with a less expensive actively managed retail fund.   The contrast is even starker when the Davis Fund is compared to either a retail or institutional index fund in the same asset category.

---

[10] The requirement for Admiral Shares is "a minimum initial investment of $100,000". *See* Vanguard's Share Class Page available at https://personal.vanguard.com/VGApp/hnw/content/Funds/FundsVGFundsShareClassDefJSP.jsp

| Mutual Fund Name: | Davis New York Venture Fund |
|---|---|
| Expense Ratio: | 0.88% |
| Actively Managed Alternative Expense Ratio: | 0.31% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.21% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.05% |
| Initial Plan Assets in Fund: | $1,334,000.00 |
| Estimated Total Contributions: | $269,515,393.90 |
| Estimated Losses (Active): | ($7,482,056.29) |
| Estimated Losses (Passive - Retail Class): | ($8,583,785.16) |
| Estimated Losses (Passive - Institutional Class): | ($10,599,533.69) |

77.     As of January 31, 2007, the Plan had in excess of $223 million in the actively managed Franklin Templeton Small-Mid Cap Growth Fund (the "Franklin Fund"). 2006 Form 11-K at 29. The participants' investments are assessed a gross expense ratio of 1.00 percent. The Defendants chose this fund despite the existence of high-quality alternatives available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Capital Opportunities Fund, an actively managed fund in the same Morningstar category as the Franklin Fund, offers an expense ratio of 0.49 percent to retail investors. The Plan's investments in the Franklin Fund amounted to more than $4.8 million in losses due to excessive fees and unreasonable expenses during the Class Period based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the Franklin Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | Franklin Small-Mid-Cap Growth Fund |
|---|---|
| Expense Ratio: | 1.00% |
| Actively Managed Alternative Expense Ratio: | 0.49% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Initial Plan Assets in Fund: | $790,000.00 |
| Estimated Total Contributions: | $120,727,794.60 |
| Estimated Losses (Active): | ($4,857,556.14) |
| Estimated Losses (Passive - Retail Class): | ($7,722,221.43) |
| Estimated Losses (Passive - Institutional Class): | At least ($7,722,221.43) |

78. As of January 31, 2007, the Plan had in excess of $347 million in the actively managed Massachusetts Investments Growth Stock Fund (the "MFS Fund"). 2006 Form 11-K at 16. The participants' investments are assessed a gross expense ratio of 0.93 percent. The Defendants chose this fund despite the existence of high-quality alternatives available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Primecap Fund, an actively managed fund in the same Morningstar category as the MFS Fund, offers an expense ratio of 0.46 percent to retail investors. The Plan's investments in the MFS Fund amounted to more than $5.6 million in losses due to excessive fees and unreasonable expenses during the Class Period based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the MFS Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | MFS Growth Stock Fund |
|---|---|
| Expense Ratio: | 0.93% |
| Actively Managed Alternative Expense Ratio: | 0.46% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.07% |
| Initial Plan Assets in Fund: | $710,000.00 |
| Estimated Total Contributions: | $286,113,297.30 |
| Estimated Losses (Active): | ($5,644,549.97) |
| Estimated Losses (Passive - Retail Class): | ($8,834,953.41) |
| Estimated Losses (Passive - Institutional Class): | ($10,737,230.11) |

79.     As of January 31, 2007, the Plan had in excess of $984 million in the PIMCO Total

Return Fund (the "PIMCO Fund"). 2006 Form 11-K at 16. Despite the fact that the Plan has

almost one billion dollars invested in the PIMCO Fund, the Plan holds Administrative Class

shares which are actively managed. The participants' investments are assessed a gross expense

ratio of 0.68 percent. In comparison, if the Plan held Institutional Class of shares in the PIMCO

Fund participants would only be assessed a gross expense ratio of 0.43 percent. A prudent

fiduciary who is responsible for a plan the size of the Wal-Mart Plan would have insisted on the

institutional rate for the PIMCO Fund. The Defendants failed to act prudently and instead

chose this fund despite the existence of high-quality alternatives designed to track the same

index available in the marketplace, alternatives that have lower cost fees and have more

reasonable expenses. *For example*: Vanguard's Intermediate-term Investment Grade Bond

Fund, an actively managed fund in the same Morningstar category as the PIMCO Fund, offers

an expense ratio of 0.21 percent to retail investors. The Plan's investments in the PIMCO Fund

alone amounted to more than $9 million in losses due to excessive fees and unreasonable

expenses during the Class Period based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the PIMCO Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | PIMCO Total Return Fund |
|---|---|
| Expense Ratio: | 0.68% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.21% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.07% |
| Initial Plan Assets in Fund: | $220,550,000.00 |
| Estimated Total Contributions: | $676,306,339.90 |
| Estimated Losses (Active): | ($19,601,392.63) |
| Estimated Losses (Passive - Retail Class): | ($19,601,392.63) |
| Estimated Losses (Passive - Institutional Class): | ($25,392,825.59) |

80.   Total estimated losses to the Plan for the period January 31, 2002 to January 31, 2007, due to excessive fees and expenses charged to the Plan by the Plan Investment Options are summarized as follows:.

| | Total Fees & Expenses | Losses |
|---|---|---|
| Wal-Mart Plan | $107,584,097 | --- |
| Alternative Actively Managed Funds | $45,057,152 | ($62,526,945) |
| Alternative Passively Managed Funds - Retail Class | $27,746,670 | ($79,837,428) |
| Alternative Passively Managed Funds - Institutional Class | $16,244,950 | ($91,339,147) |

## 2.   The Excessive Fees Charged by the Plan Investment Options Cannot Be Justified by Their Performance

81.   Unlike performance, costs are entirely predictable and certain. Therefore,

prudent plan fiduciaries focus on investment fees and expenses and ensure that funds that are selected charge reasonable fees. There is no excuse for giving away money on excessive fees. Imprudent fiduciaries sometimes attempt to justify the high costs paid by a plan by the performance of the funds selected. This generally is regarded as an unduly risky approach to retirement asset management since performance can change overnight but excessive fees will always be excessive.

82. Here, however, even if Defendants attempt to justify the excessive fees paid by tying the fees to the performance of the Plan Investment Options, the effort would fail. For the most part, the performances of the Plan Investment Options fell short of far less expensive actively managed funds designed to track the same indices, and, in fact, in many instances, did not match the performance of the passively managed index they are designed to track.

83. The chart below illustrates the performance of the Plan Investment Options compared to the performance of Vanguard active funds and Vanguard passive funds. Included in these calculations are the combined effect of performance and the opportunity cost of having fewer assets to continually invest.

| Date | Value of Plan Investment Options | Performance of Plan Investment Options Compared to Vanguard Active Funds | Performance of Plan Investment Options Compared to Vanguard Passive Funds |
|---|---|---|---|
| Year End January 2007 | $2,861,161,000 | ($246,552,768) | ($140,464,300) |

84.     As of Year End 2007, while the Plan Investment Options were worth $2.861 billion, an investment in index funds would have been worth $3.002 billion or $140 million more. These values are based on the combined effect of lower investment returns and higher fees.

85.     Thus, when it comes to the management of the Plan participant's retirement savings, Defendants caused the Plan to both pay too much for the Plan Investment Options and to receive an inferior product. Defendants' conduct is an egregious violation of the duties of prudence and loyalty under ERISA.

## B.     Defendants Knew or Should Have Known That the Plan Investment Options Were Imprudent Investments.

86.     During the Class Period, as described herein, Defendants knew or, had they properly discharged their fiduciary obligations, would have known that the Plan Investment Options were imprudent investments for the Plan because there are more reasonably priced, high-quality investment options available in the marketplace. Defendants could and should have selected Plan Investment Options with lower fees and expenses that provide comparable and often better performance than the Plan Investment Options.

87.     As a result, the Plan Investment Options continued to be offered in the Plan and caused participants to lose a significant portion of their retirement savings.

88.     The Defendants failed to conduct an appropriate investigation into whether the Plan Investment Options were prudent investments for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding the impact that excessive fees and

unreasonable expenses could have on a participant's retirement savings so that participants could make informed decisions regarding their investments in the Plan. Defendants knew or should have known that less expensive, comparable and superior funds were available in the marketplace, but failed to communicate this information to participants. Instead, for reasons that at present are known only to Defendants, they selected high cost options that caused the Plan to squander vast sums on unnecessary fees.

89. Presumably, Defendants, as Plan fiduciaries of an over $11 billion ERISA Plan are familiar with DOL guidance on the prudent selection of investment options. The DOL urges employers and fiduciaries to take their duty of selecting investment options for a retirement plan, including evaluating the fees that various funds charge, very seriously, as part of their fiduciary responsibilities:

> Why Consider Fees?
>
> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> In recent years, there has been a dramatic increase in the number of investment options, as well as level and types of services, offered to and by plans in which participants have individual accounts. In determining the number of investment options and the level and type of services for your plan, it is important to understand the fees and expenses for the services you decide to offer. The cumulative effect of fees and expenses on retirement savings can be substantial.

*Understanding Retirement Plan Fees And Expenses*, U.S. Department of Labor, May 2004, (available

at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html).

90.     The DOL also has cautioned employers repeatedly that the *kind* of investment

style of a particular fund, *i.e.*, whether it is actively or passively managed, has a major impact on

fees.  When fees are "passively managed," such as index funds, "little research" is required, and

thus, the fees of these funds should be much lower:

> Funds that are "actively managed" (i.e., funds with an investment adviser who
> actively researches, monitors, and trades the holdings of the fund to seek a
> higher return than the market as a whole) generally have higher fees than funds
> that are "passively managed" (see below). The higher fees are associated with the
> more active management provided and increased sales charges from the higher
> level of trading activity. While actively managed funds seek to provide higher
> returns than the market, neither active management nor higher fees necessarily
> guarantee higher returns.
>
> Funds that are "passively managed" generally have lower management fees.
> Passively managed funds seek to obtain the investment results of an established
> market index, such as the Standard and Poor's 500, by duplicating the holdings
> included in the index. Thus, passively managed funds require little research and
> less trading activity.

*Id.*

91.     Accordingly, if actively managed funds are offered in an ERISA-protected

retirement plan, the fiduciaries must ensure that the performance of those investments options

justifies the increased expense of the investment.   Paying high fees for a fund that

underperforms the applicable index, as a matter of basic prudence, is financially unsound.

92.     The detrimental impact excessive fees have on retirement savings, is, as the DOL

has noted, substantial.  Over the course of an individual's participation in a 401(k) plan,

excessive fees can result in a loss of tens of thousands of dollars, if not more, in retirement savings.

93.    *For example:* Assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000. If returns on investments in their account over the next 35 years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, their account balance would grow to $227,000 at retirement, even if there were no further contributions to their account. However, if fees and expenses being withheld are 1.5 percent, their account balance would grow to only $163,000 at retirement. The 1 percent difference in fees and expenses reduces their account balance at retirement by a shocking *28 percent*.



<u>See</u> Department of Labor Publication "A Look at 401(k) Plan Fees," available at

*http://www.dol.gov/ebsa/publications/401k_employee.html.*

94. Because of the enormous impact that excessive fees and expenses have on participants' retirement savings, plan fiduciaries are required to carefully monitor fees and expenses and ensure that amounts charged against plan accounts are reasonable.

95. In fact, according to Wal-Mart's own Investment Policy, the Retirement Plans Committee was charged to "offer investment options at reasonable cost." Investment Policy at 2. Even the purported screening process for the selection of an investment option for the Plan included the consideration of whether the fees are reasonable. *Id.* at 4. Unfortunately, the Defendants failed to follow their own stated policy.

96. An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, the Plan Investment Options were unduly expensive, and, thus, imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

97. Because Defendants knew or should have known that the Plan Investment Options were not prudent investment options for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan Investment Options.

98. Yet, despite the ready availability in the marketplace of investment options that charge reasonable fees and expenses and provide comparable and often better performance, Defendants failed to take any action to protect participants from losses resulting from the Plan Investment Options.

99.     In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Had anyone paid any meaningful attention to the Plan Investment Options, to the process by which the options were presented, and the bases for inclusion of the Plan Investment Options, to the fees and expenses charged to the Plan year-after-year for the Plan Investment Options, and to the mediocre performance obtained despite the high fees paid, tens of millions of dollars of participants' retirement savings could have been saved.

## C.   Defendants Failed to Provide Plan Participants with Complete and Accurate Information.

100.     ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

101.     Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the impact that fees and expenses charged by investment alternatives can have on an individual's retirement savings, including the following:

- Fees charged by the Plan Investment Options were paid directly from Plan assets such that every excessive dollar paid is a dollar unnecessarily and inappropriately taken from participants' retirement savings;

- Excessive fees have a devastating impact on the total retirement savings of Plan participants, decreasing total savings by a substantial percentage over time;

- Given the impact of excessive fees on participants' retirement savings, prudent selection of reasonably priced, high-quality fund options is of paramount importance to prudent plan management and administration;

- Selection of expensive Retail Class shares for a plan the size of the Wal-Mart Plan is imprudent given the ready availability of Institutional Class shares, and both retail and institutional index funds that offer comparable and often better performance at a fraction of the cost; and

- Selection of funds that charge 12(b)(1) fees is imprudent given the ready availability of less expensive, comparable, and better performing mutual funds that do not charge such fees.

102. As a result of Defendants' failure to communicate the above information, during the Class Period, Defendants failed to provide complete and accurate information to Plan participants regarding the impact excessive fees charged by the Plan Investment Options have on their retirement savings, the bases of the Defendants' selection of the Plan Investment Options, and the ready availability of far less expensive, comparable, and better performing options in the marketplace. As such, participants in the Plan could not appreciate the true risks presented by the Plan Investment Options and therefore could not make informed decisions regarding their investments in the Plan.

103. In addition despite clear fiduciary duties to the contrary, Wal-Mart agreed to conceal from its employees and Plan participants the amount of revenue sharing and other kickbacks paid to Merrill Lynch by the mutual fund companies whose funds comprise the Plan Investment Options. Remarkably, this agreement was set forth in the trust agreement Wal-Mart

entered into with Merrill Lynch, the Plan Trustee (and fiduciary). As set forth in the Trust Agreement:

> The Employer agrees that it will not, nor will it permit any employee of the Employer, to disclose, in whole or in part, the Written Fee Report [describing the fee break-down for various mutual funds] or any information in the Written Fee Report, to any person . . . . This obligation of the Employer not to disclose the Written Fee Report or any information in the Written Fee Report shall survive the termination of this agreement. The Employer and the Trustee agree that in the event of a disclosure of the Written Fee Report or any information in the Written Fee Report by the Employer and/or any of its employees, contrary to the terms of this Agreement, the Trustee may terminate this Agreement immediately.

*See* Trust Agreement Between Merrill Lynch Trust Company, FSB, as the Trustee and Wal-Mart Stores, Inc., as the Employer (Aug. 1, 2003) (hereinafter the "Trust Agreement") at § 4.04.

104. Thus, based on Wal-Mart's own agreement with Merrill Lynch, Wal-Mart ensured that participants, *to whom Wal-Mart owed fiduciary duties,* would *not* obtain information showing that Plan assets were used to pay kickbacks collected by the Trustee from mutual fund companies whose funds comprise the Plan Investment Options. Accordingly, participants were not provided with critical information regarding the investment options made available to them in the Plan, including, *inter alia,* the extent of revenue sharing and other kickback payments received by the Trustee from the Plan Investment Options, and the extent to which such payment influenced the selection of the Plan Investment Options.

## VIII. THE RELEVANT LAW

105. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

106.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

107.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part,

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

108.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

109.     ERISA defines a "party in interest" to an employee benefit plan, in relevant part,

as: (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or

custodian), counsel, or employee of such employee benefit plan; (B) a person providing services

to such plan; (C) an employer any of whose employees are covered by such plan; and (D) an

employee organization any of whose members are covered by such plan. ERISA § 3(14), 29

U.S.C. § 1002(14).

110.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan

and parties in interest. Specifically, ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a
> transaction, if he knows or should know that such transaction constitutes
> a direct or indirect—
>
> (A)     sale or exchange, or leasing, of any property between the plan and
> a party in interest;
>
> (B)     lending of money or other extension of credit between the plan
> and a party in interest;
>
> (C)     furnishing of goods, services, or facilities between the plan and a
> party in interest;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any
> assets of the plan; or
>
> (E)     acquisition, on behalf of the plan, of any employer security or
> employer real property in violation of section 1107 (a) of this title.

(Emphasis added).

111.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

112.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

113.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

114.     Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a), as well as pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3) for equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

## IX.  CAUSES OF ACTION

A.     Count I:  Failure to Prudently and Loyally Manage the Plan and Plan Assets.

115.     Plaintiff incorporates herein the allegations set forth above.

116.     This Count alleges fiduciary breach against the following Defendants:  Wal-Mart and the Retirement Plans Committee Defendants, (the "Prudence Defendants").

117.     As alleged above, the Prudence Defendants are named fiduciaries pursuant to

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

118. The Prudence Defendants are obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

119. As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants are directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

120. Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan in several respects: (1) The Prudence Defendants failed to implement a prudent procedure for evaluating, selecting, and monitoring the Plan Investment Options; (2) The Prudence Defendants selected and maintained the Plan Investment Options despite the fact that they knew or reasonably should have known that the Plan Investment Options are unreasonably expensive when compared to

readily available less expensive comparable and better performing fund options, and included fees that were not incurred solely for the benefit of Plan participants; (3) The Prudence Defendants selected and continued to offer the Plan Investment Options despite the fact that they knew or reasonably should have known that the performance of the Plan Investment Options was in large part inferior to the performance of both actively and passively managed funds within the same stated indices that were significantly less expensive; and (4) The Prudence Defendants knew or should have known that revenue sharing and other kickback payments were paid by the Plan Investment Option companies to Merrill Lynch, the Plan Trustee; that such payments were not reasonable compensation for any actual services provided by Merrill Lynch, but rather were merely *quid pro quo* kickback payments for including the Plan Investment Options in the menu of funds made available to Plan participants; and that Merrill Lynch did not credit such payments to the Plan or offset fees and expenses charged to the Plan by Merrill Lynch by the amount of the revenue sharing and other kickback payments, and, instead, kept the payments – plan assets – for their own use and benefit.

121.     The Prudence Defendants failed to conduct an appropriate investigation of the merits of the Plan Investment Options, in particular, the impact the excessive fees charged by the Plan Investment Options had on participants' retirement savings, and the ready availability of far less expensive options with comparable and often better performance. Such an investigation would have revealed to a reasonably prudent fiduciary that the Plan Investment Options are imprudent and are causing the Plan to waste tens of millions of dollars of participants' retirement savings.

122.    As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered significant losses. If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

123.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II: Failure to Monitor Fiduciaries.**

124.    Plaintiff incorporates by this reference the allegations above.

125.    This Count alleges fiduciary breach against the following Defendants: the Compensation Committee Defendants and the VP Retirement Plans Defendants (the "Monitoring Defendants").

126.    As alleged above, the Monitoring Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

127.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants includes the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Compensation Committee Defendants | Retirement Plans Committee Defendants | ¶¶ 54 - 55. |
| VP Retirement Plans Defendants | Retirement Plans Committee Defendants | ¶¶ 56 - 57. |

128.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

129.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

130.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

131.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Plan Investment Options; (b) failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing Plan fund options that charged significantly lower fees and expenses than the Plan Investment Options; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent Plan Investment Options for participants' retirement savings in the Plan during the Class Period, and who breached their fiduciary duties under ERISA.

132.     As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered substantial losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

133.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

C.  **Count III: Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

134.    Plaintiff incorporates herein the allegations set forth above.

135.    This Count alleges fiduciary breach against the Retirement Plans Committee and Wal-Mart (the "Communications Defendants").

136.    As alleged above, the Communications Defendants are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

137.    As alleged above, the scope of the fiduciary responsibility of the Communications Defendants includes the communications and material disclosures to the Plan's participants and beneficiaries.

138.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the investment alternatives in the Plan.

139.     The Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the following, such information being critical to participants' informed control over their Plan accounts:

(a).     The Plan Investment Options charge fees and expenses that are substantially higher than the fees and expenses charged by readily available fund options designed to track the same indices as the Plan Investment Options;

(b)     The performance of the Plan Investment Options is inferior to the performance of readily available actively and passively managed fund options that charge substantially lower fees and expenses;

(b)     The excessive fees and expenses charged by the Plan Investment Options substantially reduces Participants' retirement savings because all such fees and expenses are paid from Plan assets;

(c).     While all of the Plan Investment Options are Retail Class shares, a plan the size of the Wal-Mart Plan has ready access to Institutional Class shares that charge substantially lower fees and expenses than the Plan Investment Options.

(d)     While several of the Plan Investment Options charge 12(b)(1) fees, such fees do not benefit Plan participants in any manner and there are readily available fund options designed to track the same indices that do not share 12(b)(1) fees;

(e)     Defendants did not select the Plan Investment Options or evaluate them on an ongoing basis based on whether the fees and expenses charged by the Plan Investment Options were reasonable and incurred solely in the interests of Plan participants;

(f)      Each of the Plan Investment Options paid revenue sharing and/or other kickbacks to Merrill Lynch, the Plan trustee based directly on the amount of assets invested in each such option in the Plan; and

(g)      Revenue sharing and other kickback payments paid by Plan participants to Merrill Lynch were retained by Merrill Lynch and were not, in turn, paid to the Plan by Merrill Lynch.

140.    In addition, the Communications Defendants agreed with Merrill Lynch to conceal from Wal-Mart employees the amount of revenue sharing and other kickback payments that Merrill Lynch received from the Plan Investment Options in exchange for the options being included in the line-up of funds offered to Plan participants.

141.    The Communications Defendants' omissions were material to participants' ability to exercise informed control over their Plan accounts. The omissions prevented participants from making informed decisions regarding the investment of their retirement savings in the Plan Investment Options, and as to investment in mutual funds with more attractive fee arrangements.

142.    The Communications Defendants' omissions, incomplete statements and misrepresentations alleged herein were Plan-wide and uniform because Defendants failed to provide complete and accurate information to any of the Plan's participants.

143.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Plan's other participants and beneficiaries have lost a significant portion of their retirement investment.

144.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

D.     Count IV: Co-Fiduciary Liability.

145.     Plaintiff incorporates herein the allegations set forth above.

146.     This Count alleges co-fiduciary liability against the following Defendants: All Defendants.

147.     As alleged above, the Fiduciary Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

148.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he or she knows of such a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

149.     **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

150.     In particular, Wal-Mart, the Compensation Committee Defendants, and the VP

Retirement Plans Defendants knew that there were readily available fund options in the marketplace that charge substantially lower fees and expenses with comparable and better performance when compared against the indices that the Plan Investment Options were designed to track, and, thus, knew that the Prudence Defendants had failed to satisfy their duty to prudently and loyally manage Plan assets by selecting and continuing to offer the Plan Investment Options during the Class Period; yet, Wal-Mart, the Compensation Committee Defendants, and the VP Retirement Plans Defendants failed to undertake reasonable efforts to remedy the Prudence Defendants' imprudent conduct. Defendants also knew that the Plan Investment Options paid revenue sharing and other kickback payments to the Plan Trustee, Merrill Lynch, yet, undertook no effort to stop such payments or ensure that the payments, which comprise an asset of the Plan, were paid to the Plan.

151. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

152. Wal-Mart, and the VP Retirement Plans Defendants knowingly participated in and undertook to conceal the Prudence Defendants' breaches of fiduciary duty with respect to the Plan Investment Options by, *inter alia*, agreeing with Merrill Lynch to conceal the amount of revenue sharing and other kickback payments that Merrill Lynch received from the Plan Investment Options.

153. **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on

a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

154.    The Monitoring Defendants enabled the Prudence Defendants' breaches by failing to prudently monitor the performance of the Prudence Defendants and to ensure that they were faithfully discharging their fiduciary duties with respect to the management and administration of Plan assets.  Moreover, had any of the Defendants faithfully discharged his or her duty to prudently manage and administer the Plan and provide complete and accurate information to Plan participants regarding the negative impact the Plan Investment Options would have on their retirement savings, participants could have protected themselves from the losses incurred by the Plan.

155.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, the Class lost tens of millions of dollars of retirement savings.

156.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

E.    **Count V: Prohibited Transactions Regarding Revenue Sharing and Other Kickback Payments.**

157.    Plaintiff incorporates herein the allegations set forth above.

158.     This Count alleges prohibited transactions against the following Defendants: Wal-Mart and the Retirement Plans Committee Defendants ("Prohibited Transaction Defendants"). As alleged above, the Prohibited Transaction Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence, and the prohibited transaction provisions set forth in ERISA § 406, 29 U.S.C. 1106.

159.     As alleged above, the scope of the Prohibited Transaction Defendants' fiduciary duties includes managing and administering the Plan and Plan assets, as well as causing the Plan to enter into transactions with parties in interest, including the Plan Trustee, Merrill Lynch, with regard thereto.

160.     The Prohibited Transaction Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) by causing the Plan to engage in transactions that they knew or should have known constitute a direct or indirect furnishing services between the plan and a party in interest. Specifically, the Prohibited Transaction Defendants approved, authorized and caused the Plan to enter a contract and other arrangements with Merrill Lynch, the Plan Trustee, a party in interest, through and as a result of which Merrill Lynch obtained revenue sharing and other kickback payments from the Plan Investment Option companies, based on the value of Plan assets invested in the Plan Investment Options, and, indeed, contracted with Merrill Lynch to conceal the amount of such payments from Wal-Mart employees and, thus, Plan participants.

161.     ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA § 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable

arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid*. Here, this exemption does not apply. The value of the services that Merrill Lynch purportedly provides in exchange for the revenue sharing and other kickback payments is nominal at best, and yet, the payments are substantial. In truth, the payments are not for actual services performed, and, instead are merely kickbacks for inclusion of the Plan Investment Options in the menu of funds made available to Plan participants.

162.     In addition, the Plan bears the expense of the revenue sharing and other kickback payments in that the cost of the revenue sharing and other kickback payments to the Plan Investment Option companies is passed through to the Plan by way of increased fees and expenses charged to the Plan by the Plan Investment Option companies. The Plan Investment Options, thus, charge more than they normally or otherwise would in the absence of revenue sharing and other kickback payments to a third party. Accordingly, the Prohibited Transaction Defendants' conduct with respect to the revenue sharing and other kickback payments that Merrill Lynch received at the expense of the Plan constitutes prohibited transactions under ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

163.     The Prohibited Transaction Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(D) by causing the Plan to engage in transactions that they knew or should have known constitute a direct or indirect use by or for the benefit of a party in interest, of any assets of the Plan.

164.    Specifically, (1) the Prohibited Transaction Defendants approved, authorized and caused the Plan to enter a contract or other arrangement with Merrill Lynch, the Plan Trustee, through which Merrill Lynch obtained revenue sharing and other kickback payments from the Plan Investment Option companies; (2) the Prohibited Transaction Defendants knew or should have that the Plan's contract or other arrangement with Merrill Lynch constitutes a direct or indirect use by or for the benefit of a party in interest because the contract or other arrangement with Merrill Lynch enabled Merrill Lynch, a party in interest, to use and benefit from Plan assets in that: (a) Merrill Lynch, as the Plan Trustee, held the Plan assets in trust, and controlled the assets, and the kickback payments were derived from and, indeed, directly based on the value of Plan assets invested in the respective Plan Investment Options; and (b) the revenue sharing and other kickback payments are themselves Plan assets, as that term is construed under ERISA: Merrill Lynch received and held the revenue sharing and other kickback payments as a result of its status as the Plan Trustee and fiduciary, and did so at the expense of Plan participants or beneficiaries as the revenue sharing and other kickback payments were not credited to the Plan or used to offset other fees charged to the Plan by Merrill Lynch, and the Plan Investment Option companies passed the cost of the revenue sharing and other kickback payments through to the Plan by increasing the fees and expenses charged to the Plan by the Plan Investment Options.  In addition, the revenue sharing and other kickback payments came at the expense of the Plan in that only funds that paid revenue sharing and other kickback payments to Merrill Lynch were included in the menu of Plan funds.  As a result, reasonably

priced comparable and better performing funds, such as Vanguard funds, were excluded from the fund menu for the Plan.

165.     As a direct and proximate result of the prohibited transactions alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

**166.**     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## X.  ERISA § 404(c) DEFENSE INAPPLICABLE

167.     ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

168.     ERISA § 404(c) does not apply here for several reasons.

169.     First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering the Plan Investment Options as investment options in the Plan as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c)

Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

170. Secondly, even as to participant-directed investments in the Plan Investment Options, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding the Plan Investment Options. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in the Plan Investment Options as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investments.

171. Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's investment in the Plan Investment Options is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class.

## XI. CAUSATION

172.    The Plan has suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested during the Class Period, in breach of Defendants' fiduciary duties.

173.    Defendants are liable for the Plan's losses in this case because (a). the Plan Investment Option were the result of the Prudence Defendants' decision to endorse those options; and (b) because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

174.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, and eliminated the imprudent Plan Investment Options which have excessive fees and are unreasonable expensive, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XII. REMEDY FOR BREACHES OF FIDUCIARY DUTY

175.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in the imprudent Plan Investment Options during the Class Period.

176.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

177. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

178. With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investments and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investments available to them. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

179. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common

fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

180.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## XIII. CLASS ACTION ALLEGATIONS

181.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Wal-Mart Profit Sharing and 401(k) Plan and who held assets in the Plan Investment Options at any time between January 31, 2002 and the present.

182.    **Class Period.**  The fiduciaries of the Plan knew or should have known at least by January 31, 2002, that the Plan Investment Options charged excessive fees and were unreasonably expensive, and therefore were imprudent.

183.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are more than 1,000,000 members of the Class.

184.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(1).	whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(2).	whether Defendants failed to provide complete and accurate information to Plan participants regarding the Plan Investment Options and the nature of all expenses associated with these investments; and

(3).	whether the members of the Class suffered losses and, if so, the proper measure of such losses.

185.	**Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because: (a) the conduct of Defendants giving rise to the claims is identical as to all members of the Class; and (b) the losses suffered by the Plan, and, indirectly by Plan participants, are caused by Defendants Plan-wide breaches of fiduciary duty.

186.	**Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in ERISA class action litigation and complex class action litigation generally. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

187.	**Rule 23(b)(1)(B) Requirements.** Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

188.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Fed. R. Civ. P. 23(b) because:  (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment in the Plan Investment Options; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan participants would have made if Defendants had fulfilled their fiduciary obligations;

B.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

C.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

D.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

E.      An Order requiring Defendants to provide an accounting of losses suffered to the Plan as a result of Defendants' breaches of their fiduciary duties;

F.      An Order awarding actual damages in the amount of any losses the Plan suffered;

G.      An Order awarding pre- and post-judgment interest based on the greatest of: (1) the Defendants' internal rates of return; (2) the Pension Benefit Guaranty Corporation's interest rates; or (3) statutory interest rates;

H.      An Order awarding costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and other applicable laws or regulations;

I.      An Order awarding attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine;

J.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

K.      Such other and further relief as to this Court may seem just and proper.

DATED this 27th day of March, 2008.

Respectfully submitted,

*[signature]*

**ALESHIRE, ROBB & SIVILS, P.C.**
Gregory W. Aleshire, MOBAR #38691
William R. Robb, MOBAR #43322
2847 S. Ingram Mill Rd. Suite A-102
Springfield, Missouri 65804
Telephone: (417) 869-3737
Facsimile: (417) 869-5678
**arslaw@arslaw.com**

**KELLER ROHRBACK L.L.P.**
Lynn Lincoln Sarko, WSBA #16569
Derek W. Loeser, WSBA #24274
Gretchen Freeman Cappio, WSBA #29576
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
**lsarko@kellerrohrback.com**
**dloeser@kellerrohrback.com**
**gcappio@kellerrohrback.com**