| | |
|---|---|
| JEREMY BRADEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., MERRILL LYNCH TRUST COMPANY OF AMERICA, MERRILL LYNCH & CO. INC., JAMES W. BREYER, JOHN A. COOPER, JR., STANLEY C. GAULT, FREDERICK S. HUMPHRIES, DAWN G. LEPORE, ELIZABETH A. (BETSY) SANDERS, DONALD G. SODERQUIST, JOSE H. VILLARREAL, JOHN T. WALTON, STEPHEN R. HUNTER, DEBBIE DAVIS CAMPBELL, JEFF AMOS, BILL AYERS, TERRI BERTSCHY, ELIZABETH BRANIGAN-EVANS, FRED DISCH, LARRY DUFF, SAM DUNN, DON ETHEREDGE, ROBIN FORBIS, SHARON GARMON, ERIN GONZALEZ, ROB HEY, GREG JOHNSTON, DAVID MCBRIDE, PHYLLIS MOREY, CLIFF PARKER, ARVETTA POWELL, CHARLES RATELIFF, DAVE REIFF, DAVID SCOGIN, DONNA SPRADLIN, J.P. SUAREZ, JENIFER TERRELL, KEVIN TURNER, ERIN WEITZEL, JEREMY WILSON, JIMMY WRIGHT, and JOHN AND JANE DOES 1-10,<br><br>Defendants. | No.: 08-031-09-GAF<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)** |

## I. INTRODUCTION

1.     Plaintiff Jeremy Braden ("Plaintiff") alleges the following based upon personal

information as to himself and the investigation of Plaintiff's counsel, which included a review of

1

U.S. Securities and Exchange Commission ("SEC") filings by Wal-Mart Stores Inc. ("Wal-Mart" or the "Company"), including Wal-Mart's proxy statements (Form DEF 14A), annual reports (Form 10-K), and the annual reports (Form 11-K) filed on behalf of the Wal-Mart Profit Sharing and 401(k) Plan (the "Plan"), a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL"), a review of fund prospectuses for the following investment options: PIMCO Total Return Fund (Administrative Class); Davis New York Venture Fund (Class A); Merrill Lynch Equity Index Trust (Tier 1); Massachusetts Investors Growth Stock Fund (Class A); Ariel Fund; Franklin Small-Mid Cap Growth Fund (Class A); Merrill Lynch Small Cap Index Trust (Tier 1); AIM International Growth Fund (Class A); American EuroPacific Growth Fund (Class R4); and Allianz RCM Technology Fund (Class A), (collectively, "Plan Investment Options"),[1] interviews with participants of the Plan, and a review of available documents governing the operations of the Plan. Initial discovery has provided support for Plaintiff's claims, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further discovery.

## II. NATURE OF THE ACTION

2.      This is a class action brought on behalf of the Plan pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

3.      The Plan is a retirement plan sponsored by Wal-Mart.

---

[1] The participant-directed investment options offered in the Plan have changed over time. Accordingly, this list of ten funds is not all-inclusive, but represents the bulk of funds challenged in this litigation. Plaintiff's allegations regarding the imprudent selection of Plan Investment Options extend to any fund offered by the Plan during the Class Period that was selected as a result of an imprudent process, where the selection of the fund was tainted by the consideration of revenue sharing or other payments made by the fund company to Merrill Lynch, or where Plan assets were used to pay undisclosed or excessive fees, as described more fully herein.

2

4.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets between July 1, 1997 and the present, as well as those who will become participants in or beneficiaries of the Plan in the future and, as a result, will be subject to the same fiduciary breaches (the "Class Period").

5.      Although Defendants are responsible for the selection of Plan Investment Options and for ensuring that participants are provided with prudent options in which to investment their retirement savings, Defendants fail to satisfy these duties. Despite the ready availability of reasonably priced investment options, particularly for a massive Plan like Wal-Mart's with tremendous potential to leverage economies of scale, Defendants select and offer to Plan participants unreasonably expensive retail funds. As a result, the Plan has squandered tens of millions of dollars of participants' retirement savings to pay for over-priced mutual funds that do not serve the best interests of the Plan participants. Absent relief from this Court, the unnecessary and entirely avoidable drain on participants' retirement savings will continue and cause further substantial harm to the Plan and to the participants and beneficiaries of the Plan. The failure of Defendants to ensure that the fees and expenses charged to the Plan are reasonable is particularly galling given that Wal-Mart has built its image in the marketplace around the concept of cutting costs and rolling back prices. The Company has failed its "Associates"[2] by not living up to its own slogans: "Always Low Prices" and "Save Money. Live Better." To make matters worse, the unreasonably expensive funds in many respects significantly underperformed their benchmarks. Thus, the additional fees paid did not buy a better product.

---

[2] "Associates" is a term Wal-Mart uses to refer to its employees.

To the contrary, more money was spent on, by and large, inferior products—a further affront to the Wal-Mart credo.

6.     The Amended Complaint sets forth Eleven Counts for relief. Counts I, III, and V are alleged against Wal-Mart and the Retirement Plans Committee Defendants. Count II is alleged against the Compensation Committee Defendants and the VP Retirement Plans Defendants. Count IV is alleged against Defendant Wal-Mart, the Compensation Committee Defendants, the VP Retirement Plans Defendants, and the Retirement Plans Committee Defendants (collectively the "Wal-Mart Defendants"). Counts VI through XI are alleged against Defendant Merrill Lynch, Pierce, Fenner & Smith Inc.; Defendant Merrill Lynch Trust Company of America; Defendant Merrill Lynch & Co. Inc.; and John and Jane Does 6-10 (collectively the "Merrill Lynch Defendants").

7.     Plaintiff alleges in Count I that certain Defendants who were responsible for the selection of investment options for the Plan acted imprudently and disloyally in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), by failing to implement a prudent process for evaluating fund options, and by selecting unreasonably expensive retail mutual funds, thereby causing the Plan to incur excessive fees and expenses that substantially diminished the retirement savings of Plan participants. Count I further alleges that with respect to certain Plan Investment Options, Defendants imprudently offered expensive funds that provided inferior returns.

8.     In Count II, Plaintiff alleges that the certain Defendants who were responsible for the appointment of the Plan's other fiduciaries failed to properly monitor the performance of their fiduciary appointees and to remove and replace those whose performance was inadequate in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

4

9.     In Count III, Plaintiff alleges that the certain Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information to participants regarding the impact excessive fees charged by the Plan Investment Options have on their retirement savings, the bases of the Defendants' selection of the Plan Investment Options, the ready availability of far less expensive options in the marketplace, the performance of funds, or the fees paid by participants and/or collected by Merrill Lynch associated with the Plan Investment Options.

10.     In Count IV, Plaintiff alleges that certain Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring in violation of ERISA § 405(a), 29 U.S.C. § 1105(a).

11.     In Count V, Plaintiff alleges that certain Defendants, Plan fiduciaries, engaged in prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a), by causing the Plan to engage in transactions with the Plan Trustee, Merrill Lynch, whereby, the Plan assets were transferred to and used for the benefit of Merrill Lynch. Specifically, the Defendants authorized, approved, and allowed Merrill Lynch to receive revenue sharing and other kickback payments from the Plan Investment Options, where such payments were not in exchange for any actual services provided to the Plan, and instead were merely the *quid pro quo* for offering the Plan Investment Options as fund options for the Plan.

12.     Plaintiff alleges in Count VI that certain Defendants who were responsible for the selection of investment options for the Plan acted imprudently and disloyally in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), by failing to implement a prudent process for evaluating fund options, and by selecting unreasonably expensive retail mutual funds, thereby causing the Plan to incur excessive fees and expenses that substantially

5

diminished the retirement savings of Plan participants. Count VI further alleges that with respect to certain Plan Investment Options, Defendants imprudently offered expensive funds that provided inferior returns and that the revenue sharing and other payments made from the fund companies to Defendants significantly and improperly influenced the selection of those funds.

13. In Count VII, Plaintiff alleges that certain Defendants, Plan fiduciaries, engaged in prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a), by causing the Plan to engage in transactions with Merrill Lynch whereby the Plan assets were transferred to and used for the benefit of Merrill Lynch. Specifically, the Defendants authorized, approved, and allowed Merrill Lynch to receive revenue sharing and other kickback payments from the Plan Investment Options, where such payments were not in exchange for any actual services provided to the Plan, and instead were merely the *quid pro quo* for offering the Plan Investment Options as fund options for the Plan.

14. In Count VIII, Plaintiff alleges that certain Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information to participants regarding the impact excessive fees charged by the Plan Investment Options have on their retirement savings, the bases of the Defendants' selection of the Plan Investment Options, the ready availability of far less expensive options in the marketplace, the performance of funds, or the fees paid by participants and/or collected by Merrill Lynch associated with the Plan Investment Options.

15. In Count IX, Plaintiff alleges that certain Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring in violation of ERISA § 405(a), 29 U.S.C. § 1105(a).

16. In Count X, Plaintiff alleges unjust enrichment of Merrill Lynch in violation of the federal common law of ERISA.

17. In Count XI, Plaintiff alleges knowing participation in fiduciary breaches by certain Defendants for which ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides a remedy.

18. Defendants' breaches of fiduciary duty have caused the Plan to squander tens of millions of dollars of lost retirement savings for Plan participants in violation of ERISA §§ 404(a)(1)(A) and (B) and §405(a).

19. Based on publicly available information for the Plan and information regarding far less expensive comparable investment alternatives readily available in the marketplace, Plaintiff conservatively estimates that Defendants' breaches of fiduciary duty have, between early 2002 and early 2008 alone, caused the Plan to spend over $60 million of participants' retirement savings in excessive fees and unreasonable expenses. Plaintiff conservatively estimates that Defendants' failure to prudently and loyally manage Plan assets will cause the Plan to incur substantial additional losses at a rate of approximately $20 million per year due to excessive fees and expenses. Defendants could have avoided these losses in their entirety by selecting reasonably priced investment options that are readily available in the marketplace instead of selecting the unreasonably expensive retail funds in the Plan.

20. Compounding the effect of the Plan Investment Options' high fees, the funds selected by Defendants have, to a large extent, failed to meet or exceed the benchmarks they were designed to track. Even though the Plan Investment Options charged fees that substantially exceeded the cost of relevant index funds as well as readily available less expensive, better performing actively managed funds, the Plan Investment Options often performed worse than

their benchmarks.[3] Thus, Wal-Mart Plan participants paid more for mutual funds, and in return were "rewarded" by lower returns. Taking into account the excessive fees charged, and the poor performance achieved, it is abundantly clear that Defendants failed to implement an adequate and effective process for evaluating and selecting fund options, and breached their obligation under ERISA to prudently and loyally manage the Plan's assets.

21.     Discovery is ongoing, and Plaintiff continues to obtain documents and information that demonstrate the Plan's losses due to Defendants' breaches of fiduciary duty. Projected into the future, because of the Plan's flawed asset-based fee structure, the damages can be expected to continue to accrue. In order to prevent this ongoing harm, Plaintiff seeks injunctive relief in addition to the damages incurred to date.

22.     This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, an accounting, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

23.     ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plan during the Class Period.

24.     In addition, because the information and documents on which some of the Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of

---

[3] *See* Wal-Mart Profit Sharing and 401(k) Plan Investment Policy Statement (Updated through September 26, 2007) (hereinafter the "Investment Policy") for a list of the asset class and indices the Plan Investment Options are designed to track.

Plaintiff's allegations are made by necessity on information and belief. At such time as Plaintiff has had the opportunity to conduct further discovery, Plaintiff will, to the extent necessary and appropriate, further amend this Amended Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiff's claims.

### III.  JURISDICTION AND VENUE

25.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

26.    **Personal Jurisdiction.** ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in Missouri.

27.    **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches or other violations for which relief is sought occurred in this district, and/or some Defendants reside and/or may be found in this district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391, because Wal-Mart and Merrill Lynch systematically and continuously do business in this district and because a substantial part of the events or omissions giving rise to the claims occurred within this district.

### IV.  PARTIES

**A.    Plaintiff.**

28.    Plaintiff Jeremy Braden is a resident of Highlandville, Missouri. Plaintiff Braden began working for Wal-Mart in May, 2002 and is a current employee at the Company. Plaintiff

Braden is a current participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

**B.   Defendants.**

29.    **Defendant Wal-Mart Stores, Inc.**    Defendant Wal-Mart is a Delaware corporation headquartered in Bentonville, Arkansas.   Wal-Mart operated nearly 4,000 stores throughout the United States in 2006.   Outside the United States, the Company operated more than 1,000 stores.   Wal-Mart's annual sales totaled more than $300 billion in 2006, and Wal-Mart transacts millions of dollars of business within Missouri each year.   In 2006, the Company employed approximately 1.8 million employees worldwide, 1.3 million of whom were employed in the United States.

30.    The Plan provides that the Company is the "Plan Administrator."

31.    **Compensation and Nominating Committee.**    As explained in more detail below, the Compensation and Nominating Committee ("Compensation Committee") is appointed by Wal-Mart's Board of Directors and had certain fiduciary responsibilities with respect to the Plan, including appointment and oversight responsibilities, at relevant times during the Class Period.   The Defendants identified in this paragraph are referred to as the "Compensation Committee Defendants."   On information and belief, the Compensation Committee Defendants are as follows:

> (1).   **Defendant James W. Breyer** served as a member of the Compensation Committee at relevant times during the Class Period.
>
> (2).   **Defendant John A. Cooper, Jr.** served as a member of the Compensation Committee at relevant times during the Class Period.
>
> (3).   **Defendant Stanley C. Gault** served as a member of the Compensation Committee at relevant times during the Class Period.

(4). **Defendant Frederick S. Humphries** served as a member of the Compensation Committee at relevant times during the Class Period.

(5). **Defendant Dawn G. Lepore** served as a member of the Compensation Committee at relevant times during the Class Period.

(6). **Defendant Elizabeth A. (Betsy) Sanders** served as a member of the Compensation Committee at relevant times during the Class Period.

(7). **Defendant Donald G. Soderquist** served as a member of the Compensation Committee at relevant times during the Class Period.

(8). **Defendant Jose H. Villarreal** served as a member of the Compensation Committee at relevant times during the Class Period.

(9). **Defendant John T. Walton** served as a member of the Compensation Committee at relevant times during the Class Period.

32. **Vice President, Retirement Plans Governance and/or Vice President, Retirement Savings Plans.** As explained in more detail below, the Vice President, Retirement Plans Governance and/or the Vice-President, Retirement Savings Plans (collectively, "VP Retirement Plans"), including any successor position (*e.g.*, "Vice President Global Benefits Design"), had certain fiduciary responsibilities with respect to the Plan, including appointment and oversight responsibilities with respect to Plan fiduciaries.

(1). **Defendant Stephen R. Hunter** served as the Vice President, Retirement Savings Plans at relevant times during the Class Period.

(2). **Defendant Debbie Davis Campbell** served as the Vice President, Retirement Savings Plans at relevant times during the Class Period.

33. The identity of any additional person(s) who may have served as the VP Retirement Plans during the Class Period is currently unknown to Plaintiff, and is therefore

11

named fictitiously as John or Jane Doe 1. If the identity of any John or Jane Doe 1 is ascertained, Plaintiff will seek leave to join him/her under his/her true name.

34. Defendants Hunter, Campbell, and John or Jane Doe 1 are referred to as the "VP Retirement Plans Defendants."

35. **Defendant Wal-Mart Retirement Plans Committee.** As explained more fully below, the Wal-Mart Retirement Plans Committee (the "Retirement Plans Committee"), including any of its predecessors (*e.g.*, the 401(k) "Administrative Committee"), is appointed by the Vice President, Retirement Plans Governance and/or the Vice-President, Retirement Savings Plans, and at relevant times during the Class Period, also was appointed by the Compensation Committee, and has certain fiduciary responsibilities and duties for the Plan.

36. The fiduciary responsibilities of the Retirement Plans Committee include the responsibility to manage, interpret, and administer the Plan at relevant times during the Class Period. The Defendants identified in this paragraph, together with any additional members of the Retirement Plans Committee that may be identified in the future, are referred to as the "Retirement Plans Committee Defendants." On information and belief, the Retirement Plans Committee Defendants are as follows:

> (1). **Defendant Jeff Amos** served as a member of the Retirement Plans Committee at relevant times during the Class Period.
>
> (2). **Defendant Bill Ayers** served as a member of the Retirement Plans Committee at relevant times during the Class Period.
>
> (3). **Defendant Terri Bertschy** served as a member of the Retirement Plans Committee at relevant times during the Class Period.
>
> (4). **Defendant Elizabeth Branigan-Evans** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

12

(5). **Defendant Debbie Davis Campbell** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(6). **Defendant Fred Disch** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(7). **Defendant Larry Duff** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(8). **Defendant Sam Dunn** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(9). **Defendant Don Etheredge** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(10). **Defendant Robin Forbis** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(11). **Defendant Sharon Garmon** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(12). **Defendant Erin Gonzalez** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(13). **Defendant Rob Hey** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(14). **Defendant Stephen R. Hunter** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(15). **Defendant Greg Johnston** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(16). **Defendant David McBride** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

13

(17).  **Defendant Phyllis Morey** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(18).  **Defendant Cliff Parker** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(19).  **Defendant Arvetta Powell** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(20).  **Defendant Charles Rateliff** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(21).  **Defendant Dave Reiff** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(22).  **Defendant David Scogin** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(23).  **Defendant Donna Spradlin** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(24).  **Defendant J.P. Suarez** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(25).  **Defendant Jenifer Terrell** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(26).  **Defendant Kevin Turner** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(27).  **Defendant Erin Weitzel** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(28).  **Defendant Jeremy Wilson** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

(29). **Defendant Jimmy Wright** served as a member of the Retirement Plans Committee at relevant times during the Class Period.

37.     The Plan provides that the Retirement Plans Committee is a "Named Fiduciary" of the Plan.

38.     The identities of any additional members of the Retirement Plans Committee are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 2-5. If the identities of additional members of the Retirement Plans Committee are ascertained, Plaintiff will seek leave to join them under their true names.

39.     Defendant Wal-Mart, the Compensation Committee Defendants, the VP Retirement Plans Defendants, and the Retirement Plans Committee Defendants are collectively referred to hereinafter as the "Wal-Mart Defendants" or "Wal-Mart."

40.     **Defendant Merrill Lynch, Pierce, Fenner & Smith Inc.**  Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. includes Merrill Lynch, Pierce, Fenner & Smith Inc. together with any of its predecessors, successors, or affiliates. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware corporation headquartered in New York, NY. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. contracted with Wal-Mart Stores, Inc. to provide administrative and/or recordkeeping services to the Plan. *See* 1997 Servicing Agreement, WAL059226-60; *see also* July 29, 2003 Amendment to the Servicing Agreement, WAL050721-44; 2003 Servicing Agreement, WAL050767-802.

41.     **Defendant Merrill Lynch Trust Company of America.**  Defendant Merrill Lynch Trust Company of America includes Defendant Merrill Lynch Trust Company of America together with any of its predecessors, successors, or affiliates. Defendant Merrill Lynch Trust Company of America, together with its successors, served as "Trustee" of the Plan during the Class Period, as follows. Defendant Merrill Lynch Trust Company of America, an Illinois

15

corporation, served as the first "Trustee" of the Plan. *See* 1997 Trust Agreement, WAL001015-30. In 2001, Defendant Merrill Lynch Trust Company of America merged into Merrill Lynch Trust Co., FSB, which was a Savings Association headquartered in New Jersey. Merrill Lynch Trust Co., FSB was a party to the 2003 Trust Agreement. *See* 2003 Trust Agreement, WAL002481-96. In 2006, Merrill Lynch Trust Co., FSB merged with Merrill Lynch Bank & Trust Co, becoming Merrill Lynch Bank & Trust Co., FSB, a Savings Association headquartered in New York. On or about November 2, 2009, Merrill Lynch Bank & Trust Co., FSB merged into Bank of America, National Association, a national bank headquartered in Charlotte, NC. Upon information and belief, Bank of America, N.A. is the successor to all entities that served as "Trustee" of the Plan during the Class Period.

42. **Defendant Merrill Lynch & Co. Inc.** Defendant Merrill Lynch & Co. Inc. includes Merrill Lynch & Co. Inc. together with any of its predecessors, successors, subsidiaries, or affiliates. Defendant Merrill Lynch & Co. Inc. is a Delaware corporation headquartered in Charlotte, NC. Defendant Merrill Lynch & Co. Inc. is or was the parent company of (a) Merrill Lynch Trust Company, FSB, (b) Merrill Lynch Bank & Trust Co., FSB, (c) Merrill Lynch Investment Managers LLC ("MLIM"); and (d) Merrill Lynch, Pierce, Fenner & Smith Inc. during the Class Period. Under the terms of the Servicing Agreement, Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. and Defendant Wal-Mart Stores, Inc. could assign any or all rights and duties to any subsidiary or affiliate of Defendant Merrill Lynch & Co. Inc. or Wal-Mart Stores, Inc. *See* 1997 Servicing Agreement, WAL059226-60, at WAL059236.

43. **Merrill Lynch "Doe" Defendants.** Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., Defendant Merrill Lynch Trust Company of America, and Defendant Merrill Lynch & Co. Inc. are alleged to be fiduciaries of the Plan with accompanying fiduciary responsibilities and duties, as discussed below. In addition, it is alleged below that these entities knowingly

16

participated in breaches of fiduciary duty regardless of their own fiduciary status and that they were unjustly enriched in violation of the federal common law of ERISA. These entities acted through or relied upon the actions of individuals, who are personally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a). The identities of any individuals acting in a fiduciary or agency capacity in connection with or on behalf of Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., Defendant Merrill Lynch Trust Company of America, or Defendant Merrill Lynch & Co. Inc. are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 6-10. Once the identities of such individuals are ascertained, Plaintiff will seek leave to join them under their true names.

44. **Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., Defendant** Merrill Lynch Trust Company of America, Defendant Merrill Lynch & Co. Inc., and John and Jane Does 6-10 are collectively referred to hereinafter as the "Merrill Lynch Defendants" or "Merrill Lynch."

45. References hereinafter to "Defendants" include all of the Wal-Mart Defendants and all of the Merrill Lynch Defendants.

## V. THE PLAN

46. The Plan, sponsored by Wal-Mart, is an "employee pension benefit plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The Plan is also an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and contains a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401 (k), 26 U.S.C. § 401(k).

47. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l). In a breach of fiduciary duty action such as this, however, the Plan is neither defendant nor plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law

17

interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

48.     The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in trust and controlled by Merrill Lynch pursuant to the trust agreement. All contributions made to the Plan constitute a form of deferred compensation.

A.     **Wal-Mart Profit Sharing and 401(k) Plan.**

49.     Wal-Mart initially had two plans, the Wal-Mart Stores, Inc. Profit Sharing Plan, effective September 1, 1971, and the Wal-Mart Stores, Inc. 401(k) Retirement Savings Plan, effective February 1, 1997. *See* Wal-Mart Profit Sharing and 401(k) Plan, Effective October 31, 2003, including amendments adopted through August 31, 2007 (hereinafter the "Plan Document"), at 1. Effective October 31, 2003, the two plans were merged into one plan and renamed the Wal-Mart Profit Sharing and 401(k) Plan.[4] *Id.*

50.     The Plan has two separate accounts for participants' and Company Contributions: the Profit Sharing Account and the 401(k) Account.

51.     The Profit Sharing Account holds Wal-Mart's Company Contributions to the profit sharing portion of the Plan, both before October 31, 2003 and after October 31, 2003, and earnings on those contributions. *See* 2010 Summary Plan Description (hereinafter the "SPD") at 228. The Profit Sharing Account is considered an Employee Stock Ownership Plan. *Id.* at 233.

52.     The 401(k) Account holds some or all of the following: (1) participants' contributions to the Plan and earnings on those contributions; (2) the Company-Funded 401(k) Account which holds Wal-Mart's Company Contributions to the 401(k) portion of the Plan and

---

[4] All employees who were participants in the Plan prior to the 2003 merger continued to be Plan participants after the merger, as long as they continued to be eligible employees. Each eligible employee who was not a Plan participant prior to October 2003, and who completed at least 1,000 hours of service in a consecutive 12 month period is eligible to participate in the Plan.

18

earnings on those contributions; and (3) the 401(k) Rollover Account which holds any contributions that a participant rolled over to the Plan from another qualified retirement plan and earnings on those contributions. *Id.* at 228.

53.     All eligible Wal-Mart employees may participate in the Plan and may elect to contribute from one percent to 25 percent of their eligible wages to the 401(k) Account in the Plan. Regardless of whether an employee contributes to the Plan, he or she is entitled to receive a portion of the Company's Qualified Non-Elective contributions and Profit Sharing Contributions, if otherwise eligible. To be eligible to receive Company Contributions, an employee must complete at least 1,000 hours of service during the Plan year for which the contributions are made, as well as be employed on the last day of that Plan year. *Id.* at 232.

54.     At the end of each plan year, Wal-Mart determines the amount of the Company Contribution (if any) for the plan year. The contribution is a percentage of an employee's pay while he or she was a participant for the plan year. The contribution percentage can vary from year to year and may be reduced or eliminated in the future. Company Contributions are made to a participant's Profit Sharing Account and to the Company-Funded 401(k) Account. *Id.* at 231.

55.     Plan participants are immediately vested in all elective contributions, catch-up contributions, qualified non-elective contributions, roll-over contributions, tax credit contributions and Profit Sharing Plan rollover contributions. A participant's Profit Sharing Contributions vest based on years of service at a rate of 20 percent per year from years three through seven. Effective January 1, 2008, a participant becomes fully vested in the Profit Sharing Contributions after six years of service. *Id.*

56.     Throughout the Class Period, the Plan fiduciaries, by and through the Retirement Plans Committee, selected the Plan Investment Options that were made available to Plan

participants for investment of their retirement savings. Plan Document § 4.2(c).[5] The Plan consists of a variety of mutual funds, a common/collective trust, Wal-Mart common stock, and a stable value fund, which consists of a money market fund, a common/collective trust, and traditional and synthetic guaranteed investment contracts. 2006 Form 11-K at 8.

57. Additionally, Merrill Lynch exercised discretion, authority, and control over Plan assets by determining, altering, and influencing which mutual funds would be available for investment by Plan participants for investment of their retirement savings.

58. Selection and management of the Plan Investment Options was a discretionary decision made by the Defendants subject to the fiduciary duty requirements of ERISA. Nothing in the Plan limits the ability of the Plan fiduciaries to remove particular Plan Investment Options or divest assets invested in the options as prudence dictates—and to the contrary, the Defendants, including specifically, the Retirement Plan Committee Defendants and Merrill Lynch were expressly authorized to exercise this function.

## VI.  DEFENDANTS' FIDUCIARY STATUS

A.     **The Nature of Fiduciary Status.**

59. **Named Fiduciaries.** Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

60. **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent:

---

[5] If further discovery shows the involvement of other entities, Plaintiff will amend the complaint to the extent necessary and appropriate.

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

61.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

62.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

63.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

64.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, on information and belief, Wal-Mart chose to assign the appointment and removal of fiduciaries to the Wal-Mart Monitoring Defendants named herein. These persons and entities in turn selected Wal-Mart employees, officers and agents to perform most fiduciary functions.

65.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.     Wal-Mart's Fiduciary Status.**

66.     Pursuant to the Plan Document, the Company was the "Administrator" as that term is defined in ERISA § 3(16)(A). Plan Document § 9.5. In addition, to the extent not delegated to other Plan fiduciaries, Wal-Mart exercised responsibility for communicating with participants regarding the Plan and Plan assets and providing information and materials required by law and ERISA. SPD at 242.

67.     Moreover, Wal-Mart, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the VP Retirement Plans Defendants and the Retirement Plans Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Wal-Mart is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

68.     Finally, under basic tenants of corporate law, Wal-Mart is imputed with the knowledge that the Defendants had regarding the breaches of fiduciary duty alleged herein, even if not communicated to Wal-Mart.

69.     Consequently, in light of the foregoing duties, responsibilities, and actions, Wal-Mart was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting

management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

70.    Wal-Mart, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Wal-Mart relied directly on the Compensation Committee Defendants, the VP Retirement Plans Defendants, and the other individual Defendants named herein to carry out its fiduciary responsibilities under the Plan and ERISA.

**C.    The Compensation Committee Defendants' Fiduciary Status.**

71.    The Compensation Committee Defendants had the authority to appoint the members of the Retirement Plans Committee.[6] Plan Document § 9.1(a). Accordingly, the Compensation Committee Defendants had the duty to monitor the Retirement Plans Committee Defendants in order to ensure that the members of the Retirement Plans Committee satisfy their fiduciary duties under ERISA, and to the extent necessary and appropriate under the circumstance replace the members with competent fiduciaries. Thus, according to DOL regulations, the Compensation Committee Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

72.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

---

[6] The Plan was subsequently amended and, effective December 5, 2003, the Compensation Committee ceased to have the responsibility to appoint the members of the Retirement Plans Committee. *Id.* at 2003-1 Amendment, such authority thereafter being assigned to the Vice-President, Retirement Savings Plans, or if no individual holds such position, the individual performing the functions (the "Appointing Fiduciary").

23

**D.    The VP Retirement Plans Defendants' Fiduciary Status.**

73.    The VP Retirement Plans Defendants had the authority to appoint the members of the Retirement Plans Committee. *Id.* at 2003-1 Amendment and 2005-1 Amendment. Accordingly, the VP Retirement Plans Defendants had the duty to monitor, and to remove, the Retirement Plans Committee Defendants. Thus, according to DOL regulations, the VP Retirement Plans Defendants exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

74.    Consequently, in light of the foregoing duties, responsibilities, and actions, the VP Retirement Plans Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**E.    The Retirement Plans Committee Defendants' Fiduciary Status.**

75.    According to the Plan Document, the Retirement Plans Committee is the "Named Fiduciary" of the Plan, as that term is defined under ERISA, with authority to manage, interpret and administer the Plan. Plan Document § 9.1(b).

76.    Pursuant to the Plan Document, the Retirement Plans Committee "generally shall be responsible for the management, interpretation, and administration of the Plan." *Id.* In addition, the Retirement Plans Committee has the following duties:

> (1).    Determine the names of those Employees who are eligible to participate, together with their Compensation, Hours of Service, Beneficiary designations, Termination of Employment and such other matters as may be necessary to determine a Participant's benefits under the Plan;

> (2).    Establish procedures for allocation of responsibilities among fiduciaries of the Plan and Trust which are not allocated herein or in the Trust Agreement;

24

(3). Establish a written investment policy, including a participant directed investment policy under Section 404(c) of the Act, which investment policy will be reviewed by an independent advisor at least annually;[7]

(4). With respect to any Participant, determine the amount of any benefits payable under the Plan; and

(5). Perform such other functions and take such other actions as may be required by the Plan or may be necessary or advisable to accomplish the purpose of the Plan.

*Id.* and 2003-1 Amendment.

77.     The Retirement Plans Committee is authorized to select investment managers and "may use the services of one or more outside investment advisers to assist in the selection of investment alternatives and investment managers under the Plan." Investment Policy at 3.

78.     The Retirement Plans Committee was also specifically assigned responsibility for the selection of Plan Investment Options, Plan Document at § 4.2(c), which it may have discharged with the assistance of outside consultants.

79.     On information and belief, the Retirement Plans Committee exercised responsibility for communicating with participants regarding Plan assets in a plan-wide, uniform, mandatory manner through ERISA required disclosures and information.

80.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Retirement Plans Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control

---

[7] Prior to the amendment effective December 5, 2003, § 9.1(b)(3) of the Plan provided that the Retirement Plans Committee: Establish a written investment policy subject to the approval of the Compensation and Nominating Committee of the Board of Directors of Wal-Mart Stores, Inc., including a participant directed investment policy under Section 404(c) of the Act.

respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

F.     **Merrill Lynch's Fiduciary Status.**

81.     The Trust Agreement itself clearly states that Merrill Lynch "acknowledges its status as a 'fiduciary' of the Plan within the meaning of ERISA." 2003 Trust Agreement, § 6.03, WAL002481-96, at WAL002489; *see also* 1997 Trust Agreement, WAL0001015-30, at WAL001023. Merrill Lynch also signed the Plan's Schedule P to the Form 5500 as a fiduciary. *See, e.g.*, 2003 Form 5500, WAL004282-460, at WAL004457.

82.     The Servicing Agreement establishes Merrill Lynch's fiduciary role specifically with respect to the selection and management of Plan Investment Options. For example, the Servicing Agreement provides that Merrill Lynch would maintain the investment selection for participants and have the unilateral right to amend or modify the mutual funds offered to Plan participants by the Plan. *Id. See also* July 29, 2003 Amendment to Servicing Agreement, WAL050721-44, at WAL050740. This discretionary authority and control over Plan assets establishes Merrill Lynch's fiduciary status under ERISA with respect to the selection of Plan Investment Options.

83.     Abundant evidence developed in discovery substantiates Merrill Lynch's fiduciary role with respect to the selection of Plan Investment Options. Specifically, Merrill Lynch prepared a list of mutual fund options, and Wal-Mart and Merrill Lynch agreed that Wal-Mart would pay a certain per participant amount for recordkeeping, contingent upon investment options under the Plan being limited to the mutual fund options designated by Merrill Lynch. 1997 Servicing Agreement, Attachment C, at 13, WAL059226-60, at WAL059258. Merrill Lynch further used its fiduciary authority and control to ensure that the Plan only offered funds that would agree to pay Merrill Lynch sufficient revenue sharing and/or other payments, and to

impose additional per participant fees of up to an additional $5 in the event that Wal-Mart sought to include funds that were not on the list originally proposed by Merrill Lynch. *Id.*

84.     In light of Merrill Lynch's authority to change the Plan's investment options, and the substantial additional expense levied in the event Wal-Mart sought to deviate from the list of funds provided by Merrill Lynch, Wal-Mart neither maintained complete control nor independence with respect to selection of investment options offered by the Plan. Instead, Wal-Mart allowed Merrill Lynch to prepare a list of acceptable funds, and amend or modify the list. Furthermore, Merrill Lynch's unilateral right to change investment options makes it clear that Merrill Lynch had a central role in the selection of investment options and had and exercised discretionary authority and control over Plan assets, making it a fiduciary to the Plan in this respect.

85.     Merrill Lynch's power to increase per participant fees by over 300 percent in the event that Wal-Mart sought to include funds that were not within the Merrill Lynch "alliance"— that is, to include funds that paid less generous revenue sharing to Merrill Lynch—contributed to Merrill Lynch's ability to influence, and exercise significant control over the fund selection process.     Likewise, this flawed arrangement though which Merrill Lynch's interests were elevated about the interests of Plan participants, created a substantial impediment to Wal-Mart's ability to modify the fund line-up or object to changes proposed by Merrill Lynch, and, thus, undermined Wal-Mart's ability to reject substitutions and exercise independent control over the selection process.

86.     In addition, Wal-Mart's ability to exercise effective control over the Plan Investment Options was undermined by Merrill Lynch's failure to inform Wal-Mart or Plan participants of the true amount of fees collected by Merrill Lynch from the Plan and the Plan Investment Options.     Wal-Mart could have obtained this information through a diligent

27

investigation (and should have done so under the circumstances of this case), but, nonetheless, by concealing the information, Merrill Lynch further enhanced its ability to exercise effective control over the selection of the Plan Investment Options.

87. Consequently, in light of the foregoing duties, responsibilities, and actions, Merrill Lynch was both a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## VII.  FACTS BEARING ON FIDUCIARY BREACH

A.  **The Plan Investment Options Were Imprudent Investments for the Plan During the Class Period and Defendants Breaches Have Caused the Plan to Incur Substantial Losses.**

1.  **The Fees and Expenses Charged by the Plan Investment Options Are Excessive.**

88. There is no shortage of reasonably priced well managed investment options in the 401(k) plan marketplace. Nonetheless, Defendants ignored these options and instead assembled a small group of funds for the Plan—the only funds made available for participants' retirement savings—that charged unreasonably high fees and expenses. Moreover, they stuck with the Plan Investment Options, even though, for the most part they fell short of the indices they were designed to track. As a result, contrary to the Wal-Mart way, and indeed, its very corporate culture, the Plan wasted money—large sums of money—on inferior products. While perhaps an explanation, though certainly not an excuse, it was *not* Wal-Mart's money that was wasted; rather, it was the retirement savings of Wal-Mart's hard-working, low-paid employees.

28

89.     By failing to implement a prudent and adequate procedure for evaluating, selecting and monitoring fund options and for ensuring that the reasonably priced, prudent investment options were selected for the Plan, Defendants caused the Plan to incur substantial losses. Thus, the Defendants violated their fiduciary duties under ERISA.

90.     Fiduciaries of a prudently managed retirement plan of the size of the Wal-Mart Plan should evaluate investment options in the marketplace in order to select reasonably priced, well-managed funds. The 401(k) marketplace is highly competitive and there are many options available that are far superior to the Plan Investment Options selected by Defendants. An adequate investigation in this respect would have revealed to Defendants that the Plan Investment Options are imprudent, and a reasonably prudent fiduciary would have acted differently under the circumstances.

91.     All of the Plan Investment Options enumerated above, *see supra* note 1 & accompanying text, are Retail Class shares. Retail Class shares are generally for individual investors and not large pools of retirement savings. Large retirement plans, such as Wal-Mart's Plan, have the ability to obtain Institutional Class shares for company-sponsored retirement plans. Institutional Class shares are vastly cheaper than Retail Class shares, for the same or better performance, which is why prudent retirement plan fiduciaries often select the funds for inclusion in large plans. The relatively higher fees for the Retail Class shares in the Plan are unwarranted when better options, in the form of Institutional Class shares, are available.

92.     Further, the Plan Investment Options are predominantly actively managed funds. Upon even the most cursory inspection of fund performance, one can see that many of the actively-managed funds selected by the Defendants yielded lower returns than the passively-managed funds, at a higher cost to the Plan.

93.     Furthermore, seven of the Plan Investment Options[8] charge 12b-1 fees to the Plan. Accordingly, Plaintiff and the other Wal-Mart Plan participants paid distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders, regardless of whether they were Plan participants or not. *See* C.F.R. § 270.12b-1 ("Distribution Plans"). The distribution fees are based on a percentage of the net assets of each of the Plan Investment Options. 12b-1 fees are purportedly collected to grow or stabilize the assets of the Funds so that the Funds can benefit from economies of scale through reduced advisory and administrative fees. In reality, they are hidden loads that do not benefit Plan participants, and instead cost them money.

94.     The selection of mutual funds with 12b-1 fees represents an imprudent Plan Investment Option because there is no shortage of comparable and better performing funds that do not charge such fees, and participants derive no benefit whatsoever from the 12b-1 fees because the sole purpose of the fees is to reimburse the mutual fund companies for advertising the funds in order to attract new customers. For this reason, even outside the ERISA context, 12b-1 fees are often criticized. The following chart shows the amount that Plan participants paid in 12b-1 fees from January 31, 2002 through January 31, 2007:

| Investment Option | 12b-1 Fees | 2002-2007 12b-1 Fees |
|---|---|---|
| AIM International Fund | 0.25% | $715,590 |
| American Europacific Fund | 0.25% | $3,698,805 |
| Ariel Fund | 0.25% | $1,766,044 |
| Davis NY Venture Fund | 0.25% | $3,613,773 |
| Franklin Small-Mid Cap Fund | 0.25% | $2,167,739 |
| MFS Growth Stock Fund | 0.35% | $4,084,443 |
| PIMCO Total Return Fund | 0.25% | $10,524,962 |
| **TOTAL:** | | **$26,571,356** |

---

[8] Plan Investment Options charging 12b-1 fees are: AIM International Fund, American Europacific Fund, Ariel Fund, Davis NY Venture Fund, Franklin Small-Mid Cap Fund, MFS Growth Stock Fund, and PIMCO Total Return Fund.

95.    In order to demonstrate the amount of losses to Plan participants' retirement savings caused year-after-year by Defendants' failure to ensure the fees and expenses charged to the Plan are reasonable, Plaintiff provides the following tables that: (1) summarize the fees and expenses of the Plan Investment Options; (2) compare the Plan Investment Options to less expense investment alternatives available in the marketplace; and (3) provide an estimate of the losses to the Plan from January 31, 2002 to January 31, 2007.[9] The estimated losses are based on rates published by Vanguard.  On information and belief, investment houses such as Vanguard offer even lower rates to large institutional clients with hundreds of millions of dollars to invest. To the extent that the Plan could have negotiated even lower fees, the actual losses to the Plan are even greater than the estimates herein.  Plaintiff reserves the right to claim such higher damages following additional discovery.

96.    As of January 31, 2007, the Plan had in excess of $122 million in the AIM International Growth Fund (the "AIM Fund").  2006 Form 11-K at 29.  Despite the fact that the Plan had over $100 million invested in the AIM Fund, the Plan holds Class A shares, which are Retail Class shares.  The participants' investments are assessed a gross expense ratio of 1.59 percent.  The Defendants chose this fund despite the existence of high-quality alternatives designed to track the same index available in the marketplace, alternatives that have lower cost fees and more reasonable expenses.  *For example*: Vanguard's International Growth Fund, an actively managed fund in the same Morningstar category as the AIM Fund, offers an expense ratio of 0.55 percent to *retail* investors.  The Plan's investments in the AIM Fund amounted to more than $2.8 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007, based solely on a comparison of funds with a less

---

[9] All calculations of losses use actively-managed and passively-managed Vanguard funds of the same Morningstar category as points of comparison.  These funds are chosen as examples of investment products available in the marketplace.

expensive actively managed retail fund. The contrast is even starker when the AIM Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | AIM International Growth Fund |
|---:|:---:|
| Expense Ratio: | 1.59% |
| Actively Managed Alternative Expense Ratio: | 0.55% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.32% |
| Passively Managed Alternative Expense Ratio (Institutional): | Less than 0.32% |
| Initial Plan Assets in Fund: | $2,618,000.00 |
| Estimated Total Contributions: | $111,441,493.80 |
| Estimated Losses (Active): | ($2,874,330.17) |
| Estimated Losses (Passive – Retail Class): | ($3,699,330.54) |
| Estimated Losses (Passive – Institutional Class): | At least ($3,699,330.54) |

97.     As of January 31, 2007, the Plan had in excess of $168 million in the actively managed American Europacific Growth Fund (the "Europacific Fund"). 2006 Form 11-K at 16. The participants' investments are in Class R4 shares that are assessed a gross expense ratio of 0.87 percent. The Defendants chose this fund despite the existence of high-quality alternatives designed to track the same index available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's International Value Fund, an actively managed fund in the same Morningstar category as the Europacific Fund, offers an expense ratio of 0.46 percent to retail investors. The Plan's investments in the Europacific Fund amounted to more than $5.8 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007 based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the Europacific Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | American Europacific Growth Fund |
|---|---|
| Expense Ratio: | 0.87% |
| Actively Managed Alternative Expense Ratio: | 0.46% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.32% |
| Passively Managed Alternative Expense Ratio (Institutional): | Less than 0.32% |
| Initial Plan Assets in Fund: | $168,860,000.00 |
| Estimated Total Contributions: | $181,631,583.70 |
| Estimated Losses (Active): | ($5,859,893.91) |
| Estimated Losses (Passive - Retail Class): | ($8,212,078.41) |
| Estimated Losses (Passive - Institutional Class): | At least ($8,212,078.41) |

98.    As of January 31, 2007, the Plan had in excess of $232 million in the actively managed Ariel Fund. 2006 Form 11-K at 16. The participants' investments are assessed a gross expense ratio of 1.07 percent. The Defendants chose this fund despite the existence of high-quality alternatives designed to track the same index available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Strategic Equity Fund, an actively managed fund in the same Morningstar category as the Ariel Fund, offers an expense ratio of 0.35 percent to retail investors. The Plan's investments in the Ariel Fund amounted to more than $5.5 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007 based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the Ariel Fund is compared to either a retail or institutional index funds in the same asset category.

| Mutual Fund Name: | Ariel Fund |
|---|---|
| Expense Ratio: | 1.07% |
| Actively Managed Alternative Expense Ratio: | 0.35% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.08% |
| Initial Plan Assets in Fund: | $95,943,000.00 |
| Estimated Total Contributions: | $175,140,904.70 |
| Estimated Losses (Active): | ($5,599,372.43) |
| Estimated Losses (Passive - Retail Class): | ($6,793,331.03) |
| Estimated Losses (Passive - Institutional Class): | ($7,850,106.78) |

99. As of January 31, 2007, the Plan had in excess of $362 million in the passively managed Merrill Lynch Equity Index Trust ("Merrill Index Fund"). 2006 Form 11-K at 16. The participants' investments are assessed a gross expense ratio of 0.30 percent for this index fund that seeks to track the performance of the Standard & Poor's 500 Index (the "S&P 500"). The Defendants chose this fund despite the preponderance of high-quality alternatives designed to track the same index available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Institutional Index Fund, a passively managed fund that tracks the S&P 500, offers an expense ratio of 0.05 percent to institutional investors. The Plan's investments in the Merrill Index Fund amounted to more than $2.7 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007 based on a comparison with a less expensive retail index fund. The contrast is even starker when the Merrill Index Fund is compared to an institutional index fund in the same asset category.

| Mutual Fund Name: | Merrill Lynch Equity Index Trust |
|---|---|
| Expense Ratio: | 0.30% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.05% |
| Initial Plan Assets in Fund: | $297,306,000.00 |
| Estimated Total Contributions: | $181,074,545.30 |
| Estimated Losses (Passive - Retail Class): | ($2,797,037.13) |
| Estimated Losses (Passive - Institutional Class): | ($5,819,873.22) |

100. As of January 31, 2007, the Plan had in excess of $363 million in the actively managed Davis New York Venture Fund (the "Davis Fund"). 2006 Form 11-K at 16. The participants' investments are assessed a gross expense ratio of 0.88 percent. The Defendants chose this fund despite the existence of high-quality alternatives available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Windsor Fund, an actively managed fund in the same Morningstar category as the Davis Fund,

offers an expense ratio of 0.19 percent for Admiral Class shares.[10] The Plan's investments in the Davis Fund amounted to more than $7.4 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007 based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the Davis Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | Davis New York Venture Fund |
|---|---|
| Expense Ratio: | 0.88% |
| Actively Managed Alternative Expense Ratio: | 0.31% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.21% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.05% |
| Initial Plan Assets in Fund: | $1,334,000.00 |
| Estimated Total Contributions: | $269,515,393.90 |
| Estimated Losses (Active): | ($7,482,056.29) |
| Estimated Losses (Passive - Retail Class): | ($8,583,785.16) |
| Estimated Losses (Passive - Institutional Class): | ($10,599,533.69) |

101.    As of January 31, 2007, the Plan had in excess of $223 million in the actively managed Franklin Templeton Small-Mid Cap Growth Fund (the "Franklin Fund"). 2006 Form 11-K at 29. The participants' investments are assessed a gross expense ratio of 1.00 percent. The Defendants chose this fund despite the existence of high-quality alternatives available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Capital Opportunities Fund, an actively managed fund in the same Morningstar category as the Franklin Fund, offers an expense ratio of 0.49 percent to retail investors. The Plan's investments in the Franklin Fund amounted to more than $4.8 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007 based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the Franklin Fund is compared to either a retail or institutional index fund in the same asset category.

---

[10] The requirement for Admiral Shares is "a minimum initial investment of $100,000." *See* Vanguard's Share Class Page available at https://personal.vanguard.com/VGApp/hnw/content/Funds/FundsVGFundsShareClassDefJSP.jsp

| Mutual Fund Name: | Franklin Small-Mid-Cap Growth Fund |
|---|---|
| Expense Ratio: | 1.00% |
| Actively Managed Alternative Expense Ratio: | 0.49% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Initial Plan Assets in Fund: | $790,000.00 |
| Estimated Total Contributions: | $120,727,794.60 |
| Estimated Losses (Active): | ($4,857,556.14) |
| Estimated Losses (Passive - Retail Class): | ($7,722,221.43) |
| Estimated Losses (Passive - Institutional Class): | At least ($7,722,221.43) |

102.    As of January 31, 2007, the Plan had in excess of $347 million in the actively managed Massachusetts Investments Growth Stock Fund (the "MFS Fund"). 2006 Form 11-K at 16. The participants' investments are assessed a gross expense ratio of 0.93 percent. The Defendants chose this fund despite the existence of high-quality alternatives available in the marketplace, alternatives that have lower cost fees and more reasonable expenses. *For example*: Vanguard's Primecap Fund, an actively managed fund in the same Morningstar category as the MFS Fund, offers an expense ratio of 0.46 percent to retail investors. The Plan's investments in the MFS Fund amounted to more than $5.6 million in losses due to excessive fees and unreasonable expenses between January 31, 2002 and January 31, 2007 based solely on a comparison with a less expensive actively managed retail fund. The contrast is even starker when the MFS Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | MFS Growth Stock Fund |
|---|---|
| Expense Ratio: | 0.93% |
| Actively Managed Alternative Expense Ratio: | 0.46% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.07% |
| Initial Plan Assets in Fund: | $710,000.00 |
| Estimated Total Contributions: | $286,113,297.30 |
| Estimated Losses (Active): | ($5,644,549.97) |
| Estimated Losses (Passive - Retail Class): | ($8,834,953.41) |
| Estimated Losses (Passive - Institutional Class): | ($10,737,230.11) |

103.    As of January 31, 2007, the Plan had in excess of $984 million in the PIMCO

Total Return Fund (the "PIMCO Fund"). 2006 Form 11-K at 16. Despite the fact that the Plan

has almost one billion dollars invested in the PIMCO Fund, the Plan holds Administrative Class

shares which are actively managed. The participants' investments are assessed a gross expense

ratio of 0.68 percent. In comparison, if the Plan held Institutional Class of shares in the PIMCO

Fund participants would only be assessed a gross expense ratio of 0.43 percent. A prudent

fiduciary who is responsible for a plan the size of the Wal-Mart Plan would have insisted on the

institutional rate for the PIMCO Fund. The Defendants failed to act prudently and instead chose

this fund despite the existence of high-quality alternatives designed to track the same index

available in the marketplace, alternatives that have lower cost fees and have more reasonable

expenses. *For example*: Vanguard's Intermediate-term Investment Grade Bond Fund, an

actively managed fund in the same Morningstar category as the PIMCO Fund, offers an expense

ratio of 0.21 percent to retail investors. The Plan's investments in the PIMCO Fund alone

amounted to more than $9 million in losses due to excessive fees and unreasonable expenses

between January 31, 2002 and January 31, 2007 based solely on a comparison with a less

expensive actively managed retail fund. The contrast is even starker when the PIMCO Fund is

compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | PIMCO Total Return Fund |
|---|---|
| Expense Ratio: | 0.68% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.21% |
| Passively Managed Alternative Expense Ratio (Institutional): | 0.07% |
| Initial Plan Assets in Fund: | $220,550,000.00 |
| Estimated Total Contributions: | $676,306,339.90 |
| Estimated Losses (Active): | ($19,601,392.63) |
| Estimated Losses (Passive - Retail Class): | ($19,601,392.63) |
| Estimated Losses (Passive - Institutional Class): | ($25,392,825.59) |

104.    Total estimated losses to the Plan for the period January 31, 2002 to January 31,

2007, due to excessive fees and expenses charged to the Plan by the Plan Investment Options are

summarized as follows:

| | Total Fees & Expenses | Losses |
|---|---|---|
| Wal-Mart Plan | $107,584,097 | --- |
| Alternative Actively Managed Funds | $45,057,152 | ($62,526,945) |
| Alternative Passively Managed Funds - Retail Class | $27,746,670 | ($79,837,428) |
| Alternative Passively Managed Funds - Institutional Class | $16,244,950 | ($91,339,147) |

105.    Further, the total excess fees paid from 1998 to 2008, when the Plan Investment

Options are compared to Vanguard *retail* funds with an average expense ratio of 23.5 basis

points, is over *$97 million*.

### 2.    The Excessive Fees Charged by the Plan Investment Options Cannot Be Justified by Their Performance.

106.    Unlike performance, costs are entirely predictable and certain.  Therefore, prudent

plan fiduciaries focus on investment fees and expenses and ensure that funds that are selected

charge reasonable fees.  There is no excuse for giving away money on excessive fees.  Imprudent

fiduciaries sometimes attempt to justify the high costs paid by a plan by the performance of the

funds selected.  This generally is regarded as an unduly risky approach to retirement asset

management since performance can change overnight but excessive fees will always be

excessive.

107.    Here, however, even if Defendants attempt to justify the excessive fees paid by

tying the fees to the performance of the Plan Investment Options, the effort would fail.  For the

most part, the performances of the Plan Investment Options fell short of far less expensive

actively managed funds designed to track the same indices, and, in fact, in many instances, did

not match the performance of the passively managed index they are designed to track.

108.     The chart below illustrates the performance of the Plan Investment Options compared to the performance of Vanguard active funds and Vanguard passive funds. Included in these calculations are the combined effect of performance and the opportunity cost of having fewer assets to continually invest.

| Date | Value of Plan Investment Options | Performance of Plan Investment Options Compared to Vanguard Active Funds | Performance of Plan Investment Options Compared to Vanguard Passive Funds |
|---|---|---|---|
| Year End January 2007 | $2,861,161,000 | ($246,552,768) | ($140,464,300) |

109.     As of Year End 2007, while the Plan Investment Options were worth $2.861 billion, an investment in index funds would have been worth $3.002 billion or $140 million more. These values are based on the combined effect of lower investment returns and higher fees.

110.     Thus, when it comes to the management of the Plan participants' retirement savings, Defendants caused the Plan to both pay too much for the Plan Investment Options and to receive an inferior product. Defendants' conduct is an egregious violation of the duties of prudence and loyalty under ERISA.

**B.     Defendants Knew or Should Have Known That the Plan Investment Options Were Imprudent Investments.**

111.     During the Class Period, as described herein, Defendants knew or, had they properly discharged their fiduciary obligations, would have known that the Plan Investment Options were imprudent investments for the Plan because there are more reasonably priced, high-quality investment options available in the marketplace. Defendants could and should have selected Plan Investment Options with lower fees and expenses that provide comparable and often better performance than the Plan Investment Options.

112. As a result, the Plan Investment Options continued to be offered in the Plan and caused participants to lose a significant portion of their retirement savings.

113. The Defendants failed to conduct an appropriate investigation into whether the Plan Investment Options were prudent investments for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding the impact that excessive fees and unreasonable expenses could have on a participant's retirement savings so that participants could make informed decisions regarding their investments in the Plan. Defendants knew or should have known that less expensive, comparable and superior funds were available in the marketplace, but failed to communicate this information to participants. Instead, for reasons that at present are known only to Defendants, they selected high cost options that caused the Plan to squander vast sums on unnecessary fees.

114. Presumably, Defendants, as Plan fiduciaries of an over $11 billion ERISA Plan are familiar with DOL guidance on the prudent selection of investment options. The DOL urges employers and fiduciaries to take their duty of selecting investment options for a retirement plan, including evaluating the fees that various funds charge, very seriously, as part of their fiduciary responsibilities:

Why Consider Fees?

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

In recent years, there has been a dramatic increase in the number of investment options, as well as level and types of services, offered to and by plans in which

40

participants have individual accounts. In determining the number of investment options and the level and type of services for your plan, it is important to understand the fees and expenses for the services you decide to offer. The cumulative effect of fees and expenses on retirement savings can be substantial.

*Understanding Retirement Plan Fees And Expenses*, U.S. Department of Labor, May 2004,

(available at http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html).

115.    The DOL also has cautioned employers repeatedly that the *kind* of investment style of a particular fund, *i.e.*, whether it is actively or passively managed, has a major impact on fees. When fees are "passively managed," such as index funds, "little research" is required, and thus, the fees of these funds should be much lower:

> Funds that are "actively managed" (i.e., funds with an investment adviser who actively researches, monitors, and trades the holdings of the fund to seek a higher return than the market as a whole) generally have higher fees than funds that are "passively managed" (see below). The higher fees are associated with the more active management provided and increased sales charges from the higher level of trading activity. While actively managed funds seek to provide higher returns than the market, neither active management nor higher fees necessarily guarantee higher returns.
>
> Funds that are "passively managed" generally have lower management fees. Passively managed funds seek to obtain the investment results of an established market index, such as the Standard and Poor's 500, by duplicating the holdings included in the index. Thus, passively managed funds require little research and less trading activity.

*Id.*

116.    Accordingly, if actively managed funds are offered in an ERISA-protected retirement plan, the fiduciaries must ensure that the performance of those investments options justifies the increased expense of the investment. Paying high fees for a fund that underperforms the applicable index, as a matter of basic prudence, is financially unsound.

117.    The detrimental impact excessive fees have on retirement savings, is, as the DOL has noted, substantial. Over the course of an individual's participation in a 401(k) plan,

excessive fees can result in a loss of tens of thousands of dollars, if not more, in retirement savings.

118.    *For example:* Assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000. If returns on investments in their account over the next 35 years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, their account balance would grow to $227,000 at retirement, even if there were no further contributions to their account. However, if fees and expenses being withheld are 1.5 percent, their account balance would grow to only $163,000 at retirement. The 1 percent difference in fees and expenses reduces their account balance at retirement by a shocking *28 percent*.



*See* Department of Labor Publication "A Look at 401(k) Plan Fees," available at

*http://www.dol.gov/ebsa/publications/401k_employee.html.*

119.    Because of the enormous impact that excessive fees and expenses have on participants' retirement savings, plan fiduciaries are required to carefully monitor fees and expenses and ensure that amounts charged against plan accounts are reasonable.

120.    In fact, according to Wal-Mart's own Investment Policy, the Retirement Plans Committee was charged to "offer investment options at reasonable cost." Investment Policy at 2. Even the purported screening process for the selection of an investment option for the Plan included the consideration of whether the fees are reasonable. *Id.* at 4. Unfortunately, the Defendants failed to follow their own stated policy.

121.    An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, the Plan Investment Options were unduly expensive, and, thus, imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

122.    Because Defendants knew or should have known that the Plan Investment Options were not prudent investment options for the Plan, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan Investment Options.

123.    Yet, despite the ready availability in the marketplace of investment options that charge reasonable fees and expenses and provide comparable and often better performance, Defendants failed to take any action to protect participants from losses resulting from the Plan Investment Options.

124.    In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Had anyone paid any meaningful attention to the Plan Investment Options, to the process by

which the options were presented, and the bases for inclusion of the Plan Investment Options, to the fees and expenses charged to the Plan year-after-year for the Plan Investment Options, and to the mediocre performance obtained despite the high fees paid, tens of millions of dollars of participants' retirement savings could have been saved.

125.    Not only were the Plan Investment Options imprudent selections, the entire fee structure that Merrill Lynch offered and Wal-Mart chose was bound to be unduly expensive over time as assets grew, exacerbating the effect of these imprudent selections.  Because of the almost entirely asset-based fee structure tied to revenue sharing payments, coupled with comparatively low flat fees, and the absence of any cap on Merrill Lynch's compensation, Plan participants would pay ever-increasing fees to Merrill Lynch as time progressed.  Both Wal-Mart and Merrill Lynch knew or should have known this.

126.    Indeed, Wal-Mart and Merrill Lynch contractually agreed in their Servicing Agreement that the stated per participant fees would cover all expenses and fees related to the administration of the Plan, including those related to the recordkeeping and trustee services contemplated by the Agreement. 1997 Servicing Agreement, WAL059226-60, at WAL059259.  Despite this arrangement, Wal-Mart allowed Merrill Lynch to collect many multiples of the contractually stated amounts through direct and indirect revenue sharing, and soft-dollar payments, the total amount of which was never disclosed to participants.

127.    Wal-Mart and Merrill Lynch knew or should have known that the significant amounts paid to Merrill Lynch in the form of revenue sharing payments (not to mention the undisclosed fees discussed *infra*)—in *addition* to the per participant fee amount —would *vastly* inflate the fee burden on participants and exceed the true costs of administration, recordkeeping, or the many other costs listed in the contract.  Thus, in light of the language of their contract, which casts the flat fees as all-inclusive, it is entirely unclear what the revenue sharing payments were supposed to pay for, if not "administration"

or "recordkeeping and trustee services." Instead of ensuring that any revenue sharing payments would be reasonable, Wal-Mart allowed Merrill Lynch carte blanche authority to collect **unlimited fees from** mutual fund companies without any cap on those fees and without correlating them with any actual services.

128.   The asset-based fee structure was disproportionate in another respect. Because of the excessive fees imposed on Plan participants in the mutual funds, those participants were effectively forced to subsidize the cost of the Plan for participants invested in Wal-Mart company stock and the stable value fund—which together comprised nearly 70 percent of the Plan's total assets—both of which appear to have paid far less revenue sharing to Merrill Lynch.[11]   This flaw in the fee structure provides yet another basis for Defendants' breaches.   The fact that revenue sharing from the minority of assets invested in mutual funds was used to pay the lion's share of the cost of administering the *entire* Plan demonstrates that Defendants failed to prudently and loyally make decisions regarding how to finance the cost of the Plan in the best interest of the Plan participants to whom they owed the highest duty known to law.

**C.    Merrill Lynch Collected Undisclosed Fees that Resulted in Excessive Compensation for Merrill Lynch.**

129.   Despite Wal-Mart's refrain through the early stages of this litigation that all fees were disclosed to participants and that it carefully managed the Plan and ensured that only reasonable fees were paid to Merrill Lynch, preliminary discovery has confirmed that Merrill Lynch collected substantial undisclosed fees.   Indeed, Wal-Mart's own tardy investigation (after this lawsuit was filed) has confirmed this to be the case.   The collection of these fees was a violation of Merrill Lynch's fiduciary duties of prudence and loyalty, a prohibited transaction, a

---

[11] The stated expense ratio for the stable value fund is between 10 and 13 basis points.  However, it remains unclear whether Merrill Lynch collected additional undisclosed payments and fees as a result of Plan assets invested in the stable value fund.  If discovery demonstrates that this occurred, Plaintiff will seek leave to amend the Complaint accordingly.

violation of the Merrill Lynch's contractual obligations to the Plan, as well as unjust enrichment to Merrill Lynch.

130.    The sources of undisclosed fees remain unclear and Plaintiff has not received a full accounting in discovery. There may be substantial additional undisclosed fees that will not be known until a full forensic audit is conducted and discovery is obtained from Merrill Lynch and the participating fund companies. Nevertheless, it is clear that in addition to revenue sharing, Merrill Lynch received "sub-transfer agent" or "sub-TA" fees from fund companies to augment its profits. Discovery received to date suggests that at least some fund companies paid a substantial additional per fund position fee to Merrill Lynch, as reflected in numerous "fee analysis" sheets provided by Merrill Lynch to Wal-Mart. Nov. 10, 2004 Fiduciary Fee Review, WAL016301-18, at WAL016317. Such fees may also have been paid in connection with fund positions in the Merrill Lynch Retirement Preservation Fund (the stable value fund). Taken together, these additional per position fees substantially increased the total compensation Merrill Lynch derived from its control of Plan assets.

131.    "Sub-transfer agent" or "sub-TA" fees were paid *in addition* to the revenue sharing payments to Merrill Lynch out of the fund expense ratios. Payment of such fees, whether flat dollar amounts or portions of the expense ratios, was an improper use of "assets of the Plan" for the benefit of a party in interest within the meaning of ERISA and constituted unreasonable compensation. Similarly, payment of revenue sharing in excess of the reasonable cost of administrative and recordkeeping services was an improper use of "assets of the Plan" for the benefit of a party in interest within the meaning of ERISA.

132.    Defendants failed to negotiate any provision for payment of excess "sub-transfer agent" or "sub-TA" fees or excess revenue sharing funds back to the Plan. As such, Merrill

Lynch collected fees beyond the reasonable cost of the services it provided to the Plan and was thereby excessively compensated and unjustly enriched through its control of Plan assets.

133. Merrill Lynch thus breached its fiduciary duties by collecting fees that were not disclosed to Wal-Mart or Plan participants, and by failing to disclose that it received far more compensation from its control of the Plan than was reasonable or appropriate under its agreement with Wal-Mart.

**D.      Wal-Mart Knew or Should Have Known that Merrill Lynch Was Collecting Undisclosed Fees.**

134. Wal-Mart's failure to monitor or discover these undisclosed fees—or to curtail the influence of these undisclosed fees on fund selection—until this litigation was well underway was both a primary fiduciary breach and a failure to monitor or prevent a breach by its co-fiduciary, Merrill Lynch.

135. Documents discovered to date demonstrate Wal-Mart's failure to keep track of or properly monitor all of the fees that Merrill Lynch collected. For example, an April 28, 2009 Plan Committee Minute confirms that Wal-Mart discovered that Merrill Lynch collected $10-20 million in fees, including sub-TA fees, that were not disclosed to the Committee or Wal-Mart between 2002 and 2009. *See* Minutes of Meeting, Retirement Plans Committee (April 28, 2009), WAL066711-12, at WAL066712.

136. Wal-Mart had ample warning signs of hidden fees collected by Merrill Lynch, including but not limited to the fact that Merrill Lynch's successful 1997 per participant bid was vastly below the amount bid by Merrill Lynch's competitors for the Wal-Mart Plan. A reasonably prudent fiduciary would have know that Merrill Lynch had no intention of limiting its fees to the amount stated in its bid, and instead would utilize Plan assets in order to extract much

higher fees from the Plan and the fund companies whose funds were selected as Plan Investment Options.

137.  Instead, year after year, Wal-Mart accepted at face value Merrill Lynch's representations regarding the amount of fees Merrill Lynch was receiving from and in relation to the Plan, and failed to diligently investigate and determine the accuracy of Merrill Lynch's statements. Had Wal-Mart prudently managed and monitored Merrill Lynch, it would have discovered at the very least that Merrill Lynch padded its disclosed fees with additional undisclosed fees from the inception of the Plan, and that Merrill Lynch continued to collect "sub-TA" fees in some form from 2002 to 2009. Wal-Mart's failure to determine the true amount of fees obtained by Merrill Lynch from or in relation to the Plan in a timely manner was a breach of its fiduciary duties, causing losses to participants who paid excessive fees, and who were subjected to inferior Plan Investment Options as a result of the flawed selection process utilized by Wal-Mart and Merrill Lynch.

138.  Even after discovering that Merrill Lynch had failed to disclose fees it received as the Plan Trustee, Wal-Mart allowed Merrill Lynch to continue serving as the Plan Trustee with authority and control over participants' retirement savings, further demonstrating Wal-Mart's failure to monitor and control the actions of Merrill Lynch with regard to the Plan.

**E.  Fund Selection Was Tainted by Merrill Lynch's Ability to Obtain Revenue Sharing and Other Payments from Fund Companies.**

139.  Defendants' fund selection process was tainted by the influence of revenue sharing and other payments from fund companies to Merrill Lynch.

140.  For example, when discussing with Wal-Mart and its consultant whether to get "A" shares in one fund—which would lower the expense ratio by over 40 basis points—Merrill

Lynch made clear that it would only offer the fund class with the higher expense ratio "based on our agreement" with the fund company. Nov. 2003 Email String, ML00017586-89.

141.    Merrill Lynch identified potential fund options based on which fund companies would pay the most revenue sharing or other kickback payments to Merrill Lynch, in violation of its fiduciary duties to the Plan. Wal-Mart, for its part, acquiesced in this scheme by repeatedly allowing Merrill Lynch to put its interest in maximizing its revenue sharing payments, above the Plan participants' interest in being able to invest in readily available, equally or better performing fund options that charged significantly lower fees than the options selected by Defendants.

142.    Merrill Lynch not only profited from these fiduciary breaches by Wal-Mart, but Merrill Lynch also knew or should have known that the Plan Investment Options were unduly expensive and that the selection process was tainted by Merrill Lynch's self-interest in receiving revenue sharing and other payments from the fund companies.

**F.    Defendants Failed to Provide Plan Participants with Complete and Accurate Information.**

143.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

144.    Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the impact that fees and expenses charged by investment alternatives can have on an individual's retirement savings, including the following:

- Fees charged by the Plan Investment Options were paid directly from Plan assets such that every excessive dollar paid is a dollar unnecessarily and inappropriately taken from participants' retirement savings;

- Excessive fees have a devastating impact on the total retirement savings of Plan participants, decreasing total savings by a substantial percentage over time;

- Given the impact of excessive fees on participants' retirement savings, prudent selection of reasonably priced, high-quality fund options is of paramount importance to prudent plan management and administration;

- Selection of expensive Retail Class shares for a plan the size of the Wal-Mart Plan is imprudent given the ready availability of Institutional Class shares, and both retail and institutional index funds that offer comparable and often better performance at a fraction of the cost; and

- Selection of funds that charge 12(b)(1) fees is imprudent given the ready availability of less expensive, comparable, and better performing mutual funds that do not charge such fees.

145.    As a result of Defendants' failure to communicate the above information, during the Class Period, Defendants failed to provide complete and accurate information to Plan participants regarding the impact excessive fees charged by the Plan Investment Options have on their retirement savings, the bases of the Defendants' selection of the Plan Investment Options, and the ready availability of far less expensive, comparable, and better performing options in the marketplace. As such, participants in the Plan could not appreciate the true risks presented by the Plan Investment Options and therefore could not make informed decisions regarding their investments in the Plan.

50

146.     In addition, despite clear fiduciary duties to the contrary, Wal-Mart agreed to conceal from its employees and Plan participants the amount of revenue sharing and other kickbacks paid to Merrill Lynch by the mutual fund companies whose funds comprise the Plan Investment Options.  Remarkably, this agreement was set forth in the trust agreement Wal-Mart entered into with Merrill Lynch, the Plan Trustee (and fiduciary).  As set forth in the Trust Agreement:

> The Employer agrees that it will not, nor will it permit any employee of the Employer, to disclose, in whole or in part, the Written Fee Report [describing the fee break-down for various mutual funds] or any information in the Written Fee Report, to any person . . . .  This obligation of the Employer not to disclose the Written Fee Report or any information in the Written Fee Report shall survive the termination of this agreement. The Employer and the Trustee agree that in the event of a disclosure of the Written Fee Report or any information in the Written Fee Report by the Employer and/or any of its employees, contrary to the terms of this Agreement, the Trustee may terminate this Agreement immediately.

*See* Trust Agreement Between Merrill Lynch Trust Company, FSB, as the Trustee and Wal-Mart Stores, Inc., as the Employer (Aug. 1, 2003) (hereinafter the "Trust Agreement") at § 4.04, WAL002481-96, at WAL002485; *see also* 1997 Trust Agreement, WAL001015-30, at WAL001019.

147.     Thus, based on Wal-Mart's own agreement with Merrill Lynch, Wal-Mart and Merrill Lynch ensured that participants, ***to whom Wal-Mart and Merrill Lynch owed fiduciary duties***, would ***not*** obtain information showing that Plan assets were used to pay kickbacks collected by the Trustee from mutual fund companies whose funds comprise the Plan Investment Options.  Accordingly, participants were not provided with critical information regarding the investment options made available to them in the Plan, including, *inter alia*, the extent of revenue sharing and other kickback payments received by the Trustee from the Plan Investment

Options, and the extent to which such payment influenced the selection of the Plan Investment Options.

148.    Both Wal-Mart and Merrill Lynch were responsible for the deficient communications that were provided to Plan participants. Merrill Lynch drafted communications and Wal-Mart approved them. *See* 1997 Servicing Agreement, WAL059226-60, at WAL059227.

149.    In order even to obtain basic information regarding the expense ratios charged by the Plan Investment Options, participants were required to contact Merrill Lynch directly to request the Wal-Mart 401(k) Plan "Fees" document. *See, e.g.*, 2006 Wal-Mart Profit Sharing and 401(k) Plan Investment Guide and Prospectus, WAL037360-75, at WAL037374.

150.    Moreover, the fee disclosures written by Merrill Lynch (and either approved or directed by Wal-Mart) were misleading and incomplete. For example, the 2005 "Fees" documents includes no reference to any portion of the expense ratio going to Merrill Lynch, leaving revenue sharing entirely undisclosed. *See, e.g.*, 2005 Wal-Mart Profit Sharing and 401(k) Plan Fees, WAL037417-19. Then in 2007, a new version of the "Fees" document claimed that "shareholder servicing fees" paid out of the expense ratios "offset the majority of the Plan's administrative fees, which enables Wal-Mart to keep the fee Plan participants pay for Plan administration minimal." 2007 Wal-Mart Profit Sharing and 401(k) Plan Fees, WAL013508-10, at WAL013509. While now including an extremely opaque reference to revenue sharing, the disclosure fails to explain how much the "shareholder servicing fee" is—in terms of dollars or basis points. Nor does the document make it clear that it is *participants* who shoulder the burden of (*i.e.*, pay) the revenue sharing because their Plan Investment Options are limited to high-cost funds that agreed to pay revenue sharing and kickbacks to Merrill Lynch. And while the disclosure makes reference to an "offset" of Plan administrative fees, this is

misleading as well because the amount of money paid to Merrill Lynch far exceeds the reasonable cost of Plan Administrative services, and, yet, the Plan and participants continued to pay fees to Merrill Lynch, and Merrill Lynch retained its excess compensation for itself. Finally, the description of fees paid by Plan participants for Plan administration as "minimal" is deeply misleading since, in truth, participants paid excessive fees to Merrill Lynch via revenue sharing and other kickbacks, and Merrill Lynch received in total excessive compensation that should have been returned to the Plan.

**G.    Merrill Lynch Knew or Should Have Known that the Wal-Mart Defendants Failed to Provide Plan Participants with Complete and Accurate Information Because Merrill Lynch was Concealing Information from Wal-Mart.**

151.    Due to its contractual agreement with Wal-Mart to conceal information from Wal-Mart Plan participants, Merrill Lynch knew or should have known that that such concealment would prevent Plan participants from having complete and accurate information that Wal-Mart should have provided.

152.    In addition, Merrill Lynch's own ***concealment from Wal-Mart*** of the nature and amount of fees it received over time—some of which at least the Wal-Mart Defendants belatedly discovered—prevented the Wal-Mart Defendants from making complete and accurate disclosures to Plan participants. Accordingly, Merrill Lynch knew or should have known that Plan participants would not learn either the amount of fees paid to Merrill Lynch or the influence of those fees on the fund selection process.

## VIII. THE RELEVANT LAW

153.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

Case 6:08-cv-03109-GAF   Document 107   Filed 07/21/10   Page 53 of 93

circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

154.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

155.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part,

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which

give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

156.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .  [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

157.    ERISA defines a "party in interest" to an employee benefit plan, in relevant part, as:  (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan; (B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; and (D) an employee organization any of whose members are covered by such plan.  ERISA § 3(14), 29 U.S.C. § 1002(14).

Case 6:08-cv-03109-GAF   Document 107   Filed 07/21/10   Page 55 of 93

158.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and parties in interest.  Specifically, ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B)     lending of money or other extension of credit between the plan and a party in interest;
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E)     acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

159.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

160.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

161.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

162. Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a), as well as pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

## IX.  CAUSES OF ACTION

**A.  Count I:  Failure to Prudently and Loyally Manage the Plan and Plan Assets.**

163. Plaintiff incorporates herein the allegations set forth above.

164. This Count alleges fiduciary breach against the following Defendants:  Wal-Mart and the Retirement Plans Committee Defendants, (the "Wal-Mart Prudence Defendants").

165. As alleged above, the Wal-Mart Prudence Defendants are named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

166. The Wal-Mart Prudence Defendants are obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

167. As alleged above, the scope of the fiduciary duties and responsibilities of the Wal-Mart Prudence Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Wal-Mart Prudence Defendants are directly responsible for, among

other things, selecting prudent investment options, eliminating imprudent options, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

168. Yet, contrary to their duties and obligations under ERISA, the Wal-Mart Prudence Defendants failed to loyally and prudently manage the assets of the Plan in several respects: (1) The Wal-Mart Prudence Defendants failed to implement a prudent procedure for evaluating, selecting, and monitoring the Plan Investment Options; (2) The Wal-Mart Prudence Defendants selected and maintained the Plan Investment Options despite the fact that they knew or reasonably should have known that the Plan Investment Options are unreasonably expensive when compared to readily available less expensive comparable and better performing fund options, and included fees that were not incurred solely for the benefit of Plan participants; (3) The Wal-Mart Prudence Defendants selected and continued to offer the Plan Investment Options despite the fact that they knew or reasonably should have known that the performance of the Plan Investment Options was in large part inferior to the performance of both actively and passively managed funds within the same stated indices that were significantly less expensive; and (4) The Wal-Mart Prudence Defendants knew or should have known that revenue sharing and other kickback payments were paid by the Plan Investment Option companies to Merrill Lynch, the Plan Trustee; that such payments were not reasonable compensation for any actual services provided by Merrill Lynch, but rather were merely *quid pro quo* kickback payments for including the Plan Investment Options in the menu of funds made available to Plan participants; and that Merrill Lynch did not credit such payments to the Plan or offset fees and expenses charged to the Plan by Merrill Lynch by the amount of the revenue sharing and other kickback payments, and, instead, kept the payments—plan assets—for their own use and benefit.

169.     The Wal-Mart Prudence Defendants failed to conduct an appropriate investigation of the merits of the Plan Investment Options, in particular, the impact the excessive fees charged by the **Plan Investment Options** had on participants' retirement savings, and the ready availability of far less expensive options with comparable and often better performance. Such an investigation would have revealed to a reasonably prudent fiduciary that the Plan Investment Options are imprudent and are causing the Plan to waste tens of millions of dollars of participants' retirement savings.

170.     As a consequence of the Wal-Mart Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered significant losses. If the Wal-Mart Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

171.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Wal-Mart Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.     Count II: Failure to Monitor Fiduciaries.**

172.     Plaintiff incorporates by this reference the allegations above.

173.     This Count alleges fiduciary breach against the following Defendants: the Compensation Committee Defendants and the VP Retirement Plans Defendants (the "Wal-Mart Monitoring Defendants").

174.    As alleged above, the Wal-Mart Monitoring Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

175.    As alleged above, the scope of the fiduciary responsibilities of the Wal-Mart Monitoring Defendants includes the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
| --- | --- | --- |
| Compensation Committee Defendants | Retirement Plans Committee Defendants | ¶¶ 71 – 72. |
| VP Retirement Plans Defendants | Retirement Plans Committee Defendants | ¶¶ 73 – 74. |

176.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

177.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

178.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know

that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

179.    The Wal-Mart Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Plan Investment Options; (b) failing to ensure that the monitored fiduciaries appreciated the ready availability of comparable and better performing Plan fund options that charged significantly lower fees and expenses than the Plan Investment Options or were diligently monitoring the fees that should or should not have been charged to the Plan or paid to Merrill Lynch; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to maintain the imprudent Plan Investment Options for participants' retirement savings in the Plan during the Class Period, and who breached their fiduciary duties under ERISA.

180.    As a consequence of the Wal-Mart Monitoring Defendants' breaches of fiduciary duty, the Plan suffered substantial losses. If the Wal-Mart Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

181.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Wal-Mart Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

C.     **Count III: Breach of Fiduciary Duty—Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

182.     Plaintiff incorporates herein the allegations set forth above.

183.     This Count alleges fiduciary breach against the Retirement Plans Committee and Wal-Mart (the "Wal-Mart Communications Defendants").

184.     As alleged above, the Wal-Mart Communications Defendants are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

185.     As alleged above, the scope of the fiduciary responsibility of the Wal-Mart Communications Defendants includes the communications and material disclosures to the Plan's participants and beneficiaries.

186.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the investment alternatives in the Plan.

187.    The Wal-Mart Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the following, such information being critical to participants' informed control over their Plan accounts:

(a)    The Plan Investment Options charge fees and expenses that are substantially higher than the fees and expenses charged by readily available fund options designed to track the same indices as the Plan Investment Options;

(b)    The performance of the Plan Investment Options is inferior to the performance of readily available actively and passively managed fund options that charge substantially lower fees and expenses;

(b)    The excessive fees and expenses charged by the Plan Investment Options substantially reduces Participants' retirement savings because all such fees and expenses are paid from Plan assets;

(c)    While all of the Plan Investment Options enumerated above, *see supra* note 1 and accompanying text, are Retail Class shares, a plan the size of the Wal-Mart Plan has ready access to Institutional Class shares that charge substantially lower fees and expenses than the Plan Investment Options.

(d)    While several of the Plan Investment Options charge 12(b)(1) fees, such fees do not benefit Plan participants in any manner and there are readily available fund options designed to track the same indices that do not share 12(b)(1) fees;

(e)    Defendants did not select the Plan Investment Options or evaluate them on an ongoing basis based on whether the fees and expenses charged by the Plan Investment Options were reasonable and incurred solely in the interests of Plan participants;

(f)    Each of the Plan Investment Options paid revenue sharing and/or other kickbacks to Merrill Lynch, the Plan trustee based directly on the amount of assets invested or number of positions in each such option in the Plan; and

(g)    Revenue sharing and other kickback payments paid by Plan participants to Merrill Lynch were retained by Merrill Lynch and were not, in turn, paid to the Plan by Merrill Lynch.

188.    In addition, the Wal-Mart Communications Defendants agreed with Merrill Lynch to conceal from Wal-Mart employees the amount of revenue sharing and other kickback payments that Merrill Lynch received from the Plan Investment Options in exchange for the options being included in the line-up of funds offered to Plan participants.

189.    The Wal-Mart Communications Defendants' omissions were material to participants' ability to exercise informed control over their Plan accounts. The omissions prevented participants from making informed decisions regarding the investment of their retirement savings in the Plan Investment Options, and as to investment in mutual funds with more attractive fee arrangements.

190.    The Wal-Mart Communications Defendants' omissions, incomplete statements and misrepresentations alleged herein were Plan-wide and uniform because Defendants failed to provide complete and accurate information to any of the Plan's participants.

191.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Plan's other participants and beneficiaries have lost a significant portion of their retirement investment.

192.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**D.    Count IV: Co-Fiduciary Liability.**

193.    Plaintiff incorporates herein the allegations set forth above.

194. This Count alleges co-fiduciary liability against the following Defendants: All Wal-Mart Defendants.

195. As alleged above, the Wal-Mart Co-Fiduciary Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

196. As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he or she knows of such a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Wal-Mart Co-Fiduciary Defendants breached all three provisions.

197. **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

198. In particular, Wal-Mart, the Compensation Committee Defendants, and the VP Retirement Plans Defendants knew that there were readily available fund options in the marketplace that charge substantially lower fees and expenses with comparable and better performance when compared against the indices that the Plan Investment Options were designed to track, and, thus, knew that the Wal-Mart Prudence Defendants had failed to satisfy their duty to prudently and loyally manage Plan assets by selecting and continuing to offer the Plan Investment Options during the Class Period; yet, Wal-Mart, the Compensation Committee Defendants, and the VP Retirement Plans Defendants failed to undertake reasonable efforts to remedy the Wal-Mart Prudence Defendants' imprudent conduct. Defendants also knew that the

Plan Investment Options paid revenue sharing and other kickback payments to the Plan Trustee, Merrill Lynch, yet, undertook no effort to stop such payments or ensure that the payments, which comprise an asset of the Plan, were paid to the Plan.

199.    In addition, the Wal-Mart Co-Fiduciary Defendants knew about, but failed to curtail the breaches of the Merrill Lynch Defendants.

200.    **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

201.    Wal-Mart, and the VP Retirement Plans Defendants knowingly participated in and undertook to conceal the Wal-Mart Prudence Defendants' breaches of fiduciary duty with respect to the Plan Investment Options by, *inter alia*, agreeing with Merrill Lynch to conceal the amount of revenue sharing and other kickback payments that Merrill Lynch received from the Plan Investment Options.

202.    Similarly, the Wal-Mart Co-Fiduciary Defendants knowingly participated in and knowingly undertook to conceal the Merrill Lynch Defendants' breaches of fiduciary duty with respect to the Plan Investment Options by, *inter alia*, failing to ensure that the Plan Investment Options were selected on their merits and not because of revenue sharing or other kickbacks that those fund companies paid to Plan Trustee Merrill Lynch.

203.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

204.    The Wal-Mart Monitoring Defendants enabled the Wal-Mart Prudence Defendants' breaches by failing to prudently monitor the performance of the Wal-Mart Prudence Defendants and to ensure that they were faithfully discharging their fiduciary duties with respect to the management and administration of Plan assets. Moreover, had any of the Defendants faithfully discharged his or her duty to prudently manage and administer the Plan and provide complete and accurate information to Plan participants regarding the negative impact the Plan Investment Options would have on their retirement savings, participants could have protected themselves from the losses incurred by the Plan.

205.    In addition, the Wal-Mart Defendants enabled the Merrill Lynch Defendants' breaches by failing to prudently monitor the performance of the Merrill Lynch Defendants and to ensure that they were faithfully discharging their fiduciary duties with respect to the management and administration of Plan assets.

206.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, the Class lost tens of millions of dollars of retirement savings.

207.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**E.    Count V: Prohibited Transactions Regarding Revenue Sharing and Other Kickback Payments.**

208.    Plaintiff incorporates herein the allegations set forth above.

209.    This Count alleges prohibited transactions against the following Defendants: Wal-Mart and the Retirement Plans Committee Defendants ("Wal-Mart Prohibited Transaction

Defendants"). As alleged above, the Wal-Mart Prohibited Transaction Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence, and the prohibited transaction provisions set forth in ERISA § 406, 29 U.S.C. § 1106.

210. As alleged above, the scope of the Wal-Mart Prohibited Transaction Defendants' fiduciary duties includes managing and administering the Plan and Plan assets, as well as causing the Plan to enter into transactions with parties in interest, including the Plan Trustee, Merrill Lynch, with regard thereto.

211. The Wal-Mart Prohibited Transaction Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) by causing the Plan to engage in transactions that they knew or should have known constituted a direct or indirect furnishing services between the plan and a party in interest. Specifically, the Wal-Mart Prohibited Transaction Defendants approved, authorized and caused the Plan to enter a contract and other arrangements with Merrill Lynch, the Plan Trustee, a party in interest, through and as a result of which Merrill Lynch obtained revenue sharing and other kickback payments from the Plan Investment Option companies, based on the value of Plan assets or number of positions invested in the Plan Investment Options, and, indeed, contracted with Merrill Lynch to conceal the amount of such payments from Wal-Mart employees and, thus, Plan participants.

212. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA § 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid*. Here, this exemption does not apply. The value of the services that Merrill Lynch purportedly provides in exchange for the revenue sharing and other kickback payments is nominal at best, and yet, the payments

are substantial. In truth, the payments are not for actual services performed, and, instead are merely kickbacks for inclusion of the Plan Investment Options in the menu of funds made available to Plan participants.

213. In addition, the Plan bears the expense of the revenue sharing and other kickback payments in that the cost of the revenue sharing and other kickback payments to the Plan Investment Option companies is passed through to the Plan by way of increased fees and expenses charged to the Plan by the Plan Investment Option companies. The Plan Investment Options, thus, charge more than they normally or otherwise would in the absence of revenue sharing and other kickback payments to a third party. Accordingly, the Wal-Mart Prohibited Transaction Defendants' conduct with respect to the revenue sharing and other kickback payments that Merrill Lynch received at the expense of the Plan constitutes prohibited transactions under ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

214. The Wal-Mart Prohibited Transaction Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(D) by causing the Plan to engage in transactions that they knew or should have known constituted a direct or indirect use by or for the benefit of a party in interest of any assets of the Plan.

215. Specifically, (1) the Wal-Mart Prohibited Transaction Defendants approved, authorized and caused the Plan to enter a contract or other arrangement with Merrill Lynch, the Plan Trustee, through which Merrill Lynch obtained revenue sharing and other kickback payments from the Plan Investment Option companies; (2) the Wal-Mart Prohibited Transaction Defendants knew or should have known that the Plan's contract or other arrangement with Merrill Lynch constituted a direct or indirect use by or for the benefit of a party in interest because the contract or other arrangement with Merrill Lynch enabled Merrill Lynch, a party in interest, to use and benefit from Plan assets in that: (a) Merrill Lynch, as the Plan Trustee, held

Case 6:08-cv-03109-GAF    Document 107    Filed 07/21/10    Page 69 of 93

the Plan assets in trust, and controlled the assets, and the kickback payments were derived from and, indeed, directly based on the value of Plan assets or number of positions invested in the respective Plan Investment Options; and (b) the revenue sharing and other kickback payments are themselves Plan assets, as that term is construed under ERISA: Merrill Lynch received and held the revenue sharing and other kickback payments as a result of its status as the Plan Trustee and fiduciary, and did so at the expense of Plan participants or beneficiaries as the revenue sharing and other kickback payments were not credited to the Plan or used to offset other fees charged to the Plan by Merrill Lynch, and the Plan Investment Option companies passed the cost of the revenue sharing and other kickback payments through to the Plan by increasing the fees and expenses charged to the Plan by the Plan Investment Options. In addition, the revenue sharing and other kickback payments came at the expense of the Plan in that only funds that paid revenue sharing and other kickback payments to Merrill Lynch were included in the menu of Plan funds. As a result, reasonably priced comparable and better performing funds, such as Vanguard funds, were excluded from the fund menu for the Plan.

216. As a direct and proximate result of the prohibited transactions alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

217. Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

F.      **Count VI: Failure to Prudently and Loyally Manage the Plan and Plan Assets.**

218. Plaintiff incorporates herein the allegations set forth above.

219. This Count alleges fiduciary breach against the Merrill Lynch Defendants (the "Merrill Lynch Prudence Defendants").

220. As alleged above, the Merrill Lynch Prudence Defendants are named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

221. The Merrill Lynch Prudence Defendants are obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

222. As alleged above, because they had and exercised discretion, authority, and control over Plan assets by influencing and participating in the selection of Plan Investment Options, determining which assets were made available through the Plan, and as well had the unilateral authority to alter, amend, or change the investment options, the scope of the fiduciary duties and responsibilities of the Merrill Lynch Prudence Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Merrill Lynch Prudence Defendants were required, among other things, to choose investment options based on the best interests of the Plan participants, avoid advising the Plan's other fiduciaries to select imprudent options that charged excessive fees, eliminate imprudent options from the fund line-up, evaluate the merits of the Plan's investments on an ongoing basis, and take all necessary steps to ensure that the Plan's assets were invested prudently and loyally as dictated by ERISA.

71

223.    Yet, contrary to their duties and obligations under ERISA, the Merrill Lynch Prudence Defendants failed to loyally and prudently manage the assets of the Plan in several respects: (1) The Merrill Lynch Prudence Defendants failed to implement a prudent procedure for evaluating, selecting, and monitoring the Plan Investment Options; (2) The Merrill Lynch Prudence Defendants selected and maintained the Plan Investment Options despite the fact that they knew or reasonably should have known that the Plan Investment Options are unreasonably expensive when compared to readily available less expensive comparable and better performing fund options, and included fees that were not incurred solely for the benefit of Plan participants; (3) The Merrill Lynch Prudence Defendants selected and continued to offer the Plan Investment Options despite the fact that they knew or reasonably should have known that the performance of the Plan Investment Options was in large part inferior to the performance of both actively and passively managed funds within the same stated indices that were significantly less expensive; and (4) The Merrill Lynch Prudence Defendants knew or should have known that revenue sharing and other kickback payments were paid by the Plan Investment Option companies to Merrill Lynch, the Plan Trustee; that such payments were not reasonable compensation for any actual services provided by Merrill Lynch, but rather included *quid pro quo* kickback payments for including the Plan Investment Options in the menu of funds made available to Plan participants; and that Merrill Lynch did not credit such payments to the Plan or offset fees and expenses charged to the Plan by Merrill Lynch by the amount of the revenue sharing and other kickback payments that exceeded the reasonable cost of Plan administration, and, instead, kept the payments—plan assets—for Merrill Lynch's own use and benefit.

224.    The Merrill Lynch Prudence Defendants failed to conduct an appropriate investigation of the merits of the Plan Investment Options, in particular, the impact the excessive fees charged by the Plan Investment Options had on participants' retirement savings, and the

ready availability of far less expensive options with comparable and often better performance. Such an investigation would have revealed to a reasonably prudent fiduciary that the Plan Investment Options are imprudent and are causing the Plan to waste tens of millions of dollars of participants' retirement savings.

225.    As a consequence of the Merrill Lynch Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plan suffered significant losses. If the Merrill Lynch Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

226.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Merrill Lynch Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**G.    Count VII: Prohibited Transactions Regarding Revenue Sharing and Other Kickback Payments.**

227.    Plaintiff incorporates herein the allegations set forth above.

228.    This Count alleges prohibited transactions against the Merrill Lynch Defendants ("Merrill Lynch Prohibited Transaction Defendants"). As alleged above, the Merrill Lynch Prohibited Transaction Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence, and the prohibited transaction provisions set forth in ERISA § 406, 29 U.S.C. § 1106.

229. As alleged above, the scope of the Merrill Lynch Prohibited Transaction Defendants' fiduciary duties includes managing and administering the Plan and Plan assets, as well as causing the Plan to enter into transactions with parties in interest, including the Plan Trustee, Merrill Lynch, with regard thereto.

230. The Merrill Lynch Prohibited Transaction Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) by causing the Plan to engage in transactions that they knew or should have known constituted a direct or indirect furnishing services between the plan and a party in interest. Specifically, the Merrill Lynch Prohibited Transaction Defendants approved, authorized and caused the Plan to enter a contract and other arrangements with Merrill Lynch, the Plan Trustee, a party in interest, through and as a result of which Merrill Lynch obtained revenue sharing and other kickback payments from the Plan Investment Option companies, based on the value of Plan assets or number of positions invested in the Plan Investment Options, and contracted with Wal-Mart to conceal the amount of such payments from Wal-Mart employees and, thus, Plan participants.

231. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA § 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, ***if no more than reasonable compensation is paid***. Here, this exemption does not apply. Merrill Lynch received far more than reasonable compensation for the services it provided to the Plan. In point of fact, as the Plan grew larger, Merrill Lynch received substantially more revenue, and yet, the services it agreed to provide did not change. Merrill Lynch received excessive compensation and retained it for its own use and benefit instead of remitting it to the Plan. Accordingly, the Merrill Lynch Prohibited Transaction Defendants' conduct violated ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

232.     The Merrill Lynch Prohibited Transaction Defendants also engaged in transactions prohibited by ERISA § 406(a)(1)(D) by causing the Plan to engage in transactions that they knew or should have known constituted a direct or indirect use by or for the benefit of a party in interest of any assets of the Plan.

233.     Specifically, the Merrill Lynch Prohibited Transaction Defendants approved, authorized and caused the Plan to enter a contract or other arrangement with Merrill Lynch, the Plan Trustee, through which Merrill Lynch obtained revenue sharing and other kickback payments from the Plan Investment Option companies.

234.     The Merrill Lynch Prohibited Transaction Defendants knew or should have known that the Plan's contract or other arrangement with Merrill Lynch constituted a direct or indirect use by or for the benefit of a party in interest because the contract or other arrangement with Merrill Lynch enabled Merrill Lynch, a party in interest, to use and benefit from Plan assets in that: (a) Merrill Lynch, as the Plan Trustee, held the Plan assets in trust, and controlled the assets, and the kickback payments were derived from and, indeed, directly based on the value of Plan assets or number of positions invested in the respective Plan Investment Options; and (b) the revenue sharing and other kickback payments are themselves Plan assets, as that term is construed under ERISA.

235.     The revenue sharing and other kickback payments are Plan assets because Merrill Lynch received and held the revenue sharing and other kickback payments as a result of its status as the Plan Trustee and fiduciary, and did so at the expense of Plan participants or beneficiaries. The payments were at the expense of Plan participants in that revenue sharing and other kickback payments that exceeded the value of the services purportedly provided by Merrill Lynch to the Plan were not returned to the Plan. In addition, the revenue sharing and other kickback payments came at the expense of the Plan in that only funds that paid revenue sharing

and other kickback payments to Merrill Lynch were included in the menu of Plan funds. As a result, reasonably priced comparable and better performing funds were excluded from the fund menu for the Plan.

236.    As a direct and proximate result of the prohibited transactions alleged herein, the Plan, and indirectly the Plaintiff and the other Class members, lost tens of millions of dollars of retirement savings.

237.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**H.    Count VIII:  Breach of Fiduciary Duty—Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

238.    Plaintiff incorporates herein the allegations set forth above.

239.    This Count alleges fiduciary breach against the Merrill Lynch Defendants (the "Merrill Lynch Communications Defendants").

240.    As alleged above, the Merrill Lynch Communications Defendants are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

241.    As alleged above, the scope of the fiduciary responsibility of the Merrill Lynch Communications Defendants includes the communicating with Plan participants regarding the fees and expenses charged by the Plan Investment Options and received by the Plan fiduciaries, including Merrill Lynch.

242.    In addition, the duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose

information that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.

243. The Merrill Lynch Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the following, such information being critical to participants' informed control over their Plan accounts:

> (a) The Plan Investment Options charge fees and expenses that are substantially higher than the fees and expenses charged by readily available fund options designed to track the same indices as the Plan Investment Options;

> (b) The performance of the Plan Investment Options is inferior to the performance of readily available actively and passively managed fund options that charge substantially lower fees and expenses;

> (b) The excessive fees and expenses charged by the Plan Investment Options substantially reduces participants' retirement savings because all such fees and expenses are paid from Plan assets;

> (c) While all of the Plan Investment Options enumerated above, *see supra* note 1 & accompanying text, are Retail Class shares, a plan the size of the Wal-Mart Plan has ready access to Institutional Class shares that charge substantially lower fees and expenses than the Plan Investment Options.

> (d) While several of the Plan Investment Options charge 12(b)(1) fees, such fees do not benefit Plan participants in any manner and there are readily available fund options designed to track the same indices that do not share 12(b)(1) fees;

(e)     Defendants did not select the Plan Investment Options or evaluate them on an ongoing basis based on whether the fees and expenses charged by the Plan Investment Options were reasonable and incurred solely in the interests of Plan participants;

(f)     Each of the Plan Investment Options paid revenue sharing and/or other kickbacks to Merrill Lynch, the Plan Trustee, based directly on the amount of assets invested or number of positions in each such option in the Plan; and

(g)     Revenue sharing and other kickback payments paid by Plan participants to Merrill Lynch were retained by Merrill Lynch and were not, in turn, paid to the Plan by Merrill Lynch.

244.     In addition, the Merrill Lynch Communications Defendants agreed with Wal-Mart to conceal from Wal-Mart employees the amount of revenue sharing and other kickback payments that Merrill Lynch received from the Plan Investment Options in exchange for the options being included in the line-up of funds offered to Plan participants.

245.     Moreover, the Merrill Lynch Communications Defendants concealed from Wal-Mart the true nature and amount of fees it received over time—some of which at least the Wal-Mart Defendants belatedly discovered. This concealment prevented the Wal-Mart Defendants from making complete and accurate disclosures to Plan participants.

246.     The Merrill Lynch Communications Defendants' omissions were material to participants' ability to exercise informed control over their Plan accounts. The omissions prevented participants from making informed decisions regarding the investment of their retirement savings in the Plan Investment Options, and as to investment in mutual funds with more attractive fee arrangements.

247.    The Merrill Lynch Communications Defendants' omissions, incomplete statements and misrepresentations alleged herein were Plan-wide and uniform because Defendants failed to provide complete and accurate information to any of the Plan's participants.

248.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiff and the Plan's other participants and beneficiaries have lost a significant portion of their retirement investment.

249.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## I.    Count IX: Co-Fiduciary Liability.

250.    Plaintiff incorporates herein the allegations set forth above.

251.    This Count alleges co-fiduciary liability against the Merrill Lynch Defendants ("Merrill Lynch Co-Fiduciary Defendants").

252.    As alleged above, the Merrill Lynch Co-Fiduciary Defendants are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence.

253.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he or she knows of such a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Merrill Lynch Co-Fiduciary Defendants breached all three provisions.

254.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts

under the circumstances to remedy the breach. Each Merrill Lynch Co-Fiduciary Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

255. In particular, the Merrill Lynch Co-Fiduciary Defendants knew that there were readily available fund options in the marketplace that charge substantially lower fees and expenses with comparable and better performance when compared against the indices that the Plan Investment Options were designed to track, and, thus, knew that the Wal-Mart Prudence Defendants had failed to satisfy their duty to prudently and loyally manage Plan assets by selecting and continuing to offer the Plan Investment Options during the Class Period; yet, the Merrill Lynch Co-Fiduciary Defendants failed to undertake reasonable efforts to remedy the Wal-Mart Prudence Defendants' imprudent conduct. The Merrill Lynch Co-Fiduciary Defendants also knew that the Wal-Mart Defendants had failed to ensure that the revenue sharing and other kickback payments received by Merrill Lynch was limited to reasonable compensation for the services purportedly provided by Merrill Lynch, yet, undertook no effort to remedy this breach.

256. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

257. The Merrill Lynch Co-Fiduciary Defendants knowingly participated in and undertook to conceal the Wal-Mart Prudence Defendants' breaches of fiduciary duty with respect to the Plan Investment Options by, *inter alia*, agreeing with Wal-Mart to conceal the amount of revenue sharing and other kickback payments that Merrill Lynch received from the Plan Investment Options, and by knowing the Plan communications provided incomplete and

inaccurate information regarding the amount of fees paid to Merrill Lynch, the basis of fees, and the extent to which participants bore such expense, as well as by concealing this information from participants.

258. **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

259. The Merrill Lynch Co-Fiduciary Defendants enabled the Wal-Mart Prudence Defendants' breaches by failing to ensure that they were faithfully discharging their fiduciary duties with respect to the management and administration of Plan assets, and by concealing the amount of revenue sharing and other kickback payments that Merrill Lynch received as a result of its authority and control of Plan assets. Moreover, had any of the Merrill Lynch Co-Fiduciary Defendants faithfully discharged his her or its duty to prudently manage and administer the Plan and provide complete and accurate information to Plan participants regarding the negative impact the Plan Investment Options would have on their retirement savings, participants could have protected themselves from the losses incurred by the Plan.

260. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, the Class lost tens of millions of dollars of retirement savings.

261. Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**J.**      **Count X: Federal Common Law Unjust Enrichment under ERISA.**

262.      Plaintiff incorporates herein the allegations set forth above.

263.      This Count alleges unjust enrichment against all Merrill Lynch Defendants.

264.      Merrill Lynch induced Wal-Mart to select it as provider, Trustee and recordkeeper for the Plan by submitting a bid which materially understated the total compensation it would earn directly and indirectly as a result of its status as provider, Trustee and recordkeeper for the Plan.

265.      Merrill Lynch knowingly and intentionally steered Wal-Mart, and therefore Plan Participants, into investment options which maximized the total compensation Merrill Lynch could derive from the Plan. Such funds were those with which Merrill Lynch had or could establish an "alliance" relationship through which Merrill Lynch would receive additional revenue sharing and other kickback payments based on Plan assets and investment positions.

266.      Merrill Lynch received revenue sharing and other kickback payments from the Plan Investment Options that far exceeded the value of the services that Merrill Lynch provided to the Plan and that were allowed by the contract Merrill Lynch entered into with the Wal-Mart. As such, revenue sharing and other kickback payments (including but not limited to "sub-transfer agent" or "sub-TA" fees) constituted unreasonable compensation to Merrill Lynch, which Merrill Lynch could not have received but for its status as Plan Trustee and its role as a service provider to the Plan.

267.      The excess compensation received by Merrill Lynch constitutes the receipt of something of value, to which Merrill Lynch was not reasonably entitled, and that it in good conscience should have repaid to the Plan.

268.     Merrill Lynch concealed from Wal-Mart and Plan participants the total amount of the fees it collected directly and indirectly as a result of its control of Plan assets, thereby collecting fees that Plan participants did not reasonably expect Merrill Lynch to receive.

269.     Merrill Lynch profited unjustly from the foregoing conduct, extracting and retaining millions of dollars of fees as a result of its control of Plan assets over and above any amount that could be considered reasonable compensation for the services provided by Merrill Lynch to the Plan.  These excess fees are directly traceable to Merrill Lynch, and can be determined through a full accounting of the fees received by Merrill Lynch in connection with the Plan.

270.     Under the federal common law of ERISA, the Plan and its participants are entitled to equitable restitution from Merrill Lynch of the excess amounts paid to Merrill Lynch by the Plan, the Plan Investment Options, and any other source due to Merrill Lynch's control of Plan assets, as well as other appropriate equitable relief to remedy Merrill Lynch's unjust enrichment.

**K.     Count XI:  Knowing Participation in a Breach of Fiduciary Duty (Pled in the Alternative).**

271.     Plaintiff incorporates herein the allegations set forth above.

272.     This Count alleges liability for knowing participation in a breach of fiduciary duty against all Merrill Lynch Defendants.

273.     To the extent that any of the Merrill Lynch Defendants is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, the Merrill Lynch Defendants knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity. Merrill Lynch fully understood the duties that fiduciaries have under ERISA.

274.     Despite its understanding of the duties of a fiduciary under ERISA, Merrill Lynch induced, encouraged and caused the other Plan fiduciaries to imprudently select and manage the Plan Investment Options. Specifically, Merrill Lynch induced Wal-Mart to select funds with which Merrill Lynch had or could establish an "alliance" relationship (and that would result in additional revenue sharing and other kickback payments to Merrill Lynch) by contractually obligating Wal-Mart to pay an additional annual per participant fee for adding any non-"alliance" fund Wal-Mart to the Plan. Merrill Lynch's actions not only caused Wal-Mart to act in Merrill Lynch's best interest rather than the best interest of the Plan participants but also resulted in imprudent and inferior funds that charged unreasonably high fees and expenses being placed into the Plan to the detriment of the Plan participants.

275.     Not only did Merrill Lynch receive revenue sharing and other kickback payments from the Plan Investment Options that far exceeded the cost to Merrill Lynch of providing actual services to the Plan, but Merrill Lynch also required Wal-Mart to conceal from Plan participants the amount of the fees paid to Merrill Lynch. *See supra* ¶¶ 145-147.

276.     Moreover, Merrill Lynch concealed from Wal-Mart many of the fees it collected, thereby furthering Wal-Mart's breach. *See supra* ¶¶ 129-138.

277.     Merrill Lynch also was the party in interest that was furnishing services to the Plan and receiving assets of the Plan through the fees it charged. As such, Merrill Lynch knew that Wal-Mart Prohibited Transaction Defendants were breaching their fiduciary duties by engaging in transactions prohibited by ERISA §§ 406(a)(1)(C) and 406(a)(1)(D) and participated in the breach by engaging in the prohibited transactions alongside the Wal-Mart Prohibited Transaction Defendants. *See supra* ¶¶ 208-217.

278.     Merrill Lynch profited from its knowing participation in Wal-Mart's fiduciary breaches, extracting millions of dollars of fees directly and indirectly from the Plan over and

above any amount that could be considered reasonable compensation for the services provided by Merrill Lynch. Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Plan is entitled to equitable restitution from Merrill Lynch with respect to the excess amounts paid to it by the Plan, as well as other appropriate equitable relief.

## X.  ERISA § 404(C) DEFENSE INAPPLICABLE

279.  ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

280.  ERISA § 404(c) does not apply here for several reasons.

281.  First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering the Plan Investment Options as investment options in the Plan as this is not a decision that was made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

282.  Secondly, even as to participant-directed investments in the Plan Investment Options, ERISA § 404(c) does not apply because Defendants failed to ensure effective

participant control by providing complete and accurate material information to participants regarding the Plan Investment Options. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in the Plan Investment Options as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investments.

283. Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff and the Class (as defined below) for losses caused by the Plan's investment in the Plan Investment Options is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class.

## XI. CAUSATION

284. The Plan has suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested during the Class Period, in breach of Defendants' fiduciary duties.

285. Defendants are liable for the Plan's losses in this case because (a) the Plan Investment Option were the result of the Wal-Mart and Merrill Lynch Prudence Defendants' decision to endorse those options; and (b) because all Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

286. Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminated the imprudent Plan Investment Options which have excessive fees and are unreasonable expensive, and prevented Merrill Lynch's unjust enrichment

at the expense of the Plan, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XII. REMEDY FOR BREACHES OF FIDUCIARY DUTY

287.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in the imprudent Plan Investment Options during the Class Period.

288.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

289.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

290.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investments and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investments available to them. The Court should adopt the measure of loss most advantageous to the Plan. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

291.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper, including disgorgement of unjust enrichment.

292.    Under ERISA and the federal common law, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

### XIII. CLASS ACTION ALLEGATIONS

293.    **Class Definition.**  Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants or others who are or may be liable for the conduct alleged herein, who are or were participants in or beneficiaries of the Wal-Mart Profit Sharing and 401(k) Plan and who have held assets in the Plan Investment Options at any time between July 1, 1997 and the present, as well as those who will become participants in or beneficiaries of the Wal-Mart Profit Sharing and 401(k) Plan in the future.

294.    **Class Period.**  The fiduciaries of the Plan knew or should have known at least by July 1, 1997, that the Plan Investment Options charged excessive fees and were unreasonably expensive, and therefore were imprudent.

295.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at

this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are more than 1,000,000 members of the Class.

296. **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(1). whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(2). whether Defendants failed to provide complete and accurate information to Plan participants regarding the Plan Investment Options and the nature of all expenses associated with these investments; and

(3). whether the members of the Class suffered losses and, if so, the proper measure of such losses.

297. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because: (a) the conduct of Defendants giving rise to the claims is identical as to all members of the Class; and (b) the losses suffered by the Plan, and, indirectly by Plan participants, are caused by Defendants Plan-wide breaches of fiduciary duty.

298. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in ERISA class action litigation and complex class action litigation generally. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

299. **Rule 23(b)(1)(B) Requirements.** Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which

would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

300. **Other Rule 23(b) Requirements.** Class action status is also warranted under the other subsections of Fed. R. Civ. P. 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A. An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment in the Plan Investment Options; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan participants would have made if Defendants had fulfilled their fiduciary obligations;

B. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

C. An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

D. An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

E. An Order requiring Defendants to provide an accounting of losses suffered to the Plan as a result of Defendants' breaches of their fiduciary duties;

F. An Order awarding actual damages in the amount of any losses the Plan suffered;

G. An Order awarding pre- and post-judgment interest based on the greatest of: (1) the Defendants' internal rates of return; (2) the Pension Benefit Guaranty Corporation's interest rates; or (3) statutory interest rates;

H. An Order awarding costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and other applicable laws or regulations;

I. An Order awarding attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and the common fund doctrine;

J. An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including but not limited to disgorgement of unjust enrichment obtained through the improper use of Plan assets or the collection of unreasonable compensation; and

K. Such other and further relief as to this Court may seem just and proper.

Dated this 21st day of July, 2010.

Respectfully submitted,

KELLER ROHRBACK L.L.P.

Lynn Lincoln Sarko, WSBA #16569
Michael Woerner, WSBA #15452
Derek W. Loeser, WSBA #24274
Gretchen Freeman Cappio, WSBA #29576
Gretchen S. Obrist, WSBA #37071
1201 Third Avenue, Suite 3200

Seattle, WA  98101-3052
Telephone: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
mwoerner@kellerrhrback.com
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com
gobrist@kellerrohrback.com

ALESHIRE ROBB P.C.
Gregory W. Aleshire, MOBAR #38691
William R. Robb, MOBAR #43322
2847 S. Ingram Mill Rd., Suite A-102
Springfield, MO  65804
Telephone: (417) 869-3737
Fax: (417) 869-5678
arslaw@arslaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following: William C. Martucci, Kristen A. Page, Katherine R. Sinatra, Morgan D. Hodgson, Paul J. Ondrasik, Jr., and Eric Serron. There are no non-CM/ECF participants.

/s/ Linda J. Vandiver
Linda J. Vandiver