# EXHIBIT C

# Merrill Lynch Group Employee Services
## Servicing Agreement

AGREEMENT dated ~~April~~ May 9 , 1997 and effective as of February 1, 1997 ("Effective Date") between Wal-Mart Stores, Inc. ("Employer") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch").

WHEREAS, the Employer maintains the Wal-Mart 401(k) Retirement Savings Plan (the "Plan") under which Merrill Lynch Trust Company of America, an affiliate of Merrill Lynch, has been appointed as Trustee (the "Trustee"); and

WHEREAS, the Employer desires to retain Merrill Lynch to perform certain recordkeeping and investment services relating to the Plan and Merrill Lynch is willing to perform the services described below on the terms and conditions of this Agreement;

NOW, THEREFORE, the Employer and Merrill Lynch agree as follows:

## Section 1.  Implementation of the Plan

(a)  Merrill Lynch and the Employer shall have begun work on the implementation of the recordkeeping services described herein to the Plan no later than January 8, 1997.  Merrill Lynch agrees to begin processing Plan enrollments as of June 9, 1997 and payroll deferrals no later than July 15, 1997, subject to Section 1(b).  Only upon written mutual agreement by both parties may these dates be adjusted.

(b)  The Employer shall provide Merrill Lynch all information needed to enable Merrill Lynch to implement the services described above in Section 1(a), and the Employer shall also perform all other duties and obligation necessary to Merrill Lynch to implement such services.

## Section 2.  Merrill Lynch Recordkeeping and Investment Services

During the term of the Agreement, Merrill Lynch will:

(a)  establish such number of securities accounts (each a "Securities Account") in the name of the Trustee as are necessary for Merrill Lynch to properly execute transactions in and maintain records of the investment options under the Plan, which Securities Account shall be maintained by Group Employee Services, a business unit of Merrill Lynch, subject to the terms and conditions of such securities accounts generally, the current form of which is attached hereto as Attachment A;

(b)  establish a Recordkeeping Account for each Participant which will be divided to track the manner in which the contribution types specified in the Merrill Lynch Group Employee Services Plan Profile ("Plan Profile"), which shall be evidenced in writing and executed by the parties and attached hereto as Attachment C, are invested and the earnings attributable to each of the contribution types;

(c)  maintain with respect to each Recordkeeping Account standing investment instructions in the form of an "investment matrix" specified, and revised from time to time, by the Participant involved or the "Named Administrative Fiduciary", as defined in the trust agreement with Merrill Lynch,  of the Plan for those participants failing to direct the investment of their Recordkeeping Account;

WMHOp-401026-011-00000248

(d) prepare in conjunction with the Employer a Plan Administrative Manual ("Administrative Manual") setting forth the various other recordkeeping services to be provided by Merrill Lynch (including, but not limited to, contribution processing, participant investment transfers, participant telephone services, Employer reports, Participant statement, and distribution processing) and the procedures and service standards applicable thereto. The terms of such Administrative Manual are incorporated herein by reference and made a part of this Agreement and shall only be prepared or amended with the mutual consent of the Employer and Merrill Lynch; provided, however, nothing herein shall limit the Employer's right to amend the Plan;

(e) prepare customized Participant communication materials in conjunction with the Employer informing Plan Participants of provisions and changes in the Plan and their investment alternatives under the Plan for the initial rollout as well as following the implementation at the same compensation rates as described in Section 4 of this Agreement and all Attachments to this Agreement. All Participant communications must be approved by the Employer before being sent to Plan Participants; provided, however, this does not give the Employer the right to modify documents prepared by Merrill Lynch which were not prepared exclusively for the Employer. Participant communications shall be distributed at the times and in the manner directed by the Employer or Named Administrative Fiduciary (as specified or determined under the Plan);

(f) make available to all Plan Participants prior day balances by 8 a.m. E.S.T. each business day at least 95% of the time, as measured quarterly, where the equity prices and information (NASDAQ or equivalent file) was made available to Merrill Lynch by 8:00 p.m. E.S.T., where the mutual fund prices and information (NSCC Interactive Pricing Service or equivalent file) was made available to Merrill Lynch by 7:00 p.m. E.S.T., where the collective trust prices and information was made available to Merrill Lynch by 7:00 p.m. E.S.T., and where the balanced (or as provided in Section 2(ff)) Employer payroll data transmission was made available to Merrill Lynch three days prior to the posting of the accounts;

(g) at the direction of the fiduciary specified or determined under the Plan as responsible for monitoring compliance with the Plan's confidentiality of information procedures relating to employer stock held under the Plan (the "Confidentiality Fiduciary"), make arrangements at no extra cost to the Employer or the Plan for an independent fiduciary to carry out any activities relating to situations which the Confidentiality Fiduciary determines involve a potential for undue Employer influence upon Participants and beneficiaries with regard to the direct or indirect exercise of shareholder rights under section 404(c) of ERISA.

(h) do all things necessary to help the Employer and Named Administrative Fiduciary to (i) comply with the requirements of Section 404(c) of ERISA and (ii) satisfy its legal obligations under the Plan;

(i) make available 24 hours a day, seven days a week, at least 95% of the time, as measured quarterly, a voice response system;

(j) respond to participants' requests relating to their account in the Plan within at least five business days and communicate the response to the Participant immediately upon resolution. If the request cannot be resolved within five business days, the Participant shall be advised of the status of the request, at least every 48 hours, to the extent practicable, until a resolution is reached;

(k) conduct a survey developed jointly with the Employer at least quarterly or such other times as mutually agreed upon by the parties, of active Participants serviced by Merrill Lynch Participant

WMHOp-401026-011-00000249

Service Representatives ("PSR"). The survey shall determine the Participant's satisfaction with the service provided by the PSR's in at least the areas of courtesy, helpfulness, and overall service delivery. Merrill Lynch shall take all actions as are reasonably appropriate to achieve a service delivery satisfaction rating of at least 90%;

(l) timely prepare and mail to participants and applicable state and U.S. federal government agencies income reporting and withholding information associated with Plan distributions;

(m) obtain the prior written consent of the Employer to any references to the Employer, its parent corporation, subsidiaries, or affiliates in any communications or document pertaining to the Plan prepared by Merrill Lynch or on behalf of Merrill Lynch by any entity other than Merrill Lynch;

(n) notify the Employer as soon as possible of any bankruptcy, insolvency, moratorium, merger or other proceeding in respect of Merrill Lynch, a subsidiary or affiliate, affecting the services to be provided by Merrill Lynch, a subsidiary or affiliate, under this Agreement and, unless the Employer receives assurance satisfactory to it that the services to be provided hereunder will not be affected, the Employer shall have the option to terminate this Agreement immediately;

(o) timely prepare for review by the Employer required annual reports (and schedules) required under ERISA, provide revalued statement, SAS 70 Report, Schedule 'P', Proof of Department of Labor filings (Common/Collective Funds), audit interface and such other information reasonably requested by the Employer to timely and accurately fulfill its filing requirements under ERISA as "plan administrator;"

(p) at such times as requested by the Employer or Named Administrative Fiduciary, with respect to Employer stock investments provide a file to the Employer's designated transfer agent with record date shares in the format required by the transfer agent;

(q) make available pilot internet access to eligible Plan Participants by the end of August, 1997, with full rollout of such services at such times as are mutually agreeable by the parties;

(r) process payroll deferrals and employer contributions no later than three (3) business days after receipt of a balanced (or as provided in Section 2(ff)) transmission tape;

(s) ensure Group Employee Services' compliance with the year 2000 programming requirement by the end of 1998;

(t) provide a back-up site for its computer operations, i.e., a disaster recovery plan;

(u) provide Employer with a qualified and dedicated team of PSR's for customer service;

CONFIDENTIAL

(v) as soon as practicable upon written request of the Named Administrative Fiduciary, add to the Plan an investment option contained in the then current Plan Profile or delete from the Plan an investment option, at no additional charge to the Plan or the Employer (other than additional charges referred to in the Plan Profile); provided, however, that Merrill Lynch shall use its best efforts to add to the Plan Profile and provide under the Plan an investment option requested by the Named Administrative Fiduciary, and use its best efforts to maintain a broad selection of investment options under the Plan Profile, it being understood that before Merrill Lynch can add an investment option to the Plan Profile, Merrill Lynch must enter into an agreement covering fees and operational issues (such as daily pricing and settlement of trades);

(w) initiate trades within one business day after Merrill Lynch processes a balanced (or as provided in Section 2(ff)) payroll tape or transmission and receives funds for investment;

(x) mail trust statements to the Employer within fifteen (15) business days after the end of each month. For any period this standard is not met, except for any failure to meet such standard caused by Employer's request for an adjustment after month end, Merrill Lynch shall reduce the recordkeeping fee for that month by 5%;

(y) in the manner directed by the Named Administrative Fiduciary or Employer, ship Participant statements to the Employer at its corporate headquarters or as otherwise mutually agreed upon, within twenty (20) business days after the end of each plan quarter. For any quarter this standard is not met, Merrill Lynch shall reduce the recordkeeping for that quarter fee by 10%;

(z) mail Plan Sponsor standard reports within 15 days after the end of each month or quarter depending on the nature of the report, or such other ad hoc reports as mutually agreed upon by the parties at such times as agreed upon by the parties. For any month or quarter this standard is not met, Merrill Lynch shall reduce the recordkeeping fee for the respective month or quarter by 5%;

(aa) process automated enrollments of new Participants and Participant indicative data changes within two (2) business days;

(bb) mail to the Employer 401(k) non-discrimination testing reports within fifteen (15) business days after Merrill Lynch receives employee census tape including salary and non-Participant data; and

(cc) process all participant initiated transactions, not involving Employer stock, which are received by 3 p.m. E.S.T. within one business day and mail or distribute Plan benefits within two business days of receiving proper direction from the Participant or Named Administrative Fiduciary, as the case may be;

(dd) process all participant initiated transactions involving Employer stock, which are received by 3 p.m. E.S.T., within three (3) business days and mail or distribute Plan benefits within five (5) business days of receiving proper direction from the Participant or Named Administrative Fiduciary, as the case may be;

(ee) perform its services hereunder in accordance with all provisions of this Agreement, the Plan document (to the extent it does not conflict with this Agreement), the Plan's trust agreement, ERISA and those requirements of the Code applicable to the Plan; provided, however, in the event of any adopted or implemented Plan interpretation, rule or amendment (other than the addition of Plan loans to Participants or the extension of coverage to Puerto Rico in the manner specified in Section 25), which materially affects Merrill Lynch's operational requirements for its effective performance of its responsibilities

WMHOp-401026-011-00000251

under this Agreement, the fees and expenses provided for in Section 4 and Attachment C may be appropriately adjusted as mutually agreed upon by the parties;

(ff) notwithstanding any provision herein requiring a "balanced" transmission from the Employer to Merrill Lynch as a condition precedent to the performance of a Merrill Lynch service, Merrill Lynch shall proceed with such service if directed in writing (including fax transmissions) by the Named Administrative Fiduciary. Such service shall be performed by Merrill Lynch within the applicable time periods otherwise specified herein, but calculated from the date such written direction is received by Merrill Lynch. In the event any transmission is not "balanced," Merrill Lynch shall, immediately upon such discovery, inform the Named Administrative Fiduciary or its designee of such fact and its inability to perform the applicable service. The provisions of Section 7(b) shall expressly apply to any actions taken by Merrill Lynch in accordance with the written directions provided by the Named Administrative Fiduciary under this Section 2(ff); and

(gg) process and account for participant Plan loans, if the Plan is amended to permit the same, at fees specified in Attachment C.

## Section 3. Employer Responsibilities

During the term of the Agreement, the Employer or the Plan's Named Administrative Fiduciary, as determined in accordance with the Plan and Trust, will:

(a) assume the responsibilities and perform the duties set forth in the Administrative Manual;

(b) be solely responsible for the administration of the Plan, for directing Merrill Lynch in providing the proper nondiscretionary ministerial services for the Plan, for ensuring that the provisions of the Plan are consistent with the provisions of this Agreement, and for the execution and filing with any governmental authority or other person of all reports or documents required in connection with the Plan; except the preparation of applicable Plan state and U.S. federal income and withholding forms shall be the responsibility of Merrill Lynch.

(c) be solely responsible for reviewing each report and statement received by the Employer that is issued by Merrill Lynch in connection with this Agreement, and unless Merrill Lynch receives written notice from the Employer of any incorrectness, incompleteness or inaccuracy, with respect to information that the Employer has actual knowledge of (or would have had actual knowledge had the Employer, under the facts and circumstances, exercised reasonable efforts to review such reports or statements) in the report or statement, within 60 days after the receipt of the report or statement, then each such report or statement shall be deemed correct and, notwithstanding Section 7(c), Merrill Lynch or any of its affiliates shall not be responsible for the cost of any subsequent corrections of items previously deemed correct.

(d) obtain the prior written consent of Merrill Lynch to any references to Merrill Lynch or to services to be furnished by Merrill Lynch in any communication or document pertaining to the Plan; provided that Merrill Lynch shall have no responsibility or liability for the content of any such communication or document;

(e) notify Merrill Lynch as soon as possible of any bankruptcy, insolvency, moratorium or other proceeding in respect of the Employer affecting the enforcement of creditors' rights and, unless Merrill Lynch receives assurance satisfactory to it that it will receive full consideration for such services to be

WMHOp-401026-011-00000252

provided hereunder, Merrill Lynch will have no obligation to perform any services hereunder subsequent to the commencement of any bankruptcy, insolvency, moratorium or other proceeding;

(f) promptly notify Merrill Lynch of any change in the information specified in the Plan Profile or Administrative Manual, or of any amendment to the Plan or interpretation thereof that may affect Merrill Lynch's performance of its services hereunder.

## Section 4. Merrill Lynch Compensation

(a) The Employer will pay or cause the Trustee to pay, to Merrill Lynch the fees and expense reimbursements indicated in the Plan Profile for the services involved and any fees for additional services pursuant to Section 4(b) within 30 days of the date of receipt of Merrill Lynch's invoice for such charges. In the event such fees remain unpaid for a period of 60 days after the date of Merrill Lynch's invoice and Merrill Lynch has not received a written notice of dispute with respect to such fees, such fees shall be a proper charge against the assets of the Trust, unless the Employer has informed Merrill Lynch of its intention to pay such fees and pays such fees within 90 days of the original invoice.

(b) In the event Merrill Lynch performs services which are deemed to be additional services under the terms of this Agreement, but not included in the Plan Profile, charges for such services will be negotiated in advance with the Employer but in no event will the charges be in excess of Merrill Lynch's then current fees for such services.

(c) The Employer authorizes Merrill Lynch and/or its affiliates to receive payments from mutual funds (and/or collective trusts) for which no affiliate of Merrill Lynch acts as investment manager or adviser (or from the principal distributor and/or advisors of those funds or trusts), in connection with the performance of reasonable and necessary services and expenses (including recordkeeping, subaccounting, account maintenance, administrative and other shareholder services). Because different mutual funds (or collective trusts) may be subject to different fee arrangements, the Employer should contact Merrill Lynch to obtain further details on any specific fee arrangements that my be applicable to investments under the Plan. Within 90 days of the written request of the Employer of Named Administrative Fiduciary, Merrill Lynch shall provide a written report (the "Written Fee Report"), in the form reasonably requested by the Employer or Named Administrative Fiduciary, detailing the source and amount of such payments for the period requested. The Employer agrees that it will not, nor will it permit any employee of the Employer, to disclose, in whole or in part, the Written Fee Report or any information in the Written Fee Report, to any person, organization, entity or enterprise for any reason or purpose whatsoever; provided, however, the Employer shall be permitted to disclose such relevant information from the Written Fee Report when such disclosure is required in response to an order of a court of competent jurisdiction or for an audit, investigation or inquiry by a governmental entity under either the Internal Revenue Code or ERISA or when such information in the Written Fee Report is in the public domain. This obligation of the Employer not to disclose the Written Fee Report or any information in the Written Fee Report shall survive the termination of this Agreement. The Employer and Merrill Lynch agree that in the event of a disclosure of the Written Fee Report or any information in the Written Fee Report by the Employer and/or any of its employees, contrary to the terms of this Agreement, Merrill Lynch may terminate this Agreement immediately.

## Section 5. Term

(a) The initial term of this Agreement shall be for a period of five years from the effective date of this Agreement. Thereafter, this Agreement shall automatically be renewed for additional periods of one year unless either party notifies the other in writing at least 120 days prior to the scheduled expiration date that the Agreement shall be terminated by such party. The Merrill Lynch compensation

WMHOp-401026-011-00000253

WAL059231

provided in Section 4 of this Agreement and in the Attachments hereto shall be in effect for the five year initial period. Thereafter, for each annual period this Agreement is renewed Merrill Lynch shall be compensated as provided in Section 4 of this Agreement and in the Attachments hereto unless otherwise modified by mutual agreement by the parties at least 120 days prior to the commencement of such annual renewal period.

(b) Notwithstanding the provisions of Section 5(a) above, the Employer may terminate this Agreement, with or without cause, upon at least 120 days prior written notice delivered to Merrill Lynch and Merrill Lynch may terminate this Agreement "for cause" upon 120 days prior written notice to the Employer. For this purpose, the phrase "for cause" shall mean: (1) failure of the other party to comply substantially with this Agreement and the Attachments hereto which, when called to the attention of the other party in writing has not been corrected within 30 days; (2) the fraud or embezzlement on the part of the other party or its permitted assigns or delegates; or (3) if the other party ceases to conduct business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or avails itself of, or become subject to, any proceeding under the Federal Bankruptcy Act or any other statute of any state relating to insolvency or the protection of the rights of creditors.

(c) In the event Merrill Lynch is required to perform any service subsequent to termination of this Agreement, but prior to complete transfer of the functions performed by Merrill Lynch thereunder to a successor or complete termination of the Plan and distribution of the trust thereunder, the provisions of Section 4 shall continue to apply with respect to such services; provided, however, if the Agreement is terminated by either party, the Employer shall reimburse Merrill Lynch for all costs and expenses incurred by Merrill Lynch in performing extraordinary (e.g., computer programming to be compatible with the successor, customized employee communications regarding such termination, and consulting with the successor after the transfer of services has been made to the successor) services necessary to accomplish the transfer. There shall be no other termination fees charged to the Employer if the Agreement is terminated. Notwithstanding the foregoing, in the event the Agreement is terminated by the Employer "for cause," Merrill Lynch shall not charge the Employer for the first $100,000 incurred of the costs and expenses referred to above, the Employer shall make reimbursement of the next $400,000 of such costs and expenses, and Merrill Lynch shall be solely responsible for any such costs or expenses in excess of $500,000.

(d) In the event of termination, Merrill Lynch shall use its best efforts to convert the services hereunder to a successor provider. Upon termination, Merrill Lynch agrees to transfer all documents and records, paper or otherwise, to the Employer or successor provider, as designated by the Employer.

## Section 6. Survival

The provisions of Sections 3(c), 3(d), 2(l),(o) , 7, 8, 9 and 10 of this Agreement shall survive the termination of this Agreement.

## Section 7. Responsibility for Errors; Indemnification

(a) The Employer will promptly notify Merrill Lynch of any errors or omissions in information supplied by the Employer to Merrill Lynch. In such an event, Merrill Lynch's sole obligation shall be to use its reasonable best efforts to immediately correct any resulting errors in its own records or in any reports it has prepared for the Employer or any Participant in the manner directed by the Named Administrative Fiduciary.

WMHOp-401026-011-00000254

CONFIDENTIAL

WAL059232

(b)  The Employee will defend, indemnify and hold harmless Merrill Lynch, its subsidiaries and affiliates, and their directors, officers, employees and agents, and any subcontractor to which Merrill Lynch (as permitted by Section 13) has delegated its duties under the Agreement (collectively, the "Merrill Lynch Group") from and against all claims, liabilities, losses, damages, governmental penalties or expenses, including attorneys' fees, asserted by the Employer, Named Administrative Fiduciary and Named Investment Fiduciary and their delegates, any Participant or any other person or entity, (i) arising out of any failure of the Employer, its subsidiaries or affiliates, their officers, director or employees , the Named Administrative Fiduciary and Named Investment Fiduciary and their delegates (collectively, the "Employer Group") to supply timely and accurate information needed to enable Merrill Lynch to discharge its duties under the Agreement, the Plan or by law, (ii) arising out of the Employer Group's negligence, willful misconduct, breach of this Agreement, or actions inconsistent with those required by ERISA or by law, or (iii) arising out of any other cause of action relating to the subject matter  of this Agreement, other than those arising from the Merrill Lynch Group's own negligence, willful misconduct, breach of this Agreement or actions inconsistent with those required by ERISA or by law.

(c)  Merrill Lynch, a subsidiary or an affiliate will, at its own expense (except as provided in Section 3(c)), correct or cause the prompt correction of any errors attributable to errors of its employees or permitted subcontractors or agents hired pursuant to Section 13.  Any such correction shall be in the manner reasonably directed by the Employer or Named Administrative Fiduciary.

(d)  Merrill Lynch will defend, indemnify and hold harmless the Employer, its subsidiaries and affiliates, and their directors, officers and employees, the Plan, the Named Administrative Fiduciary and Named Investment Fiduciary and their delegates, from and against all claims, liabilities, losses, damages, governmental penalties or expenses, including attorneys' fees, asserted by the Employer, Named Administrative Fiduciary and Named Investment Fiduciary and their delegates, any Participant or any other person or entity, (i) arising  out of any failure of the Merrill Lynch Group to supply timely and accurate information needed to enable the Employer, the Named Administrative Fiduciary or Named Investment Fiduciary to discharge its duties under the Agreement, the Plan or by law, or (ii) arising out of the Merrill Lynch Group's negligence, willful misconduct, breach of this Agreement, or actions inconsistent with those required by ERISA or law, other than those arising from the Employer Group's own negligence, willful misconduct, breach of this Agreement or actions inconsistent with those required by ERISA or by law.

(e)  In case of errors or loss of data caused by power failure, mechanical difficulties with information storage and retrieval systems, or similar events not attributable to its own negligence or willful misconduct or to the negligence or willful misconduct of its agents or subcontractors, Merrill Lynch's sole obligation will be, at its own expense, to use its reasonable efforts to reconstruct any records maintained by Merrill Lynch and to amend any reports prepared by it which have been affected by such event.  Performance by Merrill Lynch of its obligations under this Agreement is subject to appropriate adjustment and extension of time in the event of strike, fire, war, insurrection, riot, electrical failure or any other event that would constitute force majeure under New York law, or in the event of a circumstance beyond Merrill Lynch's control.

## Section 8.  Non-Solicitation

No Merrill Lynch employee or employees of a subsidiary or affiliate thereof shall use the Employer's 401(k) business as a means to solicit business from the Employer's associates.  No Merrill Lynch employee or employee of a subsidiary or affiliate thereof shall distribute business cards or any other non-401(k) information in any of the Employer's stores or facilities or the stores or facilities of the

WMHOp-401026-011-00000255

Employer's parent corporation, subsidiaries or affiliates without the written consent of the Senior Vice-President of Benefits of the Employer.

Merrill Lynch and its subsidiaries or affiliates shall keep all Employer's employees (referred to as "Associates") information, including Associate identities, confidential and under the strictest security and shall not allow access to the data without the written consent by the Senior Vice-President of Benefits of the Employer.

This Section 8 does not apply to a Merrill Lynch employee who may solicit the Employer's associate in the course of Merrill Lynch's normal retail brokerage business without the knowledge of the information maintained by Merrill Lynch Group Employee Services pertaining to the Employer's associate.

In the event of a violation of this Section 8, the Employer may in its sole discretion elect to terminate this Agreement. In the event of an egregious violation of this Section 8, by way of illustration the use of confidential Plan-related information by Merrill Lynch or its affiliates on a broad and concerted basis, notwithstanding anything herein to the contrary Merrill Lynch shall not be entitled to any fees or expenses relating to the termination and shall additionally be responsible for all reasonable and necessary costs to convert the services hereunder to a successor provider. In the event this Agreement is terminated due to a non-egregious violation of this Section 8, by way of illustration the isolated and nonrecurring solicitation by Merrill Lynch employees or agents with the knowledge of the information maintained by Merrill Lynch Group Employee Services pertaining to the Employer's associates, Merrill Lynch shall not be entitled to any fees or expenses otherwise provided hereunder relating to such termination and shall be responsible for all reasonable and necessary costs to convert to a successor provider, up to $100,000, only if: (i) written notice of such non-egregious violation is provided to the Senior Vice President of Merrill Lynch; and (ii) Merrill Lynch fails to timely implement such policies or to take such actions as are reasonably necessary to prevent such non-egregious violation from reoccurring in the future. Merrill Lynch shall provide written notice of any such corrective policies or actions to the Employer.

## Section 9. Proprietary Information

The Employer agrees that all computer programs, software, forms, plans and procedures developed by or on behalf of Merrill Lynch to perform the services required under this Agreement are trade secrets or other property of Merrill Lynch

Merrill Lynch agrees that all computer programs, software, forms, plans and procedures developed solely by the Employer to perform the services required under this Agreement are trade secrets or other property of the Employer, and that all participant videos or communications developed by the Employer are copyrighted or other property of the Employer.

## Section 10. Confidentiality of Records

(a) Merrill Lynch will treat confidentially by not disclosing to unaffiliated persons all records of the Plan and will not, without written authority from the Employer or Named Administrative Fiduciary, disclose to such unaffiliated persons during the term of this Agreement or thereafter any such records or information except (i) to the Trustee, any administrator of the Plan or any other person as may be necessary in connection with the proper operation of this Agreement and the Plan, (ii) incident to an assignment, subcontract or service contract or relationship permitted by Section 13 of the Agreement,

WMHOp-401026-011-00000256

(iii) in connection with an audit or regulatory examination once a valid subpoena has been issued or written permission has been obtained by the Employer or the Named Administrative Fiduciary, or (iv) as may otherwise be legally required by a court order.

(b) During the term of the Agreement all records of the Plan in the possession of Merrill Lynch will be open to inspection and audit at any reasonable time by the Employer, the Named Administrative Fiduciary or its delegates during normal business hours.

WMHOp-401026-011-00000257

CONFIDENTIAL                                                        WAL059235

**Section 11.  Status of Parties**

The relationship of the parties to each other in the execution and performance of the Agreement shall be that of independent contractors.  Nothing in the Agreement or with respect to the obligations or services of Merrill Lynch in connection with the Agreement shall constitute Merrill Lynch a fiduciary of the Employer, the Plan, any Participant or any other person under ERISA.

**Section 12.  Persons Acting on Behalf of the Employer**

Any action to be taken or notice to be given by the Employer or Named Administrative Fiduciary under this Agreement may be taken or given by any other person duly authorized to act on behalf of the Employer or Named Administrative Fiduciary, provided that the Employer or Named Administrative Fiduciary gives Merrill Lynch prior written notice of such person's authorization.  Merrill Lynch may continue to rely upon notices and instructions received from such person until it receives notice to the contrary. Nothing in this Section 12 will be deemed to release the Employer or Named Administrative Fiduciary from any obligation.

**Section 13.  Assignment/Subcontracts**

Neither party may assign this Agreement or any right or obligation hereunder either in whole or in part without the written consent of the other party, except that (i) Merrill Lynch or the Employer may assign any or all of its rights and duties hereunder to any subsidiary or affiliate of Merrill Lynch & Co., Inc. or Wal-Mart Stores, Inc., respectively and (ii) Merrill Lynch may employ independent subcontractors or other agents to render services otherwise to be performed by Merrill Lynch under this Agreement as long as the services involved are not all or substantially all of the services to be performed by Merrill Lynch hereunder and prior written consent has been obtained by the Employer, to the extent practicable, which consent is not to be unreasonably withheld.  Merrill Lynch may also contract with or establish relationships with third parties, once prior written consent has been obtained by the Employer, which consent is not be unreasonably withheld for the provision of services to Merrill Lynch which are necessary or useful to Merrill Lynch in connection with the services or activities of Merrill Lynch required or permitted by this Agreement.  No assignment or subcontract pursuant to this Section shall be construed to relieve Merrill Lynch from its responsibility to perform the services, duties or obligations specified under this Agreement.

**Section 14.  Authorization of Merrill Lynch**

By execution of this Agreement, the Employer authorizes Merrill Lynch, its permitted subcontractors, agents and assigns, to execute trades in the Securities Account and to issue all appropriate instructions on behalf of the Plan to the Trustee and to any transfer agent, insurance company, bank or broker-dealer as are necessary or appropriate in connection with the performance of Merrill Lynch's services hereunder, and any such person may conclusively rely on a copy of this Agreement as proof of Merrill Lynch's authority to issue such instructions until notified otherwise by the Employer in writing and shall be under no obligation to inquire as to the propriety of any instruction issued pursuant to that authority.  In the event that Employer stock is among the investment options specified in the Plan Profile, Merrill Lynch will execute purchases of the stock in accordance with the provisions set forth in Attachment B to this Agreement and, by execution of this Agreement, the Employer appoints Merrill Lynch as agent for that purpose as specified in that Attachment.

WMHOp-401026-011-00000258

CONFIDENTIAL

WAL059236

**Section 15. Representations and Warranties**

(a) The Employer hereby represents and warrants that it has full power, authority and capacity to execute and deliver this Agreement and perform its obligations hereunder on behalf of itself and on behalf of the parent corporation, subsidiary or affiliate of the Employer participating in the Plan, that the Plan includes all necessary provisions in this regard, and that this Agreement constitutes a legal, valid and binding obligation of the Employer, enforceable against the Employer in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights generally. The Employer also hereby represents and warrants that prior to agreeing to the inclusion of any registered investment company in the Plan Profile for any purpose, the Employer, or such other "named administrative fiduciary" under the Plan as is appropriate for the purpose under the Plan and ERISA, has read or shall have read the current prospectus for that registered investment company.

(b) Merrill Lynch hereby represents and warrants that it has full power, authority and capacity to execute and deliver this Agreement and perform its obligations hereunder on behalf of itself and on behalf of any subsidiary or affiliate of Merrill Lynch, and that this Agreement constitutes a legal, valid and binding obligation of Merrill Lynch, enforceable against Merrill Lynch in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights generally.

(c) Merrill Lynch hereby represents and warrants that it has disclosed to the Employer the nature and amounts of all direct or indirect compensation, whether paid directly or indirectly by the Employer, the Plan or another party, which it, its subsidiaries or affiliates, or permitted subcontractors will receive as a result of the services and transactions contemplated by this Agreement, that such direct or indirect compensation is reasonable in light of the services to be undertaken under this Agreement, and that any such compensation arrangement does not constitute a prohibited transaction under ERISA or the Code.

**Section 16. Legal Compliance**

During the term of this Agreement, Merrill Lynch, at no extra cost to the Plan or Plan Participants, shall:

(a) monitor the I.R.C. Section 415 limits for the Plan, provided Employer timely furnishes Merrill Lynch with necessary information not in the possession of Merrill Lynch;

(b) assist the Employer and the Named Investment Fiduciary in complying with Section 404(c) of ERISA, including but not limited to the prospectus requirement of Section 404(c);

(c) process Qualified Domestic Relations Order ("QDRO") payouts at the direction of the Plan Administrator; and

(d) process hardship withdrawal requests based on the safe harbor parameters established by the Employer and agreed upon by Merrill Lynch;

(e) such other services as specified in the Plan Manual.

WMHOp-401026-011-00000259

**Section 17. Notices**

Any notice or instruction to be given under this Agreement shall be in writing or on such other medium and in such format as may be agreed to by the Employer and Merrill Lynch, and delivered by hand, or sent by certified mail, postage prepaid, return receipt requested, or by courier or overnight delivery service, to the address listed below or to such other address as may be designated in a written notice transmitted in accordance with this Section 17:

If to Merrill Lynch:

Group Employee Services
Merrill Lynch, Pierce, Fenner & Smith Incorporated
3840 South Wadsworth Boulevard
Denver, Colorado 80235

ATTN: GES Account Management

If to the Employer:

Wal-Mart Stores, Inc.
ATTN: Profit Sharing/401(k) Department
702 S.W. 8th Street
Bentonville, Arkansas 72716-9024

If any person other than the Employer is designated in a subsequent notice to Merrill Lynch pursuant to this Agreement to receive a notice to be sent to the Employer, a notice to the designated person at the designated address shall constitute notice to the Employer.

Any report or statement to be sent to a Participant by Merrill Lynch under this Agreement shall be sent by first class mail, postage prepaid, to the most recent address of such Participant as shown on Merrill Lynch's records maintained for purposes of this Agreement.

**Section 18. Successors**

This Agreement shall be binding upon, and inure to the benefit of, the Employer and Merrill Lynch and their respective successors and permitted assigns. Neither the Trustee nor any Participant shall constitute a third party beneficiary of, or have any rights against Merrill Lynch under, this Agreement, including, in particular, but not limited to, any rights by reason of any failure or error on the part of Merrill Lynch or any of its directors, officers, employees and agents, and any affiliate or subcontractor to which Merrill Lynch (as permitted by Section 13 of this Agreement) has delegated any of its duties under this Agreement, to promptly or correctly take action in connection with the payment, distribution or withdrawal of Plan assets.

**Section 19. Amendment**

This Agreement may not be modified or amended except by an instrument in writing signed by the Employer and Merrill Lynch; provided, however, the Plan Profile may be amended by Merrill Lynch alone where such unilateral right is specifically noted in the initial Plan Profile.

WMHOp-401026-011-00000260

**Section 20. Waiver**

No term or condition of this Agreement shall be deemed to have been waived, nor shall there be an estoppel against the enforcement of any provision of this Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

**Section 21. Severability**

The invalidity or unenforceability of any provision of the Agreement shall not affect the other provisions, and this Agreement is to be construed in all respects to the extent possible to fulfill the purposes of this Agreement with the omission of such invalid or unenforceable provision.

**Section 22. Governing Law**

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, TO THE EXTENT NOT PREEMPTED BY ERISA.

**Section 23. Counterparts**

This Agreement may be executed in various counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 24. Entire Agreement**

This Agreement, including the Attachments hereto, constitutes the entire agreement between the parties with respect to the matters dealt with herein, and supersedes all previous agreements and documents with respect to such matters. No oral statements, representations or prior written matter relating to the subject matter herein but not contained in this Agreement shall have any force or effect.

**Section 25. Puerto Rican Employees**

Merrill Lynch acknowledges that the Employer (through an affiliate) has employees in Puerto Rico and that the Employer has disclosed its desire that such employees be covered under the Plan or a separate plan providing benefits similar to this Plan. If such employees are subsequently included in this Plan, the parties agree that the services described herein shall equally apply with respect to such employees on the same fee basis as described herein and on Attachment C, so long as such services are substantially similar to those services then offered by Merrill Lynch to other customers with Puerto Rico participants. If such employees are subsequently offered benefits under a separate plan providing benefits similar to the Plan, Merrill Lynch agrees to provide the services specified hereunder with respect to the plan on the same fee basis as described herein and on Attachment C, so long as such services are substantially similar to those services then offered by Merrill Lynch to other customers with Puerto Rico

WMHOp-401026-011-00000261

participants, and to execute such agreements as counsel for the Employer and Merrill Lynch deem necessary or appropriate given the separate plan.

IN WITNESS WHEREOF, the Employer and Merrill Lynch have each caused this Agreement to be executed in its corporate name by its duly authorized officers, all as of the date first above written.

WAL-MART STORES, INC.

By: _____
Print Name: _JOHN MENZER_
Title: _EVP-CFO_

MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED

By: _____
Print Name: _____
Title: _____

6/6/97

17337 / 37592
MJMOD 514017.3

WMHOp-401026-011-00000262

## ATTACHMENT A

## SECURITIES ACCOUNT TERMS AND CONDITIONS

The following terms and conditions, to which the undersigned consents and agrees, shall govern each securities account ("Account") maintained by Group Employee Services, a business unit of Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") in connection with the employee benefit plan (the "Plan") of Wal-Mart Stores, Inc. (the "Employer"), an employer or other person who has entered into a servicing agreement (the "Agreement") with MLPF&S.

1.      The Account will be maintained pursuant to the rules and regulations of the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System, the New York Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. as well as the policies of MLPF&S and the Employer to the extent consistent with the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      The Account may be linked with a choice of money market funds ("Money Funds") specified on the Plan Profile. Through this link, available free credit balances in the account will immediately be invested in shares of the Money Fund designated in the Agreement at the then current net asset value per share. Money Fund shares will be redeemed at their net asset value and the undersigned agrees that such shares shall be automatically redeemed to satisfy amounts owed by the Plan in the Account. With the consent of MLPF&S, which shall not be unreasonably withheld, the Money Funds may be modified from time to time by the Named Administrative Fiduciary under the Plan to include Money Funds not specified on the Plan Profile. Upon reasonable notice to MLPF&S the Named Administrative Fiduciary may modify the Money Funds so long as the Money Fund is listed on the Plan Profile. The undersigned has received a copy of the Money Funds' prospectuses, the terms of which are incorporated herein, and has provided a copy to the Plan's Named Administrative Fiduciary.

3.      Contributions to, and payments and distributions from, the Account shall be made only in accordance with these Terms and Conditions and the provisions of the Agreement, or as otherwise required or permitted under the Plan and the Trust

4.      The only securities that may be acquired in the Account are those that are permissible investments for the Account under the Agreement and that are available for purchase in the Account. All securities acquired for the Account shall be delivered to, and held and registered in the name of MLPF&S or the nominee name designated by MLPF&S. Irrespective of the name(s) in which such securities shall be registered, title to same shall be at all times vested in the Plan.

5.      Purchases and sales of securities in the Account, orders and prices for such securities, and limitations on any such purchases, sales and orders shall be made, placed or determined, as applicable, in accordance with the Agreement and these Terms and Conditions.

6.      Proceeds of sales of assets in the Account shall be held for the Account as a free credit balance pending implementation of proper instructions.

7.      Cash dividends on shares held in the Account on the record date therefore will be credited to the Account on the payment date thereof and reinvested in the security with respect to which the dividends were paid. Stock dividends and stock splits with respect to shares held in the Account will be credited to the Account. Other distributions of securities and rights to subscribe will be sold and the net proceeds handled as a cash dividend.

WMHOp-401026-011-00000263

8.    Full shares in the Account will be voted in accordance with the directions of the trustee under the Plan ("Trustee"). If proper instructions are not received by MLPF&S on a timely basis, the voting of the shares in the Account will be governed by the rules and policies of the New York Stock Exchange, Inc. and the Securities and Exchange Commission then in effect.

9.    A monthly statement of all activity in the Account, including numbers of shares purchased or sold, the price per share, the transaction date, transaction costs, stock splits, dividends paid and the total number of shares in the Account will be sent to the Trustee or as otherwise provided in the Servicing Agreement. Confirmation of each dividend reinvestment during any month will be contained in the statement for that month. Other statements or documents with respect to the Account will be sent as required by law or regulation or as reasonably requested by the Employer or the Named Administrative Fiduciary.

10.    Each statement or other document provided in accordance with these Terms and Conditions by MLPF&S with respect to the Account or transactions therein or assets thereof shall be deemed conclusive and binding, and the information thereon correct, unless MLPF&S receives written notice of any incorrectness, incompleteness, or inaccuracy in the statement or document, as the case may be, within 45 days after the statement, confirmation or report is provided, but only if the Employer had actual knowledge of such incorrectness, incompleteness or inaccuracy or would have had actual knowledge had the Employer, under the facts and circumstances, exercised reasonable efforts to review such statements or documents..

11.    With the Employer's prior written consent or as otherwise required by law, MLPF&S shall have the right to amend these Terms and Conditions by modifying or rescinding any of their existing provisions or by adding a new provision. Any such amendment shall be effective as of the date established by MLPF&S and the Employer or as required by law. In the case of any conflict between any such amendment and the terms of the Agreement, the terms of the Agreement will continue to govern.

12.    Unless MLPF&S receives notice of nonacquiescence in writing, these Terms and Conditions shall inure to the benefit of the successors of MLPF&S by merger, consolidation or otherwise and MLPF&S is authorized to transfer the Account to any such successors. MLPF&S may assign these Terms and Conditions only with the prior written consent of the Employer, which shall not be unreasonably withheld.

WAL-MART STORES, INC.                MERRILL LYNCH, PIERCE, FENNER
                                     & SMITH INCORPORATED

By: _____          By: _____
      (Signature)                          (Signature)
      EVP - CFO

_____              _____
(Title)                              (Title)
      5/14/97

_____              _____
(Date)                               (Date)

WMHOp-401026-011-00000264

## ATTACHMENT B

Terms of Agency Relationship between the Employer and Merrill Lynch for Purchase of Employer Stock under a Merrill Lynch Financial Services Servicing Agreement

      1.     Where this attachment is made applicable by this Agreement, by execution of the Agreement the Employer appoints Merrill Lynch as agent, on an exclusive basis, for all purchases of the common stock of the Employer ("Common Stock") which are made on the open market pursuant to the provisions of the Plan. In such event, by execution of the Agreement Merrill Lynch accepts such appointment, on the terms and conditions set forth herein, and acknowledges that, with respect to the assets of the Plan utilized to purchase Common Stock, Merrill Lynch is a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection with the execution of its responsibilities under this Agreement.

      2.     Subject to Paragraph 6 hereof, it is contemplated that Merrill Lynch shall use all of the funds made available for this purpose under the Plan, less applicable commissions, to purchase the maximum possible number of full shares of Common Stock as is prudent. Subject only to the provisions of the Agreement and of ERISA, Merrill Lynch shall have full discretion as to all matters relating to such purchases, including determining the number of shares, if any, to be purchased on any day or at any time of that day, the prices paid for such shares, the markets on which such purchases are made, and the persons (including other brokers and dealers) from or through whom such purchases are made. Merrill Lynch will not be obligated to purchase shares of Common Stock until Merrill Lynch's (i) receipt with respect to each such purchase order from the trustee of the Plan ("Trustee") or its designee of "available funds" (which in the case of funds transmitted by check shall mean funds cleared for payment by the drawee bank), (ii) receipt of instructions from the Trustee or its designee setting forth the amount of funds delivered or to be delivered with respect to the Account, and such additional information as Merrill Lynch may specify from time to time, and (iii) reconciliation of the funds received with the instructions to determine that the aggregate amount of funds received, corresponds to the aggregate of the amounts specified in the instructions. Subject only to Paragraph 6 hereof, Merrill Lynch agrees that it will effect all purchases of Common Stock for the Plan in connection with the processing of a Payroll or Employer Contribution Tape within 3 days following completion of the reconciliation described above. In making such purchases Merrill Lynch shall act entirely independently of the Trustee and the Employer and shall not consult with or be directed or influenced by the Trustee or the Employer in any way. For the purpose of the preceding sentence, the term "Employer" shall include a parent corporation, a subsidiary or affiliate of the Employer and each director or officer or other employee of the Employer or of any such subsidiary or affiliate.

      3.     Merrill Lynch shall use its best judgment in all purchases to be made in accordance with the agency relationship described herein, so as to maximize the aggregate number of shares which may be purchased with funds made available to it for such purchases. In addition, Merrill Lynch shall at all times comply with all applicable provisions of the federal securities and other laws (including ERISA), and Merrill Lynch shall not give preference to any person whom it knows or has reason to know to be an officer or director of the Employer or the parent corporation, a subsidiary or affiliate of the Employer. Merrill Lynch shall perform its duties as agent as described herein with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, and Merrill Lynch shall incur no liability to anyone with respect to conduct (including reliance on counsel) which meets that standard and which conforms to the description of the agency relationship set forth herein.

WMHOp-401026-011-00000265

CONFIDENTIAL         WAL059243

4.     The Employer has filed with the Securities and Exchange Commission under the Securities Act of 1933 a registration statement on Form S-8 and amendments and appendices thereto and may from time to time file further amendments or appendices thereto (collectively, the "Registration Statement") relating directly to shares of Common Stock and other interests which may be issued under the Plan, and indicating that purchases under the Plan may be made on the open market. The Employer agrees to indemnify and hold harmless Merrill Lynch and each person, if any, who controls Merrill Lynch within the meaning of Section 15 of the Securities Act of 1933, jointly and severally, as follows:

i)     against any and all loss, liability, claim, damage and expense whatsoever (A) arising out of any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statement therein, in light of the circumstances under which they were made, not misleading, or arising out of an untrue statement or alleged untrue statement of a material fact contained in the prospectus in any form or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they made, not misleading, or (B) arising out of any violation or alleged violation of any "blue sky" or state securities law;

ii)     against any and all loss, liability, claim, damage and expense whatsoever to the extent of the aggregate amount paid in settlement of any litigation, commenced or threatened, or any claim whatsoever (A) based upon any such untrue statement or omission, or (B) based upon any such "blue sky" violation or any such alleged "blue sky" violation, provided that such settlement is effected with the written consent of the Employer; and

iii)     against any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation, commenced or threatened, or claim whatsoever (A) based upon any such untrue statement or omission or any such alleged untrue statement or omission or (B) based upon any such "blue sky" violation, to the extent that any such expense is not paid under (i) or (ii) above.

In no case shall the Employer be liable under this Paragraph 4 with respect to any claim made against Merrill Lynch or any such controlling person unless the Employer shall be notified in writing of the nature of the claim promptly after the assertion thereof, but failure so to notify the Employer shall not relieve it from any liability which it may have otherwise than on account of this Paragraph 4. In case of any such notice to the Employer, it shall be entitled to participate at its own expense in the defense, or if it so elects within a reasonable time after the receipt of such notice, to assume the defense, of any suit brought to enforce any such claim, but if the Employer elects to assume the defense, such defense shall be conducted by counsel chosen by it and approved by Merrill Lynch or the controlling persons, defendant, or defendants in any suit so brought. The Employer agrees to notify Merrill Lynch within a reasonable time of any claim against it, any of its officers or directors or any person who controls the Employer within the meaning of Section 15 of the Securities Act of 1933 with respect to Securities offered under the Plan. If the Plan shall be amended or discontinued by the Employer, or if Merrill Lynch ceases for any reason to act as an agent for all open market purchases of Common Stock for the Plan, the provisions of this Paragraph 4 shall remain operative and continue in full force and effect.

5.     Merrill Lynch will provide personnel who will be available each day to report to the Trustee the number of shares purchased, the prices paid, and the total dollar amount.

6.     In its transactions hereunder with respect to the Plan, Merrill Lynch shall not be obligated to effect any purchase of Common Stock as to which Merrill Lynch would be unable to observe all of the applicable restrictions and limitations set forth in Rule 10b-18 under the Securities Exchange Act of 1934, (a copy of which will be furnished by Merrill Lynch to the Employer upon

WMHOp-401026-011-00000266

request) or in any subsequent modification, addition to or substitution of such Rule (and of any interpretative release relating thereto) which may be issued by the Securities and Exchange Commission or its staff. Notwithstanding anything in Section 4 of the Agreement to the contrary, Merrill Lynch will have the right to terminate the agency relationship described herein upon five business days' advance written notice to the Employer and Trustee if Merrill Lynch cannot observe all of the applicable restrictions and limitations set forth in any such subsequent issuance of the Securities and Exchange Commission or its staff. On any day on which Merrill Lynch effects purchases under the agency relationship described herein, Merrill Lynch shall not be obligated to effect any purchase as a result of which, as to all such purchases in the aggregate, it would be unable to comply with the provisions of Rule 10b-18. All purchases pursuant to the agency relationship described herein shall be effected on behalf of the Plan on a pro rata basis in proportion to the dollar amount of each order or balance thereof. The enumeration of the foregoing restrictions and limitations is not intended to modify or affect in any manner Merrill Lynch's agreement under Paragraph 3 to comply with all applicable provisions of the federal securities and other laws.

17337 / 37592
MJMOD 514017.3

WMHOp-401026-011-00000267

WAL059245

# ATTACHMENT C

## Plan Profile

**I.**     **COMPANY INFORMATION**

1. Company Name:             Wal-Mart Stores, Inc.

2. Company Address:          Wal-Mart Stores, Inc.
                             702 South 8th Street
                             Bentonville, Arkansas 72716-9024

3. Plan Name(s):             Wal-Mart Stores, Inc. 401(k) Retirement Savings Plan

4. Trustee:                  Merrill Lynch Trust Company of America (MLTCA)

5. Names of subsidiaries or   Available Upon Request by Merrill Lynch
   affiliates of the Employer
   participating in the Plan:

6. Primary Corporate Contacts:

### *Plan Sponsor:*

| | | |
|---|---|---|
| Name:     Charles Rateliff<br>Title:     Sr. V.P. Benefits Administration<br>Address:<br>Wal-Mart Stores, Inc.<br>702 South 8th Street<br>Bentonville, Arkansas 72716-9024<br><br><br>Telephone #:  501/273-4000<br>Fax #: | Name:     Debbie Campbell<br>Title:     Benefits Manager<br><br>Address:<br>Wal-Mart Stores, Inc.<br>702 South 8th Street<br>Bentonville, Arkansas 72716-9024<br><br><br>Telephone #:  501/273-4272<br>Fax #:        501/273-4631 | |

1

WMHOp-401026-011-00000268

CONFIDENTIAL
WAL059246

## II. PLAN INFORMATION

### A. General Information

1. Start-up/<u>Conversion Date</u>:        June 6, 1997

2. Plan Year End:                1/31

3. Federal Tax ID#:              91-1589568

4. Total Number of Company Employees:   730,000 (approximate)

### B. Services

| | | | |
|---|---|---|---|
| 1. | Frequency of Valuations: | Daily | <u>X</u> |
| | | Monthly | <u>N/A</u> |
| | | Quarterly | <u>N/A</u> |
| 2. | Type of Account: | Recordkeeping | <u>X</u> |
| | | Investments Only | <u>N/A</u> |
| 3. | Type of Plan: | 401(k) | <u>X</u> |
| | | 401(a) | <u>N/A</u> |
| | | Other: | <u>N/A</u> |
| 4. | Services Provided: | Recordkeeping | <u>X</u> |
| | | Investments | <u>X</u> |
| | | Trustee | <u>X</u> |
| 5. | Start-up or Conversion: | Start-up | <u>X</u> |
| | | Conversion | <u>N/A</u> |

2

WMHOp-401026-011-00000269

CONFIDENTIAL
WAL059247

# III.    PROCESSING INFORMATION

## A. Contributions - Dollars

1. Frequency of Transmittal:                    Bi-weekly for normal pay;
                                                Special Transmittals on an as
                                                needed basis, including
                                                bonuses

2. Transmittal by:        Fed Wire             X
                          Check                N/A
                          Other                N/A

## B. Contribution - Tapes

1. Frequency of Transmittal:                    Bi-weekly for normal pay;
                                                Special Transmittals on an as
                                                needed basis, including
                                                bonuses

2. Will Merrill Lynch Calculate ER Match:       No

   If Yes, how often and by what formula? _____

## C. Eligibility (Participation)

1. List eligibility requirements:

   a) Generally, first day of calendar month following completion of one year of
      service -- see Plan document for details. Wal-Mart shall provide data feed
      monthly (at least 14 days prior to the eligibility date) and Merrill Lynch has no
      obligation to determine eligibility.

2. Participation requirements:

   a) See C.1. above.

## D. Vesting

1. Participating Vesting Schedule of Employer Contributions

   a. 100% immediate upon participation:        X

   b. 100% upon completion of:                  _____ years

   c. 20% upon completion of:                   _____ years
      (increased by 20%/year)

   d. 25% upon completion:                      _____ years
      (increased by 25%/year)

3

WMHOp-401026-011-00000270

e. Other:

**III.**      **PROCESSING INFORMATION (Continued)**

### D. Vesting (Continued)

2. Top Heavy Plan Vesting Schedule      <u>N/A</u>

### E. Loans (may be added in future)

1. Does the plan have a loan provision?      <u>No</u>

   If Yes, number of current loans?      <u>N/A</u>

   Amount of current loans?      <u>N/A</u>

2. Restrictions

   a. Maximum number of loans per participant:      <u>N/A</u>

   b. Minimum dollar amount:      <u>N/A</u>

   c. Maximum dollar amount:      <u>N/A</u>

   d. Maximum term of loan:      <u>N/A</u>

   e. Minimum frequency of repayments:      <u>N/A</u>

3. Is there a loan disbursement hierarchy?      <u>N/A</u>

   If Yes, please explain (type of funds and/or investment withdrawal/hierarchy:

4. How are loans to be repaid?      <u>N/A</u>

   Original funds                               _____
   Current Investment Matrix (default)      _____
   Other Matrix                             _____ _____
   Please explain:                            _____

5. Will EZ Loans be used?      <u>N/A</u>

4

WMHOp-401026-011-00000271

**III.** **PROCESSING INFORMATION (Continued)**

    **F. Withdrawal/Termination's**

1. List current withdrawal types:
   a. Full Payout Upon Termination
   b. In-Service: Rollover and Deferrals
   c. Required Distributions

2. State of hierarchy for funds: Sequenced - Core Funds (pro rata), Models (pro rata), Company Stock

3. In-kind distribution permitted on:

| | |
|---|---|
| In-Service Withdrawal?<br>Withdrawal Types: | <u>No</u> |
| Termination's?<br>Withdrawal Types: | <u>Yes</u><br>All or Portion of Company<br>Stock (to the extent invested) |

4. Do any suspensions or penalties apply to In-Service (Hardship) withdrawals?     <u>Yes</u>

5. Are there withdrawal restrictions by money types?   <u>Yes</u>

6. Are installment payments permitted?     <u>No</u>

    If Yes, maximum periods

7. Current Methodology:

| | | |
|---|---|---|
| | Fresh Start | <u>N/A</u> |
| | Combined Approach | <u>N/A</u> |
| | N/A | <u>N/A</u> |

8. Are hardship withdrawals allowed?     <u>Yes</u>

9. Number of hardships per year?     <u>Unlimited, Subject to<br>Hardship Restrictions</u>

10. Are all distributions (other than direct rollovers) mailed to participant's homes?     <u>Yes</u>

5

WMHOp-401026-011-00000272

CONFIDENTIAL
WAL059250

**III.**     **PROCESSING INFORMATION (Continued)**

### G. Interfund Transfers

1.  Are there any restrictions on fund transfer other       <u>No</u>
    than frequency?

    Explain _____

2.  Are there any restrictions on the transfer of funds     <u>No</u>
    by contribution source?

    Explain _____

3.  How are funds transferred?  *-either*   -Dollar Amt.    X
                                    *-or-*     Percent       X

4.  Frequency of transfers?                                 <u>Daily</u>

5.  Daily exchange between "ML Funds"?                       <u>Yes</u>

6.  Daily exchange between other than ML                    <u>Yes</u> *(Subject to stock settlement)*
    Investments?


### H. Reports

1.  Required and special request reports                    Frequency
    *To be provided per Service Agreement*                   *See Service Agreement*

2.  Participant Statements

    a. Frequency of generation?                             <u>Quarterly</u> (*Feb. - Jan.*)

    b. Are statement stuffers provided?                     <u>Yes</u>
       (My Money, Inv. Performance,
       or those prepared by the Plan so
       long as any additional postage
       due to stuffers prepared by the
       Plan are paid by the Plan or
       Wal-Mart and Merrill Lynch
       shall not be liable for any
       damages due to delays in the
       delivery of such additional stuffers.)


6

WMHOp-401026-011-00000273

**IV.**  **ASSET INFORMATION (see also IX below)**

### A. Merrill Lynch Mutual Funds ("ML Funds")  *N/A*

| Investment | Name | Class (A or B) | Allocation Default |
|---|---|---|---|
| 1. Capital Preservation | Merrill Lynch Retirement Preservation Trust | N/A | Y |
| 2. Growth | Merrill Lynch Equity Index Trust | A | |

### B. Other Merrill Lynch Investments ("Other Investments")  *N/A*

| Investment | Name |
|---|---|
| 1. Goal Manager Investment Model | Conservative to Moderate Investment Model |
| 2. Goal Manager Investment Model | Moderate Investment Model |
| 3. Goal Manager Investment Model | Aggressive Investment Model |

### C. Outside Investments ("Other Investments")

| Investment | Name | Carrier Institution | Class (A or B) |
|---|---|---|---|
| 1. Company Stock | Wal-Mart Company Stock | N/A | |
| 2. International Equity | Ivy International | Ivy | A |
| 3. Growth | Putnam New Opportunities | Amco | A |
| 4. Income | Pimco Total Return Fund | Pimco | A |

### D. Default Investment Option: *Merrill Lynch Retirement Preservation Trust*

### E. STIF Vehicle: *ML Institutional Fund*

### F. Other

1. Will there be a rollover of plan assets?   Yes ☐   No ☒

2. Will the plan have company stock?   Yes ☒   No ☐

WMHOp-401026-011-00000274

CONFIDENTIAL

WAL059252

## V.     SOURCE/MONEY TYPE INFORMATION

### A. Sources

| Description | Separate Matrix (Yes or No) | Contributions Allowed (Yes or No) | Transfers Allowed (Yes or No) | Loans Allowed (Yes or No) | Distributions Allowed |
|---|---|---|---|---|---|
| 1. Before Tax | No | Yes | Yes | No | Hardship/ Terminations |
| 2. Rollover | No | Yes | Yes | No | Hardship/ Terminations |
| 3. Company Contribution | No | Yes | Yes | No | Terminations Only |

### B. Investment Election Change Restrictions

Number of investment election changes per Year: <u>Unlimited</u>

8

WMHOp-401026-011-00000275

**VI.**   **FEES**

    **A. Recordkeeping -- <u>see</u> IX**

    **B. Asset Charges**

1.  Company Stock Investment Charges
    a. Buyside - Charge per Share <span style="float:right">$ .05</span>
    b. Sellside - Charge per Share (including exchange privileges) <span style="float:right">$ .05</span>
    c. Dividend Reinvestment, Employer Stock: <span style="float:right">Same as above</span>

2.  Mutual Funds:  <u>*N/A*</u>

| Name/Class | A/B | Load |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

    **C. Trust Charges**

1.  Asset Charge <span style="float:right">N/A</span>
    a. $0 - $5MM
    b. $5 - $15MM
    c. $15 - $50MM
    d. $50MM +

    Subject to a minimum of $1,500 per annual option.  Charged quarterly
    at one-fourth the indicated rate.

2.  Check Issuance (per check)
    a. Bulk Order: <span style="float:right">N/A</span>
    b. Separate Orders: <span style="float:right">N/A</span>
    c. Wire Payment (outside investments): <span style="float:right">N/A</span>
    d. In-Kind Distribution: <span style="float:right">N/A</span>

3.  Loan Servicing - <span style="float:right"><u>$10.00 loan origination fee, when applicable</u></span>

4.  Proxy and Similar Processing (Company Stock option only) <span style="float:right">N/A</span>

WMHOp-401026-011-00000276

# VII.    FINANCIAL INSTITUTION INFORMATION

## A. Banking Relationship

| | | |
|---|---|---|
| 1. | Name of Bank: | Wachovia of North Carolina |
| 2. | Account Number: | 873 402 7776 |
| 3. | Address: | S. E. Corp. Division, 191 Peachtree Street NE, Atlanta, Georgia 30303-1757 |
| 4. | Authorized Contact: | John Tibe |
| 5. | Title: | Banking Officer |
| 6. | ABA #: | 053100494, from Wal-Mart Stores, Inc. |
| 7. | Phone #: | (404) 332-1040 |
| 8. | Fax # | (404) 332-5016 |

## B. Trustee Information

| | | |
|---|---|---|
| 1. | Trustee Name: | Merrill Lynch Trust Company of America |
| 2. | Account Number: | 899- |
| 3. | Address: | 300 Davidson Avenue<br>Somerset, NJ 08873 |
| 4. | Primary Contact: | Tom Panebianco |
| 5. | Title: | Vice President |
| 6. | ABA #: | 021000021 |
| 7. | Phone #: | 908/627-7718 |
| 8. | Fax #: | 908/627-7698 |

10

WMHOp-401026-011-00000277

**VIII.**    **GIC PROFILE (For Each Contract)**    <u>N/A</u>

### A. Contributions

1. Contract Start Date:    _____

    Contract End Date:    _____

    Window or Bullet:    _____

2. Limitation/Restriction to dollar amount?    Yes ☐
    No ☐

    If Yes, Maximum (cap):    $_____
    Minimum (floor):    $_____

3. If Cap is reached, how should excess funds be treated?

    Return at specified date (give back):    ☐
    Shut down contributions (shut down):    ☐

4. Is there a floor grace period of 3?    Yes ☐
    No ☐

### B. Withdrawals

1. Withdrawal Method

    LIFO    Last contract purchased is withdrawn first    ☐
    Pro-Rata    Each contract is drawn down based on its    ☐
    percentage of the total assets in GIC's

    LIFO/Pro-Rata    The last contract purchased in the first
    assessed. If there are insufficient funds,
    the remainder is pro-rated among the
    remaining GIC contracts

    Other    _____
    _____

2. Does the contract require netting?    Yes ☐
    No ☐

    "Netting" means determining the amount needed for withdrawals and assessing
    it from current cash contributions. This occurs prior to the above.

11

WMHOp-401026-011-00000278

CONFIDENTIAL                              WAL059256

**VIII.**  **GIC PROFILE (For Each Contract) (Continued)**  <u>N/A</u>

### B. Withdrawals (continued)

3. Is there a contractual limit on the number of transactions, withdrawals and contributions, that may occur in a set time period?

    Yes ☐
    No ☐

    If Yes, what time period: _____
    Number of transactions: _____

### C. Interest Rate

1. What is the effective annual yield?

2. What type of rate is this?

    Net ☐
    Gross ☐

    (Net rates are the standard. Special agreements are required for gross rates and the sponsor will have to pay the difference between net and gross.)

### D. Maturity Date

1. Maturity Date:

2. At maturity, what type of payment is used?

    Lump-Sum ☐
    Installment ☐

3. If Installment, note % or $ and dates below:

| $ or % | Date |
|---|---|
| _____ | _____ |
| _____ | _____ |

### E. Monthly Statements (by contract)

1. How many days after month-end will the reports be sent?

2. Who is responsible for sending the statements?

    Name
    Phone/Fax

WMHOp-401026-011-00000279

## IX. ADDITIONAL FEE, ASSET, AND SERVICES INFORMATION

### A. Asset Funds

For the initial five-year term of the Service Agreement, the parties agree to a maximum fee of $2 per Participant (as defined in IX.B. below) per annum for the services to be provided under the Services Agreement. The $2 per Participant fee is contingent upon investment options under the Plan being limited to the following options or those available from the mutual fund families described in the following paragraph:

Merrill Lynch Retirement Preservation Trust
Merrill Lynch Equity Index Trust
Pimco Total Return Fund
Wal-Mart Common Stock
Putnam New Opportunities Fund
Ivy International Fund

The Plan's Named Administrative Fiduciary may choose from the following list of fund families at the same cost as stated above:

AIM Funds, Alliance Capital, American Capital Marketing/Van Kampen, Calvert, Compass Capital Group, Davis Venture Advisors (formerly Venture Advisers, LP), Dodge & Cox, Federated Securities, Fred Alger Asset Management, J. Hancock (formerly Transamerica), Invesco Advisor, Keystone, Lord Abbett, MFS Funds, Mackenzie Ivy Fund Distributors, Inc., The Manager Funds, Merrill Lynch Asset Management, Montgomery Asset Management, Munder, Nicholas Applegate, Oppenheimer Funds, Oppenheimer Quest for Value Family, Pasadena Group/Roger Engeman, Phoenix Duff & Phelps, PIMCO Advisor Funds, Pioneer Funds, Putnam Funds, Seligman Funds, State Street Research, Twentieth Century/Benham Group, and Zweig Securities and such other funds with which Merrill Lynch may from time to time establish an alliance arrangement.

Merrill Lynch shall have the unilateral right to amend or modify the above list of fund families; provided, however, Merrill Lynch shall use its best efforts to maintain a broad selection of investment funds for availability under the Plan.

If the Plan's Named Administrative Fiduciary decides to offer any investment funds outside the above funds or outside the fund families with which Merrill Lynch has or can establish an alliance relationship, the additional annual per Participant fee for each such fund added shall not exceed $7. Merrill Lynch agrees to aggressively negotiate with any outside fund that the Plan's Named Administrative Fiduciary should choose in order to form an alliance to reduce the additional $7 fee. In the event the fee is increased/decreased effective during a year due to an addition or removal of such a fund(s), the per participant fee shall be appropriately adjusted ratably for the year in which such fund(s) are added or removed. Notwithstanding the above, the Named Administrative Fiduciary's right to add funds outside the above alliance funds is subject to Merrill Lynch's ability to enter into an operating agreement with such fund as provided in Section 2(v) of the Service Agreement.

13

WMHOp-401026-011-00000280

CONFIDENTIAL
WAL059258

Merrill Lynch shall maintain asset allocation models consisting of a mix of the above funds, rebalancing said funds in such manner as directed by the Plan's Named Administrative Fiduciary. Maintenance of the asset allocation models shall be included in the $2 and $7 fees described above.

## B. Fees

For purposes of determining the $2 and $7 per participant cost, the term "Participant" means a employee-participant (active or former), alternate payee or beneficiary whose benefits under the Plan are segregated into a separate recordkeeping account, as required by the Plan or directed by the Named Administrative Fiduciary. The annual recordkeeping fee shall be based on the number of participants, charged quarterly beginning with the plan quarter beginning May 1, 1997, at one-fourth the annual rate based on the number of participant records maintained on the last business day of the plan year quarter.

Costs and expenses not included within such fees, and which are authorized under IX.D. below, shall be payable after the end of the plan year quarter in which incurred.

## C. Recordkeeping Services.

The parties intend that the $2 and $7 annual costs include all expenses and fees related to the administration of the Plan, including those related to the recordkeeping and trustee services contemplated by the Agreement. Services and expenses included in such costs expressly include those described in the Agreement and Plan Manual and, by way of illustration, but not of limitation, the following services and expenses as qualified in this Agreement:

Calls to the Voice Response System, inter-fund Transfers including mailing of confirmation including postage, stop pays and reissues, wire transfers, hardship withdrawal check generation including postage, distribution/withdrawal check generation including postage, truth and lending statements including postage, stock certificate distribution, proxy solicitation (includes printing, tabulation, and mailing), discrimination testing, new employee kits including postage, re-send of employee kits including postage, terminated employee kits including postage, all out of pocket fees, quarterly Participant statements, mailing of Participant statements including postage, annual communication, trustee fees, custodian fees, implementation of the Plan (includes but is not limited to: planning meetings, file-data conversion, initial enrollment, installation of IVR, set-up custom reports, remote access terminals, and travel), communication materials (includes but is not limited to: customized statements, mailing of initial communication material, initial enrollment meetings, and travel expenses for on-site meetings), on-going communication materials (includes but is not limited to: introductory brochure/materials, enrollment packets/forms, periodic mailers/stuffers, on-going meetings, and on-going materials), discrimination testing (includes but not limited to: 401(k) testing, 402(g) testing, 415 testing (based on the additional data to be provided by the Employer in connection with each running of the test), calculation to correct test, Form 5500 Series preparation, QDRO processing (not including qualification), processing of hardship withdrawals, assistance to auditors, retirement planning software, rollover processing, trustee services, compliance support, compliance support with SEC insider trading restrictions,

14

WMHOp-401026-011-00000281

The only services and expenses excluded from the annual fees are those described or permitted under IX.D. below.

### D.    Additional Costs and Expenses.

The annual fees described in IX.C. above do not include fees or expenses for the following:

- If the Employer uses a paper enrollment, an amount agreed upon by the Employer, not to exceed $2.00 per enrollment form processed by Merrill Lynch;

- The $.05 per share brokerage fee described in the Service Agreement;

- Fees and expenses for services not described in IX.C. if requested by the Employer or Named Administrative Fiduciary and the Employer or Named Administrative Fiduciary, as the case may be, is advised in advance that such services or expenses are not included in the base annual fee; and

- a $10 per participant loan origination fee.

WAL-MART STORES, INC.

By: _____

Print Name: _JOHN MENZER_____

Title: _____EVP- CFO_____

MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED

By: _____

Print Name: _____

Title: _____



15

WMHOp-401026-011-00000282

Portions Privileged Except as to Plan Participants          CONFIDENTIAL                                        WAL059260