# EXHIBIT I

# AMENDMENT
## TO THE
## SERVICING AGREEMENT BETWEEN
## WAL-MART STORES, INC. AND
## MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.

THIS AMENDMENT, made and entered into as of this 29th day of July, 2003, by and between Wal-Mart Stores, Inc (the "Employer") and Merrill Lynch, Pierce, Fenner & Smith, Inc ("Merrill Lynch") (collectively, the "Parties")

WHEREAS, the Employer and Merrill Lynch have entered into the Merrill Lynch Group Employee Services Servicing Agreement (the "Agreement") with respect to the Wal-Mart 401(k) Retirement Savings Plan (the "U S 401(k) Plan"), effective as of May 9, 1997,

WHEREAS, pursuant to Section 19 of the Agreement, the Parties may amend the Agreement,

WHEREAS, the Employer also maintains the Wal-Mart Puerto Rico, Inc 401(k) Retirement Savings Plan (the "Puerto Rico Plan") and the Wal-Mart Stores, Inc Profit Sharing Plan (the "Profit Sharing Plan"),

WHEREAS, the Employer desires to transfer certain assets and liabilities associated with Puerto Rico Participants to the Puerto Rico Plan and the remaining assets and liabilities to the U S 401(k) Plan, effective as of October 31, 2003,

WHEREAS, the Parties have agreed that Merrill Lynch shall perform certain additional services related to the transfer to the U S 401(k) Plan of participant account balances from the Profit Sharing Plan, and

WHEREAS, the Parties wish to rename the U S 401(k) Plan, as designated below, effective as of October 31, 2003

NOW, THEREFORE, the Parties hereby amend the Agreement as follows

1    Section 1 of the Agreement "Implementation of the Plan," is amended to add the following new subsection 1(d)

    "(d) Merrill Lynch shall perform certain transitional services, with respect to plan assets and associated liabilities to be transferred to the Plan from the Wal-Mart Stores, Inc Profit Sharing Plan, prior to the period ending October 31, 2003 (or the date preceding the actual date of transfer, if the proposed transfer takes place after October 31, 2003) (the "Transition Period') Such transitional services shall be governed by the terms and conditions of this Agreement (including the Administrative Manual) and by applicable attachments hereto, including but not limited to Attachment D ("Terms and Conditions Governing Transitional Services with respect to Assets Transferred to the Plan from the Wal-Mart Stores, Inc Profit Sharing Plan") "

2    A new attachment D shall be added to and incorporated into the Agreement, a copy of which is attached hereto

WDC99 770944-3 047750 0090

Case 6:08-cv-03109-GAF   Document 157-11   Filed 10/01/10   Page 2 of 25

WAL050721

3   Effective October 31, 2003, the Wal-Mart 401(k) Retirement Savings Plan shall be known as the "Wal-Mart Profit Sharing and 401(k) Plan," and all references thereto in the Agreement shall be amended accordingly

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC ("MERRILL LYNCH")

By _Ben SCl_

_Ben Sheppard_
(Name typed or printed)

Title _Director_

Date _7/29/03_

WAL-MART STORES, INC ("EMPLOYER")

By _M Sur Chamber_

M Susan Chambers
Sr Vice President, Benefits
Wal-Mart Stores, Inc

Date _7/23/03_

WDC99 770944-3 047750 0090



WMHOp-500536-001-00001099

Portions Privileged Except as to Plan Participants                                                      WAL050722

## SECURITIES ACCOUNT TERMS AND CONDITIONS

The following terms and conditions, to which the undersigned consents and agrees, shall govern each securities account ("Account") maintained by Group Employee Services, a business unit of Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") in connection with the employee benefit plan (the "Plan") of Wal-Mart Stores, Inc. (the "Employer"), an employer or other person who has entered into a servicing agreement (the "Agreement") with MLPF&S.

1.      The Account will be maintained pursuant to the rules and regulations of the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System, the New York Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. as well as the policies of MLPF&S and the Employer to the extent consistent with the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      The Account may be linked with a choice of money market funds ("Money Funds") specified on the Plan Profile.  Through this link, available free credit balances in the account will immediately be invested in shares of the Money Fund designated in the Agreement at the then current net asset value per share.  Money Fund shares will be redeemed at their net asset value and the undersigned agrees that such shares shall be automatically redeemed to satisfy amounts owed by the Plan in the Account.  With the consent of MLPF&S, which shall not be unreasonably withheld, the Money Funds may be modified from time to time by the Named Administrative Fiduciary under the Plan to include Money Funds not specified on the Plan Profile.  Upon reasonable notice to MLPF&S the Named Administrative Fiduciary may modify the Money Funds so long as the Money Fund is listed on the Plan Profile.  The undersigned has received a copy of the Money Funds' prospectuses, the terms of which are incorporated herein, and has provided a copy to the Plan's Named Administrative Fiduciary.

3.      Contributions to, and payments and distributions from, the Account shall be made only in accordance with these Terms and Conditions and the provisions of the Agreement, or as otherwise required or permitted under the Plan and the Trust.

4.      The only securities that may be acquired in the Account are those that are permissible investments for the Account under the Agreement and that are available for purchase in the Account.  All securities acquired for the Account shall be delivered to, and held and registered in the name of MLPF&S or the nominee name designated by MLPF&S.  Irrespective of the name(s) in which such securities shall be registered, title to same shall be at all times vested in the Plan.

5.      Purchases and sales of securities in the Account, orders and prices for such securities, and limitations on any such purchases, sales and orders shall be made, placed or determined, as applicable, in accordance with the Agreement and these Terms and Conditions.

6.      Proceeds of sales of assets in the Account shall be held for the Account as a free credit balance pending implementation of proper instructions.

7.      Cash dividends on shares held in the Account on the record date therefore will be credited to the Account on the payment date thereof and reinvested in the security with respect to which the dividends were paid. Stock dividends and stock splits with respect to shares held in the Account will be credited to the Account.  Other distributions of securities and rights to subscribe will be sold and the net proceeds handled as a cash dividend.

8.     Full shares in the Account will be voted in accordance with the directions of the trustee under the Plan ("Trustee"). If proper instructions are not received by MLPF&S on a timely basis, the voting of the shares in the Account will be governed by the rules and policies of the New York Stock Exchange, Inc. and the Securities and Exchange Commission then in effect.

9.     A monthly statement of all activity in the Account, including numbers of shares purchased or sold, the price per share, the transaction date, transaction costs, stock splits, dividends paid and the total number of shares in the Account will be sent to the Trustee or as otherwise provided in the Servicing Agreement. Confirmation of each dividend reinvestment during any month will be contained in the statement for that month. Other statements or documents with respect to the Account will be sent as required by law or regulation or as reasonably requested by the Employer or the Named Administrative Fiduciary.

10.     Each statement or other document provided in accordance with these Terms and Conditions by MLPF&S with respect to the Account or transactions therein or assets thereof shall be deemed conclusive and binding, and the information thereon correct, unless MLPF&S receives written notice of any incorrectness, incompleteness, or inaccuracy in the statement or document, as the case may be, within 45 days after the statement, confirmation or report is provided, but only if the Employer had actual knowledge of such incorrectness, incompleteness or inaccuracy or would have had actual knowledge had the Employer, under the facts and circumstances, exercised reasonable efforts to review such statements or documents..

11.     With the Employer's prior written consent or as otherwise required by law, MLPF&S shall have the right to amend these Terms and Conditions by modifying or rescinding any of their existing provisions or by adding a new provision. Any such amendment shall be effective as of the date established by MLPF&S and the Employer or as required by law. In the case of any conflict between any such amendment and the terms of the Agreement, the terms of the Agreement will continue to govern.

12.     Unless MLPF&S receives notice of nonacquiescence in writing, these Terms and Conditions shall inure to the benefit of the successors of MLPF&S by merger, consolidation or otherwise and MLPF&S is authorized to transfer the Account to any such successors. MLPF&S may assign these Terms and Conditions only with the prior written consent of the Employer, which shall not be unreasonably withheld.

WAL-MART STORES, INC.                    MERRILL LYNCH, PIERCE, FENNER
                                          & SMITH INCORPORATED

By: _____                  By: _____
    (Signature)                              (Signature)
    EVP- CE.
    5/14/97                               _____
(Title)                                  (Title)
                                          6/6/97
(Date)                                   (Date)

## ATTACHMENT B

Terms of Agency Relationship between the Employer and Merrill Lynch for Purchase of Employer Stock under a Merrill Lynch Financial Services Servicing Agreement

1. Where this attachment is made applicable by this Agreement, by execution of the Agreement the Employer appoints Merrill Lynch as agent, on an exclusive basis, for all purchases of the common stock of the Employer ("Common Stock") which are made on the open market pursuant to the provisions of the Plan. In such event, by execution of the Agreement Merrill Lynch accepts such appointment, on the terms and conditions set forth herein, and acknowledges that, with respect to the assets of the Plan utilized to purchase Common Stock, Merrill Lynch is a fiduciary within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection with the execution of its responsibilities under this Agreement.

2. Subject to Paragraph 6 hereof, it is contemplated that Merrill Lynch shall use all of the funds made available for this purpose under the Plan, less applicable commissions, to purchase the maximum possible number of full shares of Common Stock as is prudent. Subject only to the provisions of the Agreement and of ERISA, Merrill Lynch shall have full discretion as to all matters relating to such purchases, including determining the number of shares, if any, to be purchased on any day or at any time of that day, the prices paid for such shares, the markets on which such purchases are made, and the persons (including other brokers and dealers) from or through whom such purchases are made. Merrill Lynch will not be obligated to purchase shares of Common Stock until Merrill Lynch's (i) receipt with respect to each such purchase order from the trustee of the Plan ("Trustee") or its designee of "available funds" (which in the case of funds transmitted by check shall mean funds cleared for payment by the drawee bank), (ii) receipt of instructions from the Trustee or its designee setting forth the amount of funds delivered or to be delivered with respect to the Account, and such additional information as Merrill Lynch may specify from time to time, and (iii) reconciliation of the funds received with the instructions to determine that the aggregate amount of funds received, corresponds to the aggregate of the amounts specified in the instructions. Subject only to Paragraph 6 hereof, Merrill Lynch agrees that it will effect all purchases of Common Stock for the Plan in connection with the processing of a Payroll or Employer Contribution Tape within 3 days following completion of the reconciliation described above. In making such purchases Merrill Lynch shall act entirely independently of the Trustee and the Employer and shall not consult with or be directed or influenced by the Trustee or the Employer in any way. For the purpose of the preceding sentence, the term "Employer" shall include a parent corporation, a subsidiary or affiliate of the Employer and each director or officer or other employee of the Employer or of any such subsidiary or affiliate.

3. Merrill Lynch shall use its best judgment in all purchases to be made in accordance with the agency relationship described herein, so as to maximize the aggregate number of shares which may be purchased with funds made available to it for such purchases. In addition, Merrill Lynch shall at all times comply with all applicable provisions of the federal securities and other laws (including ERISA), and Merrill Lynch shall not give preference to any person whom it knows or has reason to know to be an officer or director of the Employer or the parent corporation, a subsidiary or affiliate of the Employer. Merrill Lynch shall perform its duties as agent as described herein with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, and Merrill Lynch shall incur no liability to anyone with respect to conduct (including reliance on counsel) which meets that standard and which conforms to the description of the agency relationship set forth herein.

WMHOp-500536-001-00001102

WAL050725

4.     The Employer has filed with the Securities and Exchange Commission under the Securities Act of 1933 a registration statement on Form S-8 and amendments and appendices thereto and may from time to time file further amendments or appendices thereto (collectively, the "Registration Statement") relating directly to shares of Common Stock and other interests which may be issued under the Plan, and indicating that purchases under the Plan may be made on the open market. The Employer agrees to indemnify and hold harmless Merrill Lynch and each person, if any, who controls Merrill Lynch within the meaning of Section 15 of the Securities Act of 1933, jointly and severally, as follows:

i)     against any and all loss, liability, claim, damage and expense whatsoever (A) arising out of any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statement therein, in light of the circumstances under which they were made, not misleading, or arising out of an untrue statement or alleged untrue statement of a material fact contained in the prospectus in any form or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they made, not misleading, or (B) arising out of any violation or alleged violation of any "blue sky" or state securities law;

ii)     against any and all loss, liability, claim, damage and expense whatsoever to the extent of the aggregate amount paid in settlement of any litigation, commenced or threatened, or any claim whatsoever (A) based upon any such untrue statement or omission, or (B) based upon any such "blue sky" violation or any such alleged "blue sky" violation, provided that such settlement is effected with the written consent of the Employer; and

iii)     against any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation, commenced or threatened, or claim whatsoever (A) based upon any such untrue statement or omission or any such alleged untrue statement or omission or (B) based upon any such "blue sky" violation, to the extent that any such expense is not paid under (i) or (ii) above.

In no case shall the Employer be liable under this Paragraph 4 with respect to any claim made against Merrill Lynch or any such controlling person unless the Employer shall be notified in writing of the nature of the claim promptly after the assertion thereof, but failure so to notify the Employer shall not relieve it from any liability which it may have otherwise than on account of this Paragraph 4. In case of any such notice to the Employer, it shall be entitled to participate at its own expense in the defense, or if it so elects within a reasonable time after the receipt of such notice, to assume the defense, of any suit brought to enforce any such claim, but if the Employer elects to assume the defense, such defense shall be conducted by counsel chosen by it and approved by Merrill Lynch or the controlling persons, defendant, or defendants in any suit so brought. The Employer agrees to notify Merrill Lynch within a reasonable time of any claim against it, any of its officers or directors or any person who controls the Employer within the meaning of Section 15 of the Securities Act of 1933 with respect to Securities offered under the Plan. If the Plan shall be amended or discontinued by the Employer, or if Merrill Lynch ceases for any reason to act as an agent for all open market purchases of Common Stock for the Plan, the provisions of this Paragraph 4 shall remain operative and continue in full force and effect.

5.     Merrill Lynch will provide personnel who will be available each day to report to the Trustee the number of shares purchased, the prices paid, and the total dollar amount.

6.     In its transactions hereunder with respect to the Plan, Merrill Lynch shall not be obligated to effect any purchase of Common Stock as to which Merrill Lynch would be unable to observe all of the applicable restrictions and limitations set forth in Rule 10b-18 under the Securities Exchange Act of 1934, (a copy of which will be furnished by Merrill Lynch to the Employer upon

request) or in any subsequent modification, addition to or substitution of such Rule (and of any interpretative release relating thereto) which may be issued by the Securities and Exchange Commission or its staff. Notwithstanding anything in Section 4 of the Agreement to the contrary, Merrill Lynch will have the right to terminate the agency relationship described herein upon five business days' advance written notice to the Employer and Trustee if Merrill Lynch cannot observe all of the applicable restrictions and limitations set forth in any such subsequent issuance of the Securities and Exchange Commission or its staff. On any day on which Merrill Lynch effects purchases under the agency relationship described herein, Merrill Lynch shall not be obligated to effect any purchase as a result of which, as to all such purchases in the aggregate, it would be unable to comply with the provisions of Rule 10b-18. All purchases pursuant to the agency relationship described herein shall be effected on behalf of the Plan on a pro rata basis in proportion to the dollar amount of each order or balance thereof. The enumeration of the foregoing restrictions and limitations is not intended to modify or affect in any manner Merrill Lynch's agreement under Paragraph 3 to comply with all applicable provisions of the federal securities and other laws.

17337 / 37592
MJMOD 514017.3

# ATTACHMENT C

## Plan Profile

### I.  COMPANY INFORMATION

1. Company Name:  Wal-Mart Stores, Inc.

2. Company Address:  Wal-Mart Stores, Inc.
   702 South 8th Street
   Bentonville, Arkansas 72716-9024

3. Plan Name(s):  Wal-Mart Stores, Inc. 401(k) Retirement Savings Plan

4. Trustee:  Merrill Lynch Trust Company of America (MLTCA)

5. Names of subsidiaries or  Available Upon Request by Merrill Lynch
   affiliates of the Employer
   participating in the Plan:

6. Primary Corporate Contacts:

### *Plan Sponsor:*

| | | |
|---|---|---|
| Name:    Charles Rateliff<br>Title:     Sr. V.P. Benefits Administration<br>Address:<br>Wal-Mart Stores, Inc.<br>702 South 8th Street<br>Bentonville, Arkansas 72716-9024 | Name:     Debbie Campbell<br>Title:     Benefits Manager<br>Address:<br>Wal-Mart Stores, Inc.<br>702 South 8th Street<br>Bentonville, Arkansas 72716-9024 | |
| Telephone #:  501/273-4000<br>Fax #: | Telephone #:  501/273-4272<br>Fax #:          501/273-4631 | |

1

WMHOp-500536-001-00001105

## II.      PLAN INFORMATION

### A. General Information

1. Start-up/<u>Conversion Date</u>:      June 6, 1997

2. Plan Year End:      1/31

3. Federal Tax ID#:      91-1589568

4. Total Number of Company Employees:      730,000 (approximate)

### B. Services

| | | | |
|---|---|---|---|
| 1. | Frequency of Valuations: | Daily | X |
| | | Monthly | N/A |
| | | Quarterly | N/A |
| 2. | Type of Account: | Recordkeeping | X |
| | | Investments Only | N/A |
| 3. | Type of Plan: | 401(k) | X |
| | | 401(a) | N/A |
| | | Other: | N/A |
| 4. | Services Provided: | Recordkeeping | X |
| | | Investments | X |
| | | Trustee | X |
| 5. | Start-up or Conversion: | Start-up | X |
| | | Conversion | N/A |

2

WMHOp-500536-001-00001106

Case 6:08-cv-03109-GAF   Document 157-11   Filed 10/01/10   Page 10 of 25

WAL050729

## III.     PROCESSING INFORMATION

### A. Contributions - Dollars

1. Frequency of Transmittal:                    <u>Bi-weekly for normal pay;<br>Special Transmittals on an as<br>needed basis, including<br>bonuses</u>

2. Transmittal by:        Fed Wire        <u>X</u><br>
                                   Check        <u>N/A</u><br>
                                   Other        <u>N/A</u>

### B. Contribution - Tapes

1. Frequency of Transmittal:                    <u>Bi-weekly for normal pay;<br>Special Transmittals on an as<br>needed basis, including<br>bonuses</u>

2. Will Merrill Lynch Calculate ER Match:        <u>No</u>

    If Yes, how often and by what formula? _____

### C. Eligibility (Participation)

1. List eligibility requirements:

   a) Generally, first day of calendar month following completion of one year of service -- <u>see</u> Plan document for details. Wal-Mart shall provide data feed monthly (at least 14 days prior to the eligibility date) and Merrill Lynch has no obligation to determine eligibility.

2. Participation requirements:

   a) <u>See</u> C.1. above.

### D. Vesting

1. Participating Vesting Schedule of Employer Contributions

   a. 100% immediate upon participation:        <u>X</u>

   b. 100% upon completion of:        _____ years

   c. 20% upon completion of:        _____ years<br>
      (increased by 20%/year)

   d. 25% upon completion:        _____ years<br>
      (increased by 25%/year)

3

e. Other:

**III.**    **PROCESSING INFORMATION (Continued)**

   **D. Vesting  (Continued)**

   2.  Top Heavy Plan Vesting Schedule          N/A


   **E.  Loans (may be added in future)**

   1.  Does the plan have a loan provision?       No

       If Yes, number of current loans?          N/A

       Amount of current loans?                  N/A

   2.  Restrictions

       a. Maximum number of loans per participant:   N/A

       b. Minimum dollar amount:                 N/A

       c. Maximum dollar amount:                 N/A

       d. Maximum term of loan:                  N/A

       e. Minimum frequency of repayments:       N/A

   3.  Is there a loan disbursement hierarchy?    N/A

       If Yes, please explain (type of funds and/or investment
       withdrawal/hierarchy:

   4.  How are loans to be repaid?               N/A

           Original funds                        _____
           Current Investment Matrix (default)   _____
           Other Matrix                          _____ _____
           Please explain:                       _____

   5.  Will EZ Loans be used?                    N/A

4

WMHOp-500536-001-00001108

III.     PROCESSING INFORMATION (Continued)

### F. Withdrawal/Termination's

1. List current withdrawal types:
   a. Full Payout Upon Termination
   b. In-Service: Rollover and Deferrals
   c. Required Distributions

2. State of hierarchy for funds: Sequenced - Core Funds (pro rata), Models (pro rata), Company Stock

3. In-kind distribution permitted on:

   In-Service Withdrawal?                    No
   Withdrawal Types:

   Termination's?                            Yes
   Withdrawal Types:                         All or Portion of Company
                                             Stock (to the extent invested)

4. Do any suspensions or penalties apply to     Yes
   In-Service (Hardship) withdrawals?

5. Are there withdrawal restrictions by money types?   Yes

6. Are installment payments permitted?          No

   If Yes, maximum periods

7. Current Methodology:   Fresh Start            N/A
                          Combined Approach      N/A
                          N/A                    N/A

8. Are hardship withdrawals allowed?            Yes

9. Number of hardships per year?                Unlimited, Subject to
                                                Hardship Restrictions

10. Are all distributions (other than direct rollovers)   Yes
    mailed to participant's homes?

5

WMHOp-500536-001-00001109

Case 6:08-cv-03109-GAF   Document 157-11   Filed 10/01/10   Page 13 of 25

WAL050732

### G. Interfund Transfers

1. Are there any restrictions on fund transfer other than frequency?                    <u>No</u>

   Explain _____

2. Are there any restrictions on the transfer of funds by contribution source?          <u>No</u>

   Explain _____

3. How are funds transferred?  *-either*  -Dollar Amt.    <u>X</u>
                                *-or-*     Percent         <u>X</u>

4. Frequency of transfers?                                <u>Daily</u>

5. Daily exchange between "ML Funds"?                      <u>Yes</u>

6. Daily exchange between other than ML Investments?       <u>Yes</u> *(Subject to stock settlement)*


### H. Reports

1. Required and special request reports           Frequency
   *To be provided per Service Agreement*         *See Service Agreement*

2. Participant Statements

   a. Frequency of generation?                    <u>Quarterly</u> *(Feb. - Jan.)*

   b. Are statement stuffers provided?            <u>Yes</u>
      (My Money, Inv. Performance,
      or those prepared by the Plan so
      long as any additional postage
      due to stuffers prepared by the
      Plan are paid by the Plan or
      Wal-Mart and Merrill Lynch
      shall not be liable for any
      damages due to delays in the
      delivery of such additional stuffers.)

6

WMHOp-500536-001-00001110

WAL050733

## IV.  ASSET FORMATION (see also IX below)

### A. Merrill Lynch Mutual Funds ("ML Funds")  *N/A*

| | Investment | Name | Class (A or B) | Allocation Default |
|---|---|---|---|---|
| 1. | Capital Preservation | Merrill Lynch Retirement Preservation Trust | N/A | Y |
| 2. | Growth | Merrill Lynch Equity Index Trust | A | |

### B. Other Merrill Lynch Investments ("Other Investments")  *N/A*

| | Investment | Name |
|---|---|---|
| 1. | Goal Manager Investment Model | Conservative to Moderate Investment Model |
| 2. | Goal Manager Investment Model | Moderate Investment Model |
| 3. | Goal Manager Investment Model | Aggressive Investment Model |

### C. Outside Investments ("Other Investments")

| | Investment | Name | Carrier Institution | Class (A or B) |
|---|---|---|---|---|
| 1. | Company Stock | Wal-Mart Company Stock | N/A | |
| 2. | International Equity | Ivy International | Ivy | A |
| 3. | Growth | Putnam New Opportunities | Amco | A |
| 4. | Income | Pimco Total Return Fund | Pimco | A |

### D. Default Investment Option:  *Merrill Lynch Retirement Preservation Trust*

### E. STIF Vehicle:  *ML Institutional Fund*

### F. Other

1. Will there be a rollover of plan assets?  Yes ☐  No ☒

2. Will the plan have company stock?  Yes ☒  No ☐

7

WMHOp-500536-001-00001111

Case 6:08-cv-03109-GAF   Document 157-11   Filed 10/01/10   Page 15 of 25

WAL050734

## A. Sources

| Description | Separate Matrix (Yes or No) | Contributions Allowed (Yes or No) | Transfers Allowed (Yes or No) | Loans Allowed (Yes or No) | Distributions Allowed |
|---|---|---|---|---|---|
| 1. Before Tax | No | Yes | Yes | No | Hardship/ Terminations |
| 2. Rollover | No | Yes | Yes | No | Hardship/ Terminations |
| 3. Company Contribution | No | Yes | Yes | No | Terminations Only |

## B. Investment Election Change Restrictions

Number of investment election changes per Year: <u>Unlimited</u>

8

WMHOp-500536-001-00001112

WAL050735

A. Recordkeeping -- <u>see</u> IX

B. Asset Charges

1. Company Stock Investment Charges
   a. Buyside - Charge per Share                                      <u>$ .05</u>
   b. Sellside - Charge per Share (including exchange privileges)     <u>$ .05</u>
   c. Dividend Reinvestment, Employer Stock:                          <u>Same as above</u>

2. Mutual Funds:   *N/A*

| Name/Class | A/B | Load |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

C. Trust Charges

1. Asset Charge                                                       N/A
   a. $0 - $5MM
   b. $5 - $15MM
   c. $15 - $50MM
   d. $50MM +

   Subject to a minimum of $1,500 per annual option.  Charged quarterly
   at one-fourth the indicated rate.

2. Check Issuance (per check)
   a. Bulk Order:                                                     N/A
   b. Separate Orders:                                                N/A
   c. Wire Payment (outside investments):                             N/A
   d. In-Kind Distribution:                                           N/A

3. Loan Servicing -            <u>$10.00 loan origination fee, when applicable</u>

4. Proxy and Similar Processing (Company Stock option only)          N/A

9

WMHOp-500536-001-00001113

## A. Banking Relationship

1.  Name of Bank:              Wachovia of North Carolina

2.  Account Number:            873 402 7776

3.  Address:                   S. E. Corp. Division, 191 Peachtree Street NE, Atlanta, Georgia  30303-1757
4.  Authorized Contact:        John Tibe

5.  Title:                     Banking Officer

6.  ABA #:                     053100494, from Wal-Mart Stores, Inc.

7.  Phone #:                   (404) 332-1040

8.  Fax #                      (404) 332-5016

## B. Trustee Information

1.  Trustee Name:              Merrill Lynch Trust Company of America

2.  Account Number:            899-

3.  Address:                   300 Davidson Avenue
                               Somerset, NJ  08873

4.  Primary Contact:           Tom Panebianco

5.  Title:                     Vice President

6.  ABA #:                     021000021

7.  Phone #:                   908/627-7718

8.  Fax #:                     908/627-7698

10

### A. Contributions

1.  Contract Start Date: _____

    Contract End Date: _____

    Window or Bullet: _____

2.  Limitation/Restriction to dollar amount?     Yes ☐
                                                  No ☐

    If Yes, Maximum (cap):     $_____
              Minimum (floor):     $_____

3.  If Cap is reached, how should excess funds be treated?

    Return at specified date (give back):     ☐
    Shut down contributions (shut down):     ☐

4.  Is there a floor grace period of 3?     Yes ☐
                                            No ☐

### B. Withdrawals

1.  Withdrawal Method

    | | | |
    |---|---|---|
    | LIFO | Last contract purchased is withdrawn first | ☐ |
    | Pro-Rata | Each contract is drawn down based on its percentage of the total assets in GIC's | ☐ |
    | LIFO/Pro-Rata | The last contract purchased in the first assessed. If there are insufficient funds, the remainder is pro-rated among the remaining GIC contracts | |
    | Other | _____ _____ | |

2.  Does the contract require netting?     Yes ☐
                                           No ☐

    "Netting" means determining the amount needed for withdrawals and assessing it from current cash contributions. This occurs prior to the above.

11

WMHOp-500536-001-00001115

### B. Withdrawals (continued)

3.  Is there a contractual limit on the number of transactions,   Yes ☐
    withdrawals and contributions, that may occur in a set       No ☐
    time period?

    If Yes, what time period:                    _____
    Number of transactions:                      _____

### C. Interest Rate

1.  What is the effective annual yield?

2.  What type of rate is this?                   Net ☐
                                                 Gross ☐

    (Net rates are the standard. Special agreements are required for gross rates
    and the sponsor will have to pay the difference between net and gross.)

### D. Maturity Date

1.  Maturity Date:

2.  At maturity, what type of payment is used?   Lump-Sum ☐
                                                 Installment ☐

3.  If Installment, note % or $ and dates below:

    <u>$ or %</u>                              <u>Date</u>

    _____              _____

    _____              _____

### E. Monthly Statements (by contract)

1.  How many days after month-end will the reports be sent?

2.  Who is responsible for sending the statements?

        Name
        Phone/Fax

12

WMHOp-500536-001-00001116

WAL050739

A. Asset Funds

For the initial five-year term of the Service Agreement, the parties agree to a maximum fee of $2 per Participant (as defined in IX.B. below) per annum for the services to be provided under the Services Agreement. The $2 per Participant fee is contingent upon investment options under the Plan being limited to the following options or those available from the mutual fund families described in the following paragraph:

Merrill Lynch Retirement Preservation Trust
Merrill Lynch Equity Index Trust
Pimco Total Return Fund
Wal-Mart Common Stock
Putnam New Opportunities Fund
Ivy International Fund

The Plan's Named Administrative Fiduciary may choose from the following list of fund families at the same cost as stated above:

AIM Funds, Alliance Capital, American Capital Marketing/Van Kampen, Calvert, Compass Capital Group, Davis Venture Advisors (formerly Venture Advisers, LP), Dodge & Cox, Federated Securities, Fred Alger Asset Management, J. Hancock (formerly Transamerica), Invesco Advisor, Keystone, Lord Abbett, MFS Funds, Mackenzie Ivy Fund Distributors, Inc., The Manager Funds, Merrill Lynch Asset Management, Montgomery Asset Management, Munder, Nicholas Applegate, Oppenheimer Funds, Oppenheimer Quest for Value Family, Pasadena Group/Roger Engeman, Phoenix Duff & Phelps, PIMCO Advisor Funds, Pioneer Funds, Putnam Funds, Seligman Funds, State Street Research, Twentieth Century/Benham Group, and Zweig Securities and such other funds with which Merrill Lynch may from time to time establish an alliance arrangement.

Merrill Lynch shall have the unilateral right to amend or modify the above list of fund families; provided, however, Merrill Lynch shall use its best efforts to maintain a broad selection of investment funds for availability under the Plan.

If the Plan's Named Administrative Fiduciary decides to offer any investment funds outside the above funds or outside the fund families with which Merrill Lynch has or can establish an alliance relationship, the additional annual per Participant fee for each such fund added shall not exceed $7. Merrill Lynch agrees to aggressively negotiate with any outside fund that the Plan's Named Administrative Fiduciary should choose in order to form an alliance to reduce the additional $7 fee. In the event the fee is increased/decreased effective during a year due to an addition or removal of such a fund(s), the per participant fee shall be appropriately adjusted ratably for the year in which such fund(s) are added or removed. Notwithstanding the above, the Named Administrative Fiduciary's right to add funds outside the above alliance funds is subject to Merrill Lynch's ability to enter into an operating agreement with such fund as provided in Section 2(v) of the Service Agreement.

13

WMHOp-500536-001-00001117

Case 6:08-cv-03109-GAF   Document 157-11   Filed 10/01/10   Page 21 of 25

WAL050740

Merrill Lynch shall maintain asset allocation models consisting of a mix of the above funds, rebalancing said funds in such manner as directed by the Plan's Named Administrative Fiduciary. Maintenance of the asset allocation models shall be included in the $2 and $7 fees described above.

## B. Fees

For purposes of determining the $2 and $7 per participant cost, the term "Participant" means a employee-participant (active or former), alternate payee or beneficiary whose benefits under the Plan are segregated into a separate recordkeeping account, as required by the Plan or directed by the Named Administrative Fiduciary. The annual recordkeeping fee shall be based on the number of participants, charged quarterly beginning with the plan quarter beginning May 1, 1997, at one-fourth the annual rate based on the number of participant records maintained on the last business day of the plan year quarter.

Costs and expenses not included within such fees, and which are authorized under IX.D. below, shall be payable after the end of the plan year quarter in which incurred.

## C. Recordkeeping Services.

The parties intend that the $2 and $7 annual costs include all expenses and fees related to the administration of the Plan, including those related to the recordkeeping and trustee services contemplated by the Agreement. Services and expenses included in such costs expressly include those described in the Agreement and Plan Manual and, by way of illustration, but not of limitation, the following services and expenses as qualified in this Agreement:

Calls to the Voice Response System, inter-fund Transfers including mailing of confirmation including postage, stop pays and reissues, wire transfers, hardship withdrawal check generation including postage, distribution/withdrawal check generation including postage, truth and lending statements including postage, stock certificate distribution, proxy solicitation (includes printing, tabulation, and mailing), discrimination testing, new employee kits including postage, re-send of employee kits including postage, terminated employee kits including postage, all out of pocket fees, quarterly Participant statements, mailing of Participant statements including postage, annual communication, trustee fees, custodian fees, implementation of the Plan (includes but is not limited to: planning meetings, file-data conversion, initial enrollment, installation of IVR, set-up custom reports, remote access terminals, and travel), communication materials (includes but is not limited to: customized statements, mailing of initial communication material, initial enrollment meetings, and travel expenses for on-site meetings), on-going communication materials (includes but is not limited to: introductory brochure/materials, enrollment packets/forms, periodic mailers/stuffers, on-going meetings, and on-going materials), discrimination testing (includes but not limited to: 401(k) testing, 402(g) testing, 415 testing (based on the additional data to be provided by the Employer in connection with each running of the test), calculation to correct test, Form 5500 Series preparation, QDRO processing (not including qualification), processing of hardship withdrawals, assistance to auditors, retirement planning software, rollover processing, trustee services, compliance support, compliance support with SEC insider trading restrictions,

14

WMHOp-500536-001-00001118

WAL050741

The only services and expenses excluded from the annual fees are those described or permitted under IX.D. below.

**D.  Additional Costs and Expenses.**

The annual fees described in IX.C. above do not include fees or expenses for the following:

- If the Employer uses a paper enrollment, an amount agreed upon by the Employer, not to exceed $2.00 per enrollment form processed by Merrill Lynch;

- The $.05 per share brokerage fee described in the Service Agreement;

- Fees and expenses for services not described in IX.C. if requested by the Employer or Named Administrative Fiduciary and the Employer or Named Administrative Fiduciary, as the case may be, is advised in advance that such services or expenses are not included in the base annual fee; and

- a $10 per participant loan origination fee.

**WAL-MART STORES, INC.**

By: _____

Print Name: _____

Title: _____

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

By: _____

Print Name: _____

Title: _____

6/6/97



15

WMHOp-500536-001-00001119

Portions Privileged Except as to Plan Participants

## ATTACHMENT D

## Terms and Conditions Governing Transitional Services
## With Respect To Assets Transferred To The Plan From The
## Wal-Mart Stores, Inc. Profit Sharing Plan

Merrill Lynch shall perform the following transitional services with respect to plan assets and associated liabilities to be transferred to the Plan from the Wal-Mart Stores, Inc Profit Sharing Plan, prior to the period ending October 31, 2003 (or the date preceding the actual date of transfer, if the proposed transfer takes place after October 31, 2003) Such transitional services shall be governed by the terms and conditions of this Agreement and as provided below

(a) Merrill Lynch and the Employer shall promptly begin work on the implementation of the recordkeeping services described herein with respect to the plan assets to be transferred to the Plan from the Wal-Mart Stores, Inc Profit Sharing Plan (the "Profit Sharing Plan"), for the benefit of participants Such transferred assets shall be referred to herein as the "Transferred Assets" The Employer shall provide, in a form and format acceptable to Merrill Lynch, all information regarding Participants requested by Merrill Lynch for the transfer to the Plan of the Transferred Assets Merrill Lynch is entitled to rely on the accuracy and completeness of information submitted by or on behalf of the Employer and Merrill Lynch has no duty or responsibility to verify the accuracy of that information, provided, however, that Merrill Lynch shall provide the Employer with the form and format requirements for such information necessary to complete the Conversion Process and Merrill Lynch shall promptly inform the Employer if any information or data provided by the Employer is inaccurate or incomplete, or if Merrill Lynch has reason to believe such information is inaccurate or incomplete The Employer shall provide such information to Merrill Lynch in a form and format that is mutually agreeable to the parties

(b) With respect to the conversion of recordkeeping responsibilities related to the Transferred Assets to a Merrill Lynch recordkeeping system from another recordkeeper (the "Conversion Process") the Employer shall be responsible for ensuring (a) the timely delivery to Merrill Lynch of all information and records in the possession of another recordkeeper that are necessary for Merrill Lynch to perform services under this Agreement and this Attachment D and (b) that the prior recordkeeper performs a final valuation of all Transferred Assets and provides Merrill Lynch with a reconciliation of the Plan's records The Conversion Process shall be completed by Merrill Lynch by October 31, 2003, subject to Section 7(e) of the Agreement, provided that the Employer timely fulfills its responsibilities under this Agreement, including this Attachment D

(c) Merrill Lynch shall advise the Employer as to the requirements to be performed by the Employer to effectuate the Conversion Process in the time frame set forth herein Merrill Lynch and the Employer, as part of the Conversion Process, will develop methods to address issues that may be associated with the Conversion Process, including blackout periods, administration of contributions, investment elections, and distribution requests during blackout periods When the Conversion Process is complete, Merrill Lynch shall (i) become responsible for the recordkeeping of the Transferred Assets as part of the Plan (ii) activate the telephone voice response system to include information concerning the Transferred Assets and (iii) begin to accept Participant instructions with respect to the Transferred Assets as recordkeeper Merrill Lynch shall not become responsible for the recordkeeping of the Transferred Assets as part of the Plan, and shall not be obligated to activate the voice response system and begin to accept participant instructions with respect to the Transferred Assets, unless and until Merrill Lynch has been provided all necessary information, records and final

WDC 99 770944-3 047750 0090

WMHOp-500536-001-00001120

WAL050743

valuation, and such records have been reconciled to the satisfaction of Merrill Lynch. The parties will attempt to resolve any issues that arise during the Conversion Process as diligently and promptly as possible and in a manner mutually agreeable to both parties, provided, however, that in order to avoid any delay in the proposed transfer, Merrill Lynch will resolve any such issues as directed by the Employer in writing, to the extent such directions are consistent with this Agreement (including this Attachment D) and the systemic capabilities of Merrill Lynch's recordkeeping system, and proceed with the Conversion Process. If the Employer directs Merrill Lynch to make adjustments to participant records and data and, as a result of those adjustments, it is determined that such adjustments could affect the market value of participant accounts as posted on the Merrill Lynch recordkeeping system, then the expenses associated with such adjustments shall be borne by the Employer, to the extent not corrected with available plan assets, as permitted by ERISA and the Internal Revenue Code.

(d) Merrill Lynch shall have no liability for transactions or events, including, but not limited to, qualification defects and recordkeeping or administrative errors affecting the Transferred Assets, which are attributable to any prior recordkeeper. Merrill Lynch shall not be liable for any additional costs or liability incurred, including liability for any delay in the completion of the Conversion Process, that results from inaccurate or untimely information, records, final valuations provided to Merrill Lynch or from the inability to reconcile the initial records provided to Merrill Lynch. If Transferred Assets have been transferred to the Trustee before the completion of the Conversion Process, the Trustee will invest the Transferred Assets according to instructions from the Employer. Pending completion of the Conversion Process, Merrill Lynch may not have precise information as to any Employer stock allocated on an applicable record date to each Participant entitled to exercise voting or other rights and, in such event the Employer shall either (i) provide the Trustee with necessary information from the prior recordkeeper to enable the Trustee to pass through the voting or other rights to the Participants, (ii) direct the Trustee with respect to such voting or other rights, or (iii) make alternative arrangements to handle the voting or other rights of the Employer stock.

(e) The Employer shall perform all other duties and obligations necessary to Merrill Lynch to implement the services described in this Agreement and this Attachment D.

(f) The transitional services described in this Attachment D shall also be governed by the terms and conditions of the Agreement, as if such additional terms and conditions were stated separately in this Attachment, to the extent such terms and conditions are otherwise applicable to the Transferred Assets and not inconsistent with this Attachment D.

WMHOp-500536-001-00001121

Case 6:08-cv-03109-GAF   Document 157-11   Filed 10/01/10   Page 25 of 25

WAL050744